# 22-823CV

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**JOSEPHINE MILLER, Plaintiff-Appellant**

**v**

**HONORABLE PATRICK CARROLL, in His Individual, and Official Capacity**

On Appeal from the United States District Court District of Connecticut (Hon. Vanessa L. Bryant, U.S.D.J.)

## <u>BRIEF OF PLAINTIFF-APPELLANT JOSEPHINE MILLER</u>

Counsel for Plaintiff-Appellant
Josephine S. Miller
130 Deer Hill Avenue Suite 13
Danbury, CT 06810
Tel: (203) 512-2795

Counsel for Defendant-Appellee
Benjamin Abrams, Timothy Holzman
Assistant Attorney General
165 Capitol Avenue
Hartford, CT. 06103
Tel: (860) 808-5000

1

TABLE OF CONTENTS

TABLE OF AUTHORITIES ——————————————————————-3

STATEMENT OF THE ISSUES ——————————————————-5

STATEMENT OF THE CASE ————————————————————-6

STATEMENT OF THE FACTS ——————————————————--6

STANDARD OF REVIEW —————————————————————-10

ARGUMENTS———————————————————————————-11

    A.    Defendants Carroll and Sheridan, Either Jointly or Severally, Were Responsible for the Promulgation and Maintenance of Policies and Practices that Were Racially Discriminatory, Selectively Enforced and Were Arbitrary and Capricious———————————-11

    B.    The District Court Has Superimposed Additional Pleadings Standards Not Required by Iqbal, Twombley, or Their Progeny————————————14

    C.    Defendant Carroll Engaged Personally in a Deliberate Intentional Act When He Withheld Permission for Scheduling an Initial Reinstatement Hearing for Miller———————————22

    D.    The District Court Erred When Finding That There Were No Comparator Attorneys Similarly Situated to Miller————————————————————-27

    E.    Federal and State Authorities Have Acknowledged the Unjust Nature of Circumstances Resulting in Delayed Reinstatement for Miller————————————-34

CONCLUSION—————————————————————————————-35

**<u>TABLE OF AUTHORITIES</u>**

<u>CASES</u>

Allaire Corp. v. Okumus, 433 F.3d 248 (2d Cir. 2006)————10, 11

Bell Atlantic v. Twombley, 550 U.S. 544 (2007)—-————14, 26

Berube v. Great Atlantic & Pacific Tea Co., 348 F.App'x 684 (2d Cir. 2009)————————————————————————27

Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002)—————11

Cherry v. American Tel & Tel Co., 47 F.3d 225 (7th Cir. 1995)—29

Connecticut v. Teal, 457 U. S. 440 (1982)————————————15

DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104(2d Cir. 2010)————26

Ehrenfield v. Mahfouz, 489 F.3d 542 (2d Cir. 2007)——————————10

Graham v. Long Island Railroad, 230 F.3d 34 (2d Cir. 2000)——-27

Harlow v. Fitzgerald, 457 U.S. 800 (1982)——————————————26

Houck v. Substitute Tr. Servs., Inc. , 791 F.3d 473 (4th Cir. 2015)————————————————————27

In Re: Josephine Smalls Miller, No. 3:18-gp-00035 (SRU)————22, 34

In Re:  Rebecca L. Johnson, 3:02gp-00018-AWT————————————30, 35

Johnson, et al. v. Carrasquilla, (3:17CV1429 (MPS)————————————14

Leonard F. v. Isr. Disc. Bank of N.Y., 199 F.3d 99 (2d Cir. 1999)————————————————————————33

Lynn v. Deacons Med. Ctr.-W. Campus, 160 F.3d 484 (8th Cir. 1998)————————————————————28

Magnifico v. Blumenthal, 471 F.3d 39 (2d Cir. 2006)————————30

Miller v. Appellate Court, 320 Conn. 780 (2018)————————————23

OCDC V. Smalls Miller, DBD-CV17-6022075-S, DKT #230]————————25

3

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133
    (2000)————————————————————————————————19

Sacher v. United States, 343 U. S. 1(1952 Black, J,
    dissenting)—————————————————————————36

Scheuer v. Rhodes,  416 U.S. 232 (1974)————————————26

Shumway v. United Parcel Service, Inc., 118 F.3d 60 (2d Cir.
    1997)———————————————————————————————27

St. Mary's Honor Center v. Hicks, 509 U. S. 502(1993)—————20

Tangreti v. Bachman, 983 F.3d 609 (2d Cir. 2020)—————————33

Woods v. City of Greensboro, 855 F.3d 639 (4th Cir. 2017)—11,27

**LAW REVIEW ARTICLES**

Suzette M. Malveaux, The Jury (or More Accurately the Judge) Is
    Still Out for Civil Rights and Employment Cases Post-Iqbal,
    57 N.Y.L. Sch. L. Rev. 719, 722-23 (2012-2013)————————-11

[Moliterno, James E. "Politically Motivated Bar Disci-
    pline"(2005) Faculty Publications, Paper 928 http://scholar-
    ship.law.wm.edu/facpubs/928]————————————————---—35

## STATEMENT OF ISSUES

1.  Whether the District Court erred in finding that Plaintiff had failed to plausibly allege a claim of discrimination against the Connecticut Chief Court Administrator?

2.  Whether the District Court erred in finding that Plaintiff had failed to plausibly allege a claim of retaliation against the Connecticut Chief Court Administrator?

3.  Whether the District Court erred in that Plaintiff had failed to plausibly allege an arbitrary and capricious policy of attorney discipline against the Connecticut Chief Court Administrator?

## STATEMENT OF THE CASE

This case raises a basic question regarding the quality and quantity of facts that a plaintiff must plead in order to meet the plausibility standards under F.R.C.P. 12 (b)(6) for a claim of policies and practices that obliterate the constitutional right of attorneys to procedural and substantive due process in the reinstatement process after discipline. As a subset to this question is whether the fact that the challenged policies and procedures are promulgated and maintained by the Chief Court Administrator in their role, not as a judge, but as a policymaker requires any heightened level of fact pleading.

## STATEMENT OF THE FACTS

Appellant in this case, Josephine S. Miller, has been a licensed attorney since 1980. Eighteen of the years have been as an attorney licensed by the State of Connecticut. Effective November 16, 2018, Miller was suspended from the practice of law in Connecticut for what was supposed to be a twelve-month period. However, it took some forty-two months after the suspension, and two and one-half years *after the end* of the twelve months of suspension, before Miller was finally reinstated. The initial reason given to Miller for the delay in scheduling the first stage reinstatement hearing is that the COVID 19 pandemic had caused many court proceedings to be placed on hold. However, Miller determined

6

by merely looking at the judicial website that hearings were sched-
uled for at least three attorneys, none of whom were African Amer-
ican like her, all whose applications for reinstatement had been
filed many months *after* hers, and all whose offenses that caused
their suspension from practice had been federal criminal offenses
for which they had pled guilty.  Miller exercised her right to
file an administrative complaint of race discrimination with the
Connecticut Commission on Human Rights & Opportunities (hereafter
referred to as "CHRO")on December 9, 2020.[1]

After filing the CHRO complaint, Miller waited for approxi-
mately one month, and still having no hearing date scheduled, she
then filed the federal lawsuit that is the operative complaint in
this action on January 6, 2021.

Miller has alleged in her federal complaint that Defendant
Patrick Carroll, in his administrative role only, promulgated,
maintained, and enforced policies and practices that were unlaw-
ful.  Seven statements of these policies and practices are found
in the Fourth Amended Complaint.  These statements include  a
policy and practice of engaging in racial discrimination in the
application of attorney discipline and reinstatement, a policy of

---

[1] Although this complaint was filed against the Connecticut Judicial
Branch and not Defendant Patrick Carroll, in his official capacity
as Chief Court Administrator, he is effectively the Judicial
Branch.  Notably, as discussed infra, On June 2, 2022, CHRO found
that the judicial branch had engaged in a discriminatory practice
in the delay of Miller's reinstatement hearing.

selective enforcement of attorney discipline and reinstatement rules, and a policy of applying attorney discipline and reinstatement rules that is arbitrary and capricious. When the District Court claimed that insufficient factual pleadings had been made to establish that Defendant Carroll was even aware of who Miller was, additional factual pleadings were made establishing that Miller had been quite active in attempting to litigate the matter of racial discrimination and selective enforcement since even prior to her suspension from practice. These additional factual pleadings also established the extremely tight ship with which the Chief Court Administrator ran the judicial branch, with a firm grip of control on all parts of the attorney discipline process. These additional factual pleadings showed how implausible it was that Defendant Carroll would have been unaware of Miller and her claims of racial discrimination, selective enforcement, and arbitrary and capricious actions. As Miller became aware of additional facts in support of her claims, she sought to amend her pleadings because all discovery had been stayed in the case over her objection. Miller introduced, for example, a chart created by judicial branch lawyers that showed the name, race, gender, and other data for each attorney who had been disciplined and sought reinstatement for the preceding seven years. This Judicial Branch chart showed that of twenty-seven lawyers seeking reinstatement there were only two Black lawyers, Miller, and another Black female. The same

8

chart also showed that Miller and the other Black female attorney were the only ones[2] who had their reinstatement initial hearings **"stayed"**.  This second Black female attorney had also been a plaintiff along with Miller in a federal lawsuit against discipline authorities alleging race discrimination, selective enforcement, and arbitrary and capricious application of attorney discipline rules.  Though that federal lawsuit was dismissed, it was litigated through as far as an appeal to the Second Circuit Court of Appeals.

Miller filed her application for reinstatement in December 2019, the month after her purported twelve-month suspension expired.  However, it was not until September 2, 2021, that the first stage hearing was scheduled.  Meanwhile, on May 3, 2021, Judge Stefan Underhill of the Connecticut Federal District Court had reinstated Miller to practice in the federal courts.  It took the Connecticut Judicial Branch, and its attorney discipline/reinstatement arm, which is under the direct control of Defendant Patrick Carroll, another full year before Miller was finally reinstated to practice on May 16, 2022.  Swirling in the background was the fact that Miller's offenses, for which she was disciplined **did not** involve the commission of any state or federal crimes, she had not been incarcerated or even charged with any misdemeanor

---

[2] One other person who was said to be a Latino male attorney was listed as having his case stayed.

offenses, she had not misused any client funds, and had one griev-
ance filed by one client.  Not minimizing the reasons for the
original suspension, but they all had to do with a perceived lack
of diligence in prosecuting certain civil matters, alleged unau-
thorized practice at the Connecticut Appellate Court after a sus-
pension there that Miller had challenged, and an alleged commin-
gling of funds in an IOLTA account. Miller alleged that discipline
authorities acted as they did in carrying out the policies and
practices that had been put into place by Defendant Patrick Car-
roll.

The District Court dismissed Miller's complaint, as amended,
finding her claims to be not plausible under the Iqbal and Twombly
pleading requirements.  This appeal then followed.

## STANDARD OF REVIEW

The grant of a Rule 12(b) Motion to Dismiss is subject to de
novo review. Allaire Corp. v. Okumus, 433 F.3d 248, 249-250 (2d
Cir. 2006). See also, Ehrenfeld v. Mahfouz, 489 F.3d 542, 547 (2d
Cir 2007)(question of statutory interpretation is subject to de
novo review). All allegations in the complaint must be accepted as
true and all inferences drawn in Plaintiffs' favor. Allaire Corp.,
433 F.3d at 249-250; Caiola v. Citibank, N.A., 295 F.3d 312, 321
(2d Cir. 2002).

**ARGUMENTS**

"Discrimination claims are particularly vulnerable to prema-
ture dismissal because civil rights plaintiffs often plead facts
that are consistent with both legal and illegal behavior, and civil
rights cases are more likely to suffer from information asymmetry,
***pre-discovery***." Woods v. City of Greensboro, 855 F.3d 639 (4th
Cir. 2017)(Emphasis added).  See e.g., Suzette M. Malveaux, The
Jury (or More Accurately the Judge) Is Still Out for Civil Rights
and Employment Cases Post-Iqbal, 57 N.Y.L. Sch. L. Rev. 719, 722–
23 (2012–2013).  Similarly, selective enforcement, and other
civil rights cases of arbitrary and capricious actions/inactions
may suffer from the same "information asymmetry."

A.  Defendants Carroll and Sheridan, Either Jointly or
    Severally, Were Responsible for the Promulgation and
    Maintenance of Policies and Practices that Were
    Racially Discriminatory, Selectively Enforced,
    and Were Arbitrary and Capricious

The initial issue to be decided by this court is whether
Miller has pled sufficient facts, which must be taken to be true,
and the reasonable inferences to be drawn from those facts, to
establish that Defendants Carroll and Sheridan can be said to have
been acting in their role as administrators, not in their judicial
role.  It is axiomatic that any entity, including the Connecticut
Judicial Branch, must operate according to various policies, prac-
tices and procedures.  With regard to the judicial branch, Carroll

11

is the "chief policymaker and decision maker for the Connecticut Judicial Branch" and is responsible for prompt disposition of cases and proper administration of judicial business." [JA-61 ¶¶5,8]. In his role as presiding judge and administrative Judge for the Hartford Judicial District, Sheridan is the policymaker and decisions maker for the Hartford Judicial District but under the direction of the chief court administrator. [JA-61-62, ¶¶6, 10-11].

The decision of the District Court was that "Plaintiff did "not even identify the policy she is challenging." [JA-231]. Yet the following paragraphs are found in the proposed fourth amended complaint:

"28. At all times material herein, Defendant Carroll has established and maintained a policy and practice of refusing to provide substantive due process rights to attorneys who are charged with some violation of the Code of Professional Responsibility, or other conduct for which they may be disciplined.
29. At all times material herein, Defendant Carroll has established and maintained a policy of providing procedural due process rights of notice in a nominal sense only.
30. At all times material herein, Defendant Carroll has established and maintained a policy and practice of arbitrary and capricious discipline of attorneys and arbitrary and capricious application of rules regarding re-admission to the practice of law after discipline.
31. At all times material herein, Defendant Carroll has established and maintained a policy of racially discriminatory treatment of attorneys in the application of rules regarding re-admission to the practice of law after discipline.
32. At all times material herein, Defendant Sheridan has established and maintained a policy of providing procedural due process rights of notice in a nominal sense only with regard to the Hartford Judicial District.
33. At all times material herein, Defendant Sheridan has estab-

12

lished and maintained a pol-
icy
and practice of arbitrary and capricious discipline of attorneys
and arbitrary and capricious application of rules regarding re-
admission to the practice of law after discipline with regard to
the Hartford Judicial District.
34. At all times material herein, Defendant Sheridan has estab-
lished and maintained a policy of racially discriminatory treat-
ment of attorneys in the application of rules regarding re-admis-
sion to the practice of law after discipline with regard to the
Hartford Judicial District."

The commonsense definition of "policy" as found in Webster's

dictionary is:

> "A definite course or method of action selected from
> among alternatives and in light of given conditions
> to guide and determine present and future decisions,
> a high-level overall plan embracing the general goals
> and acceptable procedures especially of a governmental
> body.

The District Court provided no further explanation for its

conclusion that no challenged policy was identified.  It is un-

fathomable that **seven paragraphs** of statements regarding the chal-

lenged policies could be stated and yet be claimed as "unidenti-

fied".  Apparently, the District Court tacitly disagreed with the

content of Miller's statement of the policies in order to reach

such a conclusion.  But on a motion to dismiss the court is not

permitted to reach any value judgments but must accept all well-

pleaded facts in the complaint as true.  Miller needed only to

plead "enough facts to state a claim to relief that is plausible

on its face". What is required is factual matter in the complaint

13

that "nudges the plaintiff's claims across the line from conceivable to plausible". Bell Atlantic v. Twombley, 550 U.S. 544 (2007) To have federal question jurisdiction, the plaintiff's complaint must be a well-pleaded one. Which means that the initial complaint must contain references to the federal question and the federal issue evoked. The District Court cited to no case law in support of the idea that a more detailed explanation of the challenged policy was required. This was reversible error.

B.   The District Court Has Superimposed Additional Pleadings Standards Not Required by Iqbal, Twombley or Their Progeny

The District Court found that "Plaintiff has not provided any allegations of empirical evidence supporting the existence of this policy, such as statistical evidence or examples of other minority lawyers who have been discriminated against". [JA-231].

Firstly, it is inaccurate that Miller has not alleged examples of other minority lawyers who have been discriminated against. Direct reference was made in the FAC complaint to Johnson, et al. v. Carrasquilla (3:17CV1429 (MPS), wherein it was alleged that Defendants are well aware of the discriminatory and retaliatory impact of their policies. [JA 80, ¶107]. By taking judicial notice of the Johnson case, the court will readily discern that in addition to Miller, facts were pled regarding examples of discriminatory treatment of African American attorneys Rebecca Johnson and

14

Joseph Elder.   Moreover, the law in this circuit in the discrim-
ination context has been that "[a]n employer may not escape lia-
bility for discriminating against a given employee on the basis of
race simply because it can prove it treated other members of the
employee's group favorably". The purpose of the anti-discrimina-
tion statutes is to **protect individuals**, not the group as a whole.
See Connecticut v. Teal, 457 U. S. 440, 453- 55 (1982).

    Contrary to the District Court's requirement,  there is no
precedent for finding that empirical evidence must be available
and pled in a complaint to survive a motion to dismiss.  However,
Miller presented numerous exhibits in support of the FAC coming
directly from the Connecticut Judicial Branch website that demon-
strated the operation of the challenged policies and practices.[JA
94-183].   The District Court failed to incorporate in its analysis
of the pleadings the documentary evidence that provides "empirical
data", to the extent that "empirical evidence" is even required at
the pleadings stage.  That evidence showed numerous attorney dis-
ciplinary hearings that were scheduled during the same time that
Miller was denied a hearing (i.e., from the start of the pandemic
to September 1, 2021, when a hearing was finally held for Miller).

    Miller presented additional evidence to the District Court
that was either ignored or not accorded significance.  For example,
in arguing against a stay of discovery in this matter, Appellant

15

produced empirical evidence (i.e., chart[3] created by the Connecticut Judicial Branch counsel that purported to be a list of all attorneys who had applied for reinstatement during the preceding seven (7) years). That evidence established that, of the twenty-seven (27) attorneys who applied for reinstatement during this period, there were only two Blacks, both females, Appellant and Rebecca Johnson. Johnson's reinstatement has been "*stayed*" since 5/9/2014, despite her application having been filed 12/24/2013. [JA 14-17]. One other attorney, who may be considered as "minority", a Latino male had his reinstatement "stayed". [JA 17]. While not conceding that "minority" is a legally cognizable term, it is telling that only racial and ethnic minority attorneys, over at least the past seven years, have been singled out for disparate treatment in just the procedural aspect of the reinstatement process. The procedural aspect of this data is significant because it does not seek to trespass into the judicial decision-making functions. The vast number of attorneys who were receiving scheduled hearing dates at the same time that Miller was being denied a hearing establishes the pretextual nature of Defendants' claim that the COVID pandemic has caused a cessation in hearings. Secondly, the fact that *only* African American attorneys had their

---

[3] It should be noted that creation of this chart was the first and only time that anyone associated with the Connecticut Judicial Branch has deigned to respond on the merits of any of Appellant's claims of discrimination, retaliation, or selective enforcement.

16

reinstatement stayed supports Miller's claim of a policy and prac-
tice that disparately affected African Americans. These facts es-
tablished the plausibility of Miller's claim of a policy and prac-
tice that was directed toward African American attorneys.[4]

The District Court erred by requiring empirical evidence of
discriminatory treatment of "minority lawyers." Nowhere in the
FAC does Appellant use the term "minority lawyers" because that is
not a protected class under the anti-discrimination statutes or
the Constitution. The District Court analysis ended after it de-
cided that the challenged policy regarding *racial* discrimination
was unsupported. However, the District Court failed to then examine
whether the facts pled supported the other challenged unlawful
policies. For example, there was no consideration given by the
District Court to the policy of selective enforcement or arbitrary
and capricious application of the discipline rules.

Miller very carefully limited the scope of her allegations to
administrative matters to avoid claims of judicial immunity[5]. In

---

[4] The fact that there are only a very small number of African
American attorneys who sought reinstatement to practice during the
preceding seven years (i.e., two) does not lessen the starkness of
the evidence that each one appears to have been singled out for
ill treatment.

[5] It is a struggle for courts to accept the concept that no judicial
immunity exists for judges when they act purely in an administra-
tive capacity rather than a judicial capacity. In fact, the Dis-
trict Court appears to have slipped into this role of automatically
seeking an escape from liability simply because it is judges in-
volved as Defendants in this matter.

the simple matter of whether Defendant had an "administrative" policy or practice that allowed for an extraordinary delay (i.e., forty-two months on a twelve-month suspension)for Miller when every other attorney involved in the discipline process was readily accorded a hearing is empirically demonstrated by judicial branch records. The Defendant Chief Court Administrator is the individual statutorily responsible for this aspect of court operations.

The District Court was too quick to dismiss Miller's claims once she reached the conclusion that no facts of a racially discriminatory policy had been pled. Even assuming arguendo, that insufficient facts were found to support this alleged policy of racial discrimination in attorney discipline/reinstatement, the pleadings, supported by the documentary evidence, show a wide and deep variance in who was given ready access to the so-called "non-judicial resources" required to even get started in the reinstatement process. Reinstatement is part of the attorney discipline process. If *every* attorney *other than* Miller was readily given access to the resources necessarily used to effectuate any part of the discipline process, that is evidence of selective enforcement, a policy that Miller also challenged.  At the motion to dismiss stage, where Defendant has not even been required to answer the complaint, if the court accepted this fact as true, as it was required to do, it was also required to consider the likelihood that Defendants would rely upon a pretext of the pandemic as the

18

reason for this disparity in treatment. The lesson of <u>Reeves v.</u> <u>Sanderson Plumbing Products, Inc.,</u> 530 U.S. 133 (2000) is that "evidence of pretext may, together with the elements of the prima facie case, suffice to show intentional discrimination." "…it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. <u>Reeves</u> clarified that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive…. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Specifically, the court stated:

"The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." <u>St. Mary's Honor Center v. Hicks</u>, 509 U. S. 502, 511 (1993).

In determining the plausibility of Miller's pleadings, the District Court was required to consider the pretextual nature of the claimed reasons for the withholding of an initial hearing.

Curiously, the District Court found that "Plaintiff is not alleging her hearing before the judge panel was unduly delayed." Because the hearing before the SCRA is a required first step, then

19

any delay in reaching *first* base necessarily means that one would never get to *second* base. The District Court then blithely found that attorneys who were not at the same stage in the discipline process as Miller are not valid comparators. This misunderstands the significance of the wealth of data presented regarding discipline hearing scheduling. The explanation given Miller for the refusal to schedule an initial hearing for her was that it would have required permission to be granted for a "nonjudicial" use of resources. The purpose of evidence of scheduling for all attorney discipline matters was to establish that this claim was a mere pretext. The "resource" was the virtual electronic system being used by the judicial branch to effectuate hearings after the start of the COVID-19 pandemic.

Other attorneys were indeed comparators because they were all subject to scheduling of their proceedings through this electronic system. It is pretextual for Defendant to claim that an electronic system could be used for every other attorney but not for Miller. Use of an electronic system during the COVID pandemic was deemed by Defendant to be a convenient, superficially plausible basis for denying Miller reinstatement. At first glance, the claim seemed appealing. However, the claim fell apart when the facts were examined. The facts showed that everyone else, other than Miller, was able to utilize this electronic, virtual resource. Miller has pled multiple policies and practices promulgated and maintained by

20

Carroll that are implicated by the refusal to schedule a rein-
statement hearing for her. First, it was racially discriminatory.
Secondly, it showed selective enforcement of the rules against
her. Thirdly, it shows an arbitrary and capricious application of
discipline rules. Federal District Court Judge Underhill acknowl-
edged as much when on May 3, 2021, he reinstated Appellant's ad-
mission to practice in Connecticut federal courts. "The fact re-
mains, however, that over **twenty-nine months have elapsed** between
the imposition of a one-year suspension from practicing law in the
State of Connecticut and this ruling. The cumulative effect of
those delays has now reached the point where **corrective action**
should be taken." The court may take judicial notice of  <u>In RE:</u>
<u>Josephine S. Miller</u>, No. 3:18-gp-00035 (SRU)at page 6.

    C.   <u>Defendant Carroll Engaged Personally in a Deliberate</u>
        <u>Intentional Act When He Withheld Permission for Sched</u>
        <u>uling an Initial Reinstatement Hearing for Miller</u>

Defendants have argued, and The District Court accepted, the
notion that Miller did not plead sufficient facts to demonstrate
personal involvement by Defendants in the alleged unconstitutional
actions. Miller has not relied solely upon the oversight by Car-
roll of others involved in the attorney discipline and reinstate-
ment process. The knowledge of Carroll regarding how the lower-
level troops, the "arms of the court", were carrying out the chal-
lenged policies and practices alleged to have been promulgated by

21

him is significant.  However, Miller has pled sufficient facts and the inferences to be drawn from them, to establish that Carroll was personally involved in the challenged actions/inactions.

Defendants' claimed reason for delaying the scheduling of the initial reinstatement hearing for Miller is that "Defendants Carroll, upon information and belief, through Defendant Sheridan stated, *in writing*, that the need for permission to be gained in the case of Plaintiff is because this would have required a "non-judicial" use of resources." [JA-74,¶71]. However, this fact merely underscores the challenged "policy and practice of arbitrary and capricious discipline of attorneys and arbitrary and capricious application of rules regarding re-admission to the practice of law after discipline". [FAC para 30, 33].

The Connecticut Supreme Court has said in Miller v. Appellate Court, 320 Conn. 780 (2016) that in carrying out the duty to investigate allegations of attorney misconduct, attorney disciplinary "bodies act as an arm of the court".  See also General Statutes § 51-90 et seq.  It was incredulous then, for the Court to claim that scheduling the initial hearing for Appellant was a "non-judicial" use of resources when the Court itself has designated the Statewide Grievance Committee [and its constituent SCRA] as its arm. Moreover, the District Court did not explain how this pretextual claim could be accepted at face value when the same "non-judicial resource" was used for attorneys who were not African

22

American as Appellant. That is, attorneys Wang, Dressler, and Hwang were all permitted the use of non-judicial resources for their initial reinstatement hearings.

The facts pled regarding the alleged need to obtain ***permission*** for an initial hearing to be scheduled for Miller is strong evidence supporting the plausibility of her claim that application of the policy to Miller was not only on the radar of the Chief Court Administrator but also that it was he who was giving the directives regarding her reinstatement progress or lack thereof. Defendant argued essentially that he was too high up the chain to have taken notice of Miller. This is rebutted by the additional fact pleadings regarding the formal practices in place for strictly controlling the flow of information within the Office of the Chief Court Administrator and between that office, the constituent arms of the disciplinary process, the trial courts, and even the news media. [See JA-83, ¶¶120-133]

The actual personal involvement of the Chief Court Administrator in the alleged constitutional violation is found in the fact that (1) it was admitted that permission had been withheld from scheduling the hearing for Appellant; (2) the chair of the Hartford Judicial District Standing Committee admitted that his committee had not received permission to schedule the hearing as late as November 18, 2020 [JA-71, ¶57(3)]; (3) Judge Sheridan

23

Administrative and Presiding Judge for the Hartford Judicial Dis-
trict did not have the permission: "Judge Sheridan also said since
this was a nonjudicial use of a remote/virtual courtroom that he
would have to get permission to use this system) (JA-72,¶ 60); (4)
who else would the administrative and presiding judge need to
obtain permission from *except the Chief Court Administrator* Pat-
rick Carroll.   It is beyond imagination that the District Court
judge could miss this. It is in fact implausible to think that
anyone other than the two highest level persons within the admin-
istrative and policy-making arm of the judicial branch was respon-
sible for the deliberate and prolonged withholding of a reinstate-
ment hearing for Miller. The Court may take judicial notice of the
fact that Miller was not re-admitted to practice in Connecticut
star courts until May 16, 2022. [See <u>OCDC V. Smalls Miller,</u> DBD-
CV17-6022075-S, DKT #230]. The proposed amendment to the complaint
to add Judge Sheridan as a defendant was prompted by the suggestion
of Defendant Carroll that there was insufficient factual pleading
to show  that he was personally involved, i.e., that it was he who
withheld permission for the scheduling of the first stage rein-
statement hearing for Miller.  By logical deduction, if the SCRA
had to obtain permission [JA-71, ¶ 57], and the presiding/admin-
istrative judge for the Hartford Judicial District had to obtain
permission [JA-72, ¶ ¶60, 63], then such permission could only
have come from the next level up, Chief Court Administrator Patrick

24

Carroll. Defendants' evasive claims that Miller has not shown personal involvement should not trump logic and the reasonable inference that it was one or both that was responsible for withholding permission. Either way, direct personal involvement by Defendants Carroll and Sheridan was plausible alleged. In ruling on a Rule 12(b)(6) motion, the court's duty is "to assess the legal feasibility of the complaint, [but] not to assay the weight of the evidence which might be offered in support thereof." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 113 (2d Cir. 2010). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982). In fact, "it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer, 416 U.S. at 236. "The plausibility standard is not akin to a probability requirement...." so that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.") Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007). The District Court committed reversible error when it failed to find personal involvement by Carroll and/or Sheridan in the alleged constitutional violation.

25

The question is whether the Defendants' proffered reason for withholding a reinstatement hearing to Miller was "so obviously and irrefutably sound and unambiguously nondiscriminatory and non-pretextual explanation" that it rendered Miller's claim of pretext implausible. Compare Woods v. City of Greensboro, et al., 855 F.3d 639, 854 (4th Cir. 2017)citing Houck v. Substitute Tr. Servs., Inc. , 791 F.3d 473, 484 (4th Cir. 2015) (criticizing substitution of a probability standard for plausibility standard).

    D.   The District Court Erred When Finding That There Were No Comparator Attorneys Similarly Situated to Miller

The District Court erroneously concluded that other attorneys were not valid comparators to Miller because their applications were before a different SCRA.  The court then cited to Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (holding in employment discrimination case that alleged comparators were not similarly situated in part because they had different super-visors).  But see Shumway, at 63-64 (2d Cir. 1997)("..the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances rather than a showing that both cases are **identical**). Graham v. Long Island Railroad, 230 F.3d 34, 39-40 (2d Cir. 2000). See also Berube v. Great Atlantic Pacific Tea Company, Inc., 348 F.App'x 684 (2nd Cir. 10-15-2009) where the court reiterated the theme that employees used as comparators in

26

an analysis need not be identically situated, but only must be similarly situated in all *material* respects.

In the context of attorney discipline, including reinstatement, it was far more logical for the court to have examined matters such as the standards to which all attorneys are held such as the Code of Professional Responsibility, disciplinary standards, and performance standards, that is, objective standards of conduct rather the totally arbitrary and capricious standard of which SCRA happened to be assigned to perform the initial hearing on reinstatement. It is far off the mark to consider the SCRAs in any way similar to supervisors in the employment setting.

In Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 484 (8th Cir. 1998) the court said:

> "To require that employees always have to engage in the ex
> act same offense as a prerequisite for finding them simi
> larly situated would result in a scenario where evidence of
> favorable treatment of an employee who has committed a dif
> ferent but more serious, perhaps even criminal offense,
> could never be relevant to prove discrimination. Common
> sense as well as our case law dictate that we reject such
> an approach". Lynn, supra at 488.

In like manner, the District Court should have reached different conclusions regarding the applicable standard for who is a valid comparator to Miller. The Court should have found the issue of comparator to be a jury question. Secondly, the court should have applied the standard that there need not be an *exact equivalence* in the circumstances or conduct of attorneys. See Cherry,

27

v. American Tel. & Tel. Co., 47 F.3d 225, 229 (7th Cir. 1995)
(postulating that company-wide policy uniformly applicable to all
members of a group may be basis for comparing employees, regardless
of particular job being performed). The Code of Professional
Responsibility is a policy applicable to all members of the bar.
Reasonableness is the touchstone in the determination of "simi-
larly situated".

The District Court further and erroneously found other fac-
tors that she believed distinguished Miller from other attorneys.
Specifically, she found no comparators because (a) delay in the
processing of Plaintiff's application was caused by Plaintiff's
own conduct; (b) evidence that Plaintiff did not take the MPRE;
(c) did not comply with the order to designate a mentor until over
20 months after her application for reinstatement was filed. The
Court was too readily found ways to differentiate Miller from other
attorneys in order to find "no comparators." Such an exercise
falls into the trap of requiring "exact equivalency" in order to
establish a comparator.

See for example the finding of fact #19 by the CHRO that the
SCRA chair "never testified, nor had he communicated with Com-
plainant, that her application was incomplete, and the Standing
Committee could not schedule the hearing as a result. Rather, he
testified repeatedly Complainant's filings [ie., discrimination

28

complaint and this federal lawsuit] were the cause of the delay. Respondent's attempts to blame COVID 19 for the delay is also not supported by the record, as there had been communications about scheduling a remote hearing in November pending approval." [See IN RE: Rebecca L. Johnson, 3:02-gp-00018-AWT, DKT #7, Exhibit G, p.7] The Second Circuit has held that district courts may properly take judicial notice of docket sheets in other court cases. See Mangifico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (holding district court could rely on a docket sheet in another case because "docket sheets are public records of which the court could take judicial notice").

The District Court took pains to point out that "Plaintiff has not presented any allegations relating to initial hearings conducted during the time Plaintiff's application was pending be-fore any SCRA other than Fairfield." [JA-222]. However, this focus on the particular SCRA also underscores the policy challenged by Miller that permits arbitrary and capricious application of the discipline rules. It is an element of arbitrariness and capri-ciousness that the SCRAs, that are all "arms of the same court," could have such strikingly different outcomes procedurally for attorneys seeking reinstatement to practice. It also underscores the plausibility of the challenged policy and practice that re-sulted in disparity in attorney reinstatement outcomes based upon race. Every attorney who received permission to schedule their

29

reinstatement initial hearing was non-African American unlike Miller.

At the pleadings stage, when certain information is necessarily in the possession of the Defendant only, a Plaintiff is necessarily limited in the facts that she can plead. Miller has no smoking gun email or memo from Chief Court Administrator Carroll directly stating that she should be deprived of the right to a timely reinstatement hearing.  However, we have the next best thing, a written email from the chair of the SCRA that **they did not have the permission** to schedule a hearing. [JA-71, ¶57] We have the next level up in the chain, a written email from the clerk for the presiding and administrator judge for the assigned judicial district stating that **he did not have the permission** to schedule a hearing. [JA-72, ¶60] The significance of the wealth of documentary evidence regarding the scheduling of other attorney discipline matters lies in the fact that such hearings were so routinely occurring. Notably, presiding/administrative Judge Sheridan clearly was not required to obtain permission from anyone else in order to schedule the fourteen (14) discipline hearings that he was responsible for scheduling. [JA-73, ¶¶ 67-68] The question that must be asked then is why he was required to obtain permission from someone else in order to schedule the hearing for Miller and from whom was that permission required.

The next level up in the chain was the Chief Court Administrator, Patrick Carroll. The most plausible and logical person from whom such permission could be obtained was Defendant Carroll. Thus, Appellant has set forth reasonable facts, and the inferences that are to be drawn from those facts, to establish the personal involvement of Defendant Carroll in withholding permission for the scheduling of the initial reinstatement hearing for Appellant. Because at this stage of the proceedings, there has been no answer filed by Defendants and no discovery, Miller cannot be expected to provide more evidence of her claims. At this stage, it is sufficient to state Miller's claim that Defendant Carroll was personally involved in the constitutional violation. The withholding of an initial reinstatement hearing was pursuant to the policy of arbitrary and capriciously applying discipline rules, racially discriminating, and selectively enforcing discipline rules challenged by Appellant. The facts pled by Appellant go directly to the actions of Defendant Carroll, not those of his subordinates or other actors in the Connecticut attorney discipline process. It was Carroll who withheld permission so that the failures of others below him to act was all done at his behest. These facts are sufficient to establish a violation of §1983 by Defendant Carroll, establishing a deliberate, intentional act on his part to violate the Appellant's legal rights. Tangreti v. Bachman, 983 F.3d 609, 618 (2d Cir. 2020).

31

Moreover, since Defendant Carroll has been evasive in claim-
ing that Miller has not shown personal involvement by him Defendant
Sheridan is the only other person who could be held responsible
for withholding permission. In his role as a presiding and admin-
istrative judge he, like Carroll, was responsible for establishing
and maintaining policies and procedures for the Hartford Judicial
District. To the extent that Sheridan withheld permission for
scheduling of Miller's reinstatement hearing, it was pursuant to
the same unlawful policies and practices promulgated by the chief
court administrator. Amendment of the complaint to regarding
Sheridan was not futile as the District Court found.

Miller relies upon facts stated in the face of the complaint,
documents cited to in the complaint, or incorporated in the com-
plaint by reference, and to matters of which judicial notice may
be taken. Leonard F. v. Isr. Disc. Bank of N.Y., 199 F.3d 99, 107
(2d Cir. 1999). These documents include written emails from the
chair of the SCRA, emails exchanged between the SCRA chair and the
clerk for the presiding/administrative judge, emails exchanged be-
tween that same clerk and Miller. Miller further incorporated by
reference extensive documents demonstrating the highly centralized
manner in which the chief court administrator keeps abreast of all
aspects of the operation of the judicial branch including the
attorney discipline process.

E.    Federal and State Authorities Have Acknowledged the
      Unjust Nature of Circumstances Resulting in
      Delayed Reinstatement for Miller

Miller is not alone in recognizing the application of pro-
cesses that have long delayed her reinstatement to practice. U.S.
District Court Judge Stefan Underhill reinstated Appellant to
practice in the Connecticut federal courts after finding "In the
interests of justice and given the lengthy period during which
this matter has been pending, I set aside the portion of my orig-
inal order that has created a state of limbo for Miller." "The
fact remains, however, that **over twenty-nine months** have elapsed
between the imposition of a one-year suspension from practicing
law in the State of Connecticut and this ruling[6]. The cumulative
effect of those delays has now reached the point where corrective
action should be taken."[See In RE:  Josephine S. Miller, No. 3:18-
gp-00035 (SRU)p. 6]. It still took another year after the decision
of Judge Underhill before Appellant was reinstated, because of the
application of the unlawful policies and practices implemented and
maintained by Defendants.

Even the Connecticut Commission on Human Rights & Opportuni-
ties (CHRO), the administrative agency charged with investigating

---

[6] Miller has curiously been subjected to inordinate delays in rul-
ings, not only by the Defendants but even by this court. See e.g.
In Re Charge of Judicial Misconduct, Docket No. 19-90080-jm that
was decided after **three full years** despite the statutory require-
ment that such complaints be reviewed **"expeditiously"**.

33

complaints of discrimination, has found that the Connecticut Judicial Branch has engaged in a Discriminatory practice when it delayed reinstatement for Appellant. The court may take judicial/administrative notice of this finding. Specifically, the HRO found: "Respondent blames Complainant and her filing discrimination complaints and lawsuits for the delay. Such admission is direct evidence of retaliation as Complainant's CHRO filings were engaging in a protected activity for which Respondent then used to justify a delay in the proceedings." [See IN RE: Rebecca L. Johnson, 3:02-gp-00018-AWT,DKT #7,Exhibit G, p.7]

IV. CONCLUSION

In a well-researched law review article, [Moliterno, James E. "Politically Motivated Bar Discipline"(2005) Faculty Publications, Paper 928 http://scholarship.law.wm.edu/facpubs/928] it has been documented that lawyers who represent unpopular causes or unpopular persons, who are not politically connected, or those who bore ethnic identities that the organized bar found threatening to its "homogeneity of thought" have been subjected to unwarranted discipline processes. Moliterno, Id.

In dissenting from the Supreme Court's affirmance of a contempt conviction of a lawyer whose otherwise unblemished 24-year record resulted in disbarment because he deigned to represent an

34

alleged Communist Party member, Justice Black wrote, "[T]his sum-
mary blasting of legal careers ... constitutes an overhanging men-
ace to the security of every courtroom advocate in America. The
menace is most ominous for lawyers who are obscure, unpopular, or
defenders of unpopular persons or unorthodox causes." <u>Sacher v.</u>
<u>United States</u>, 343 U. S. 1, 18 (1952 Black, J, dissenting).

This Court should not be tempted to give a pass to the Dis-
trict Court or to the named Defendants simply because Miller's
license to practice in Connecticut state courts has now been re-
instated. This is a case of justice delayed being justice denied.
Miller was forced into a ***forty-two-month*** suspension instead of the
imposed twelve-month suspension. Policies and practices that per-
mit such widely varying outcomes in the attorney discipline process
are unconstitutional and should not be permitted to continue. This
case should be remanded to the District Court for further proceed-
ings.

<div style="margin-left: 30%;">

THE APPELLANT
By: <u>*/s/Josephine S. Miller*</u>
Josephine S. Miller, PRO SE
130 Deer Hill Avenue, Unit 13
Danbury, CT 06810
Tel: (203) 512-2795
Fax: (203) 702-5188
Email: jsmillerlaw@gmail.com

</div>

## CERTIFICATION OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32 (a)(7)(B) because the brief contains 7,129 words, excluding the parts of the brief exempted by Fed.R.App.P. 32 (a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32 (a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 12-point font size and Courier New.

*/s/Josephine S. Miller*
Josephine S. Miller

## CERTIFICATE OF SERVICE

In accordance with Rule 25 of the Federal Rules of Appellate Procedure, and local Rule 30.1, the undersigned hereby certifies that this Brief of Appellant was electronically filed and served on each counsel of record, Benjamin Abrams and Timothy Holzman, on July 21, 2022.


*/s/Josephine S. Miller*
Josephine S. Miller