# 22-823

*To Be Argued By:*
**Timothy J. Holzman**
**Assistant Attorney General**

## IN THE
## United States Court of Appeals
### FOR THE SECOND CIRCUIT

---

**JOSEPHINE MILLER,**
*Plaintiff-Appellant,*

**v.**

**PATRICK CARROLL, III, HONORABLE, OFFICIAL AND
INDIVIDUAL CAPACITIES,**
*Defendant-Appellee*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

---

**BRIEF OF DEFENDANT-APPELLEE
WITH ATTACHED SUPPLEMENTAL APPENDIX**

---

**WILLIAM TONG**
**ATTORNEY GENERAL**

**Timothy J. Holzman**
**Benjamin A. Abrams**
**Assistant Attorneys General**
**165 Capitol Avenue**
**Hartford, CT 06106**
**Tel. 860-808-5020**
**Fax 860-808-5347**
**Email: timothy.holzman@ct.gov**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ........................................................1

COUNTER STATEMENT OF THE ISSUES ..........................................1

COUNTER-STATEMENT OF THE CASE ..............................................2

I.   INTRODUCTION .................................................................................2

II.  FACTUAL AND PROCEDURAL BACKGROUND ...........................4

    A. Plaintiff's underlying disciplinary proceedings.............................4

    B. Connecticut rules governing attorney reinstatement. ....................6

    C. Plaintiff's application for reinstatement. .......................................9

III. PROCEDURAL HISTORY .................................................................13

SUMMARY OF THE ARGUMENT .......................................................15

ARGUMENT .........................................................................................19

I.   STANDARDS OF REVIEW...............................................................19

    A. Motion to dismiss for failure to state a claim................................19

    B. Motions to amend pleadings .........................................................20

II.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT
PLAINTIFF'S § 1983 CLAIMS AS ALLEGED IN THE PROPOSED
FAC WERE LEGALLY DEFICIENT, AND THEREFORE PROPERLY
DISMISSED THE TAC AND DENIED PLAINTIFF'S REQUEST TO
AMEND HER PLEADING.....................................................................21

    A. The District Court properly concluded that Plaintiff's Proposed
FAC failed to plausibly allege that Judge Carroll or Judge Sheridan
were personally involved in the conduct complained of. .....................21

i

B.  Alternatively, Plaintiff's claims are all barred by qualified immunity. ....................................................................34

1.  Plaintiff has not alleged that Judge Carroll or Judge Sheridan violated any "clearly established" rights. ..........................................36

2.  Plaintiff has not alleged any objectively unreasonably acts or omissions by Judge Carroll or Judge Sheridan. ...............................38

CONCLUSION ......................................................................40

CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ..........................................................................42

CERTIFICATION OF SERVICE ...........................................................43

## TABLE OF AUTHORITIES

**Cases**

*Allco Fin. Ltd. v. Klee,* 805 F.3d 89 (2d Cir. 2015) ................................ 34

*Amore v. Novarro,* 624 F.3d 522 (2d Cir. 2010) ..................................... 36

*Anderson v. Creighton,* 483 U.S. 635 (1987) ................................... 35, 38

*Ashcroft v. al-Kidd,* 131 S. Ct. 2074 (2011) ........................................... 36

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) .............................................. 19, 21

*Beckles v. City of New York,* 492 App's 181 (2d Cir. 2012).............. 17, 37

*Brosseau v. Haugen,* 543 U.S. 194 (2004)............................................... 36

*C.f. Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60 (2d Cir 1997)..33

*Colon v. Coughlin,* 58 F.3d 865 (2d Cir. 1995)...................................... 22

*Disciplinary Counsel v. Hickey,* 328 Conn. 688 (2018) ..................... 7, 10

*Doninger v. Niehoff,* 642 F.3d 334 (2d Cir. 2011)................................... 36

*Dorsett v. County of Nassau,* 732 F.3d 157 (2d Cir. 2013).................... 19

*Dwares v. City of New York,* 985 F.2d 94 (2d Cir. 1993) ....................... 27

*Graham v. Long Island R.R.,* 230 F.3d 34 (2d Cir. 2000)...................... 33

*Harbulak v. County of Suffolk,* 654 F.2d 194 (2d Cir. 1981)................. 20

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ............................................ 35

*Iqbal v. Ashcroft,* 574 F.3d 820 (2d Cir. 2009)........................... 18, 22, 26

*LaBounty v. Coughlin,* 137 F.3d 68 (2d Cir. 1998)................................. 35

*Lennon v. Miller,* 66 F.3d 416 (2d Cir. 1995)......................................... 38

iii

*Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015).................21

*Malley v. Briggs*, 475 U.S. 335 (1986)....................................35

*Mangiafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006) .........................4

*McCluskey v. Roberts*, No. 20-4018, 2022 U.S. App. LEXIS 15621, at *8 (2d Cir. June 7, 2022)........................................................25

*Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506 (2d Cir. 2005) ...................................................................................15n5

*Mullenix v. Luna*, 136 S. Ct. 305 (2015) ................................36

*Office of Chief Disciplinary Counsel v. Miller*, 335 Conn. 474 (2020)......6

*Office of Chief Disciplinary Counsel v. Miller*, DBD-CV17-6022075-S (Conn. Super. Ct.)..................................................................5

*Parent v. New York*, 485 Fed. Appx. 500, *cert. denied*, 568 U.S. 1027 (2d Cir. 2012) ..............................................................20

*Patterson v. County of Oneida*, 375 F.3d 206 (2d Cir. 2004) ................21

*Pearson v. Callahan*, 555 U.S. 223 (2009) ..............................35

*Plumhoff v. Rickard,* 134 S. Ct. 2012 (2014)...........................36

*Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008) ....................20

*Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9 (2d Cir. 2018) ...............................................................33

*Shull v. TBTF Prods.*, No. 20-3529, 2021 U.S. App. LEXIS 21220, at *7 (2d Cir. July 19, 2021).......................................................20

*Smith v. Casey*, 741 F.3d 1236 (11th Cir. 2014)....................................18

*Snall v. City of N.Y.*, No. 00-7375, 2000 U.S. App. LEXIS 33349, at *13 (2d Cir. Dec. 15, 2000).......................................................27

*Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020) ..................... passim

iv

**Statutes**

42 U.S.C. § 1983 ................................................................ passim

Conn. Gen. Stat. § 28-9 ................................................................ 8

Conn. Gen. Stat. §19a-131a ................................................................ 8

**Other Authorities**

*Emergency Meeting of the Rules Committee of the Superior Court
    pursuant to Section 1-9B of the CT Practice Book*, available at:
    https://jud.ct.gov/Committees/rules/meeting.htm ................................. 8

**Rules**

Connecticut Practice Book § 1-9B .................................................... 8, 28

Connecticut Practice Book § 2-53 .................................................. passim

Fed. R. Civ. P. 12(b)(6) ........................................................ 17, 19, 20

Fed. R. Civ. P. 15 ........................................................................ 14

Fed. R. Civ. P. 15(a)(2) ............................................................... 20

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment disposing of all parties' claims. Therefore, this Court has appellate jurisdiction under 28 U.S.C. § 1291. The District Court had federal question jurisdiction under 28 U.S.C. § 1331. The District Court entered judgment on March 29, 2022, and Plaintiff filed a timely notice of appeal on April 14, 2022.

## COUNTER STATEMENT OF THE ISSUES

1. Whether the District Court properly dismissed Plaintiff's claims for money damages under 42 U.S.C. § 1983 against a state Superior Court judge in his individual capacity, and properly denied Plaintiff's request to amend her complaint to add an additional judge as a defendant in his individual capacity on the ground that the requested amendment would have been futile, where Plaintiff failed to plausibly allege that either judge had any personal involvement in the alleged unconstitutional conduct that forms the basis for this lawsuit?

2. Whether the District Court's judgement should be affirmed on the alternative ground that Plaintiff's claims are barred by qualified immunity?

1

# COUNTER-STATEMENT OF THE CASE

## I.    INTRODUCTION

Attorney Josephine Smalls Miller ("Plaintiff") violated multiple rules of professional conduct and was suspended from the practice of law in the State of Connecticut for one year.   She filed an application for reinstatement following that period of suspension in December, 2019 that did not comply with the requirements.   Shortly thereafter, the COVID-19 pandemic hit, causing statewide court closures and widespread disruption to the provision of judicial services.   Approximately 21 months after Plaintiff filed her initial defective application, an initial hearing was held on her application for reinstatement, and Plaintiff was ultimately reinstated to the practice of law a few months thereafter.

Plaintiff alleges that the delay in the scheduling of her initial hearing was the product of an established policy or practice of discrimination and retaliation put in place by various judicial and disciplinary authorities.   But rather than suing the state actors that were actually involved in her reinstatement proceedings, Plaintiff brought this action for money damages under 42 U.S.C. § 1983 against Judge Patrick Carroll, III, Chief Court Administrator for the State of Connecticut

2

Judicial Branch ("Judge Carroll"), in his individual capacity.[1]  Plaintiff would later request to amend her pleading—a request the District Court denied on the ground that the proposed amendments would have been futile—to add as a defendant Judge David Sheridan, the Presiding/Administrative Judge of the Hartford Judicial District ("Judge Sheridan"), in his individual capacity.

Plaintiff did not allege any personal involvement by either Judge Carroll or Judge Sheridan in her reinstatement proceedings or in the conduct about which she complains.  Indeed, nearly all of Plaintiff's allegations of undue delay and misconduct are directed at other state actors who are not parties to this lawsuit, and the allegations that are directed at Judge Carroll or Judge Sheridan are either wholly conclusory and thus not entitled to the presumption of truth, or are irrelevant. Plaintiff's claims under § 1983 thus fail to state a claim and, moreover, are barred by qualified immunity.  The District Court properly dismissed Plaintiff's claims against Judge Carroll and properly rejected her attempt to add Judge Sheridan as a defendant.

---

[1] Plaintiff also sought declaratory and injunctive relief, but is not pursuing those claims in this appeal.

3

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The following facts and procedural background consist of the well-pled facts drawn from Plaintiff's Proposed Fourth Amended Complaint ("Proposed FAC"), *see* JA at 60-92,[2] and the matters about which the Court may take judicial notice, including the filings in Plaintiff's underlying disciplinary proceedings. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 397-98 (2d Cir. 2006). Although the District Court denied Plaintiff's request to file the Proposed FAC, for convenience and ease of discussion the District Court considered the facts alleged therein for purposes of its rulings on the legal sufficiency of Plaintiff's Third Amended Complaint and whether Plaintiff's request to file the Proposed FAC should be denied on futility grounds. JA at 209, 226. Judge Carroll takes that same approach for purposes of this brief.

### A.   Plaintiff's underlying disciplinary proceedings.

Plaintiff is African American. *Proposed FAC* (JA at 3), ¶ 4. She was admitted to the practice of law in the State of Connecticut in or

---

[2] Plaintiff filed what she titled a "Joint Appendix" without first consulting with Judge Carroll as to the contents of that appendix. *See* Fed. R. App. P. 30(b). References to the Joint Appendix are "JA at __." References to Judge Carroll's Supplemental Appendix are "SA at __."

around June, 2004. *Proposed FAC* (JA at 67), ¶ 35. On March 30, 2017,

the Connecticut Office of Chief Disciplinary Counsel ("OCDC") brought a

presentment action against Plaintiff for attorney misconduct. *See Office*

*of Chief Disciplinary Counsel v. Miller*, DBD-CV17-6022075-S (Conn.

Super. Ct.) ("*Presentment Action*"),[3] Entry Nos. 100.30 (presentment

complaint) and 108 (amended presentment complaint). On November 26,

2019, the Connecticut Superior Court found that Plaintiff violated

numerous rules of professional conduct and suspended her from the

practice of law in the State of Connecticut for one year.[4] *Presentment*

*Action*, Entry No. 131.05 at 38-39 (SA at 38-39); *Proposed FAC* (JA at

67), ¶ 36. The Superior Court ordered Plaintiff to comply with several

conditions prior to seeking reinstatement following her suspension

period, including (1) all requirements of Connecticut Practice Book § 2-

---

[3] Connecticut Superior Court case dockets may be accessed through the
Connecticut Judicial Branch website. The Presentment Action may be
accessed at:  Case Detail - DBD-CV17-6022075-S (ct.gov).

[4] In her post-hearing brief, Plaintiff accused various disciplinary
authorities involved in the proceedings of racial discrimination and
retaliation. *Presentment Action*, Entry No. 125. The Superior Court
found that those claims "were not properly before the court" but "would
fail even if they were properly before the court because [Plaintiff] failed
to meet her burden of proof in this regard." *Presentment Action*, Entry
No. 131.05 at 28.

5

53; and (2) that she agree to be mentored by a practicing attorney in good standing for a period of one year. *Presentment Action*, Entry No. 131.05 at 39-40 (SA at 39-40); *Proposed FAC* (JA at 68), ¶ 37. The Connecticut Supreme Court affirmed that decision on appeal. *Office of Chief Disciplinary Counsel v. Miller*, 335 Conn. 474 (2020).

## B. Connecticut rules governing attorney reinstatement.

Because this lawsuit centers around Plaintiff's efforts to be reinstated, an overview of the Connecticut rules governing attorney reinstatement—and the effect of the COVID-19 pandemic on those rules—informs the discussion of the issues in this appeal. Connecticut Practice Book § 2-53(a) provides that, unless otherwise ordered, attorneys who are suspended from the practice of law for one year or more must apply for reinstatement. Section 2-53(d) provides that, to be eligible to apply for reinstatement, attorneys must meet several requirements, including that "the applicant has passed the Multistate Professional Responsibility Examination (MPRE) not more than six months prior to the filing of the application . . . ." These requirements are prerequisites for seeking reinstatement and must be satisfied for the application to be

acted upon. *Disciplinary Counsel v. Hickey*, 328 Conn. 688, 700-701 (2018).

The application for reinstatement must be filed with the clerk of the Superior Court that issued the suspension order. Conn. Prac. Bk. § 2-53(e). The clerk then refers the application to the chief justice or his/her designee, who in turn refers the application to a standing committee. Conn. Prac. Bk. § 2-53(f). The clerk must also send notice of the application to various disciplinary authorities, including the OCDC and the Statewide Grievance Committee ("SGC"), and publish notice of the application in various forums. Conn. Prac. Bk. § 2-53(f).

Once the application is referred to the standing committee, the OCDC and the SGC have sixty days to file a report with the standing committee, which may include their recommendations on whether the applicant should be reinstated. Conn. Prac. Bk. § 2-53(h). The standing committee has 180 days from receiving the referral to investigate the application, hold hearings, and issue a report to the court with its recommendations as to whether the application should be granted, granted with conditions, or denied. Conn. Prac. Bk. § 2-53(i), (j), and (k). Upon receiving the report, the court must inform the chief justice or his

7

designee, who then designates two other judges of the Superior Court to sit with the presiding judge. Conn. Prac. Bk. § 2-53(l). A hearing is then conducted before the three-judge panel where the applicant, the SGC, the OCDC, and the standing committee have an opportunity to he heard. *Id.* The three-judge panel then determines whether to grant the application. *Id.*

On March 24, 2020, in response to the COVID-19 pandemic, the Superior Court Rules Committee ("Rules Committee") indefinitely suspended the sixty-day deadline for the SGC/OCDC report to the standing committee, and the 180-day deadline for the standing committee's report to the Superior Court. SA at 41, 43; JA at 213, *citing Emergency Meeting of the Rules Committee of the Superior Court pursuant to Section 1-9B of the CT Practice Book,* available at: https://jud.ct.gov/Committees/rules/meeting.htm. The Rules Committee suspended these deadlines pursuant to its authority under Connecticut Practice Book § 1-9B, which authorized the Rules Committee to exercise certain emergency powers following the Governor's March 20, 2020 declarations of public health and civil preparedness emergencies pursuant to Conn. Gen. Stat. §§ 19a-131a and 28-9. SA at 41.

C.    Plaintiff's application for reinstatement.

On December 30, 2019—after Plaintiff's one-year period of suspension ended—Plaintiff filed an application for reinstatement to the practice of law. *Presentment Action*, Entry No. 147 (SA at 54-56); JA at 68 ¶ 38. On her application, however, Plaintiff failed to provide proof that she had taken and passed the MPRE in the past six months, as required by Practice Book § 2-53(d). *Presentment Action*, Entry No. 147 at 1 (SA at 54). Plaintiff also failed to list the name or juris number of the person who was to serve as her mentor, as requested in the reinstatement application and as required by the Superior Court's suspension order. *Id* (SA at 55) As noted below, the record reflects that the reason Plaintiff failed provide this documentation was because she had not, in fact, taken the MPRE or identified an attorney mentor.

On January 31, 2020, the SGC filed a motion to dismiss Plaintiff's application for reinstatement, arguing that she was ineligible to apply for reinstatement because she failed to pass the MPRE. *Presentment Action*, Entry Nos. 152 and 153 at 4. On April 13, 2020, Plaintiff filed passing test results from an MPRE exam administered on March 12, 2020. *Id.*, Entry No. 158 (SA at 57-58). Because passing the MPRE was

9

a prerequisite under Practice Book § 2-53(d) for seeking reinstatement, the court could not take any action on Plaintiff's application until she filed her passing score on April 13. *See Disciplinary Counsel*, 328 Conn. at 700-701. By that time, the Rules Committee had already suspended the deadlines applicable to the SGC/OCDC and the standing committee's scheduling of attorney reinstatement proceedings. Three days after Plaintiff filed her passing test results, the SGC withdrew its motion to dismiss. *Id.*, Entry No. 159.

On October 30, 2020, Plaintiff wrote to the OCDC, the SGC, and her county standing committee—the Hartford County Standing Committee for Recommendations for Admission ("Hartford SCRA")—to inquire about the delay in scheduling an initial hearing with the Hartford SCRA on her application. *Proposed FAC* (JA at 69), ¶ 45. The SGC and Hartford SCRA responded to Plaintiff that her application for reinstatement had been delayed because of complications related to the pandemic. *Id.*, ¶¶ 46-48, 57-60. In one response, a representative of the Hartford SCRA advised Plaintiff that Judge Sheridan informed her that they were "not allowing matters to occur in person," that the hearing would need to be conducted virtually, and that "he would have to get

10

permission" to use the virtual hearing system because it was a "nonjudicial use" of the system. *Id.*, ¶¶ 59-60. Judge Sheridan provided this guidance in response to the Hartford SCRA representative's inquiry on scheduling Plaintiff's hearing. *Id.*

On November 10, 2020, the OCDC and SGC issued their report to the Hartford SCRA. *Proposed FAC* (JA at 68), ¶ 40. Thereafter, Plaintiff's application for reinstatement was transferred from the Hartford SCRA to another standing committee. *Presentment Action*, Entry No. 178 and 178.01. On May 11, 2021, the Deputy Chief Court Administrator notified Plaintiff via e-mail that her reinstatement action was transferred to the Middlesex SCRA. *Proposed FAC* (JA at 87), ¶ 141. Judge Carroll was copied on that e-mail. *Id.*

On August 12, 2021, counsel for the Middlesex SCRA filed a notice that the hearing on Plaintiff's application for reinstatement would take place on September 1, 2021. *Presentment Action*, Entry No. 185. Two days before that scheduled hearing, Plaintiff filed a letter from an attorney dated August 30, 2021, wherein the attorney agreed to serve as Plaintiff's mentor. *Id.*, Entry No. 188 (SA at 59-61). Following the hearing, on October 7, 2021, the Middlesex SCRA issued its report

11

recommending that Plaintiff's application for reinstatement be granted subject to conditions. *Id.*, Entry No. 196.

On March 30, 2022—two days after final judgment entered in this lawsuit—a three-judge panel of the Superior Court issued a decision adopting the Middlesex SCRA's recommendation and granting Plaintiff's application for reinstatement subject to conditions. *Id.*, Entry No. 221 at 12-13 (SA at 73-75). In that decision, the panel found that the delay in Plaintiff's reinstatement process "was caused by multiple reasons including unavoidable circumstances, i.e., [the] COVID-19 pandemic," as well as Plaintiff's own "failure . . . to fully comply" with the conditions and requirements for reinstatement. *Id.* (SA at 73-74). On May 9, 2022, the panel issued an order finding that Plaintiff had satisfied the conditions for reinstatement, and ordered her to be reinstated to the practice of law. *Id.*, Entry No. 230 (SA at 63-64).

During 2021, and prior to the initial hearing on Plaintiff's application for reinstatement, a *different* standing committee—the Fairfield SCRA—held an initial hearing on a Caucasian attorney's application. *Proposed FAC* (JA 70), ¶¶ 50-56, 61. The Fairfield SCRA also held initial hearings for three other attorneys. *Id.* (JA at 74), ¶p 74-

12

76. Further, during 2021, three-judge panels conducted final hearings in twenty-nine other attorneys' reinstatement proceedings, with five occurring in Fairfield, ten in New Haven, and fourteen in Hartford. *Id.* (JA 73), ¶¶ 66-69. Judge Sheridan was on the panel in all fourteen Hartford cases. *Id.*, ¶ 68. Therefore, Plaintiff does not allege that any SCRA other than the Fairfield SCRA held an initial hearing during the time her application was pending before the Hartford SCRA.

## III. PROCEDURAL HISTORY

Plaintiff filed this lawsuit against Judge Carroll in January, 2021, alleging claims under § 1983 for discrimination and retaliation and seeking, inter alia, compensatory damages against Judge Carroll in his individual capacity. Entry No. 1. Plaintiff thereafter filed a Second Amended Complaint ("SAC"). Entry No 17. The District Court granted Judge Carroll's motion to dismiss the SAC in its entirety. Entry. No. 26.

Plaintiff then filed a Third Amended Complaint ("TAC"). Entry No. 27. Judge Carroll again moved to dismiss the TAC, asserting that Plaintiff's individual capacity claims under § 1983 failed to state a claim and were barred by qualified immunity. JA at 18; Entry No. 30. Entry No. 27. While that motion was pending, Plaintiff filed a "motion to amend

13

complaint" under Fed. R. Civ. P. 15 along with a copy of the Proposed FAC, which sought to add new allegations against Judge Carroll and to add Judge Sheridan as a defendant. JA at 58. The Proposed FAC asserted four causes of action against Judge Carroll and Judge Sheridan, all under § 1983, for (1) race discrimination, (2) violations of procedural due process, (3) retaliation, and (4) selective enforcement. JA at 89-91. It sought money damages from them in their individual capacities. *Id.*, at 92. Judge Carroll objected to Plaintiff's request to file the Proposed FAC on grounds of futility, undue delay, dilatory motive and bad faith, and undue prejudice to Judge Carroll. JA at 184, 189.

The District Court issued a decision on March 28, 2022, dismissing Plaintiff's TAC with prejudice and denying Plaintiff's request to file the Proposed FAC on grounds that the proposed amendments were futile. JA at 209, 240. The District Court considered the allegations of the Proposed FAC for purposes of its decision because concluding that those allegations failed to state a claim would have provided a basis both for dismissing the TAC and denying Plaintiff's request to amend on grounds of futility. *Id.*, at 209, 226. The District Court concluded that the Proposed FAC failed to plausibly allege that Judge Carroll or Judge Sheridan were

14

personally involved in the conduct complained of.[5]  *Id.*, 237, 240.  The District Court did not address Judge Carroll's alternative arguments for why the request to amend should be denied.

This appeal followed.

## SUMMARY OF THE ARGUMENT

It is well settled that claims against government officials for money damages under § 1983 are subject to dismissal for failure to state a claim if the pleadings fail to allege a plausible claim that the official was personally involved in the unlawful conduct complained of.  Plaintiff alleges that various judicial and disciplinary authorities delayed in scheduling the initial hearing on her reinstatement application, and did so because of her race and in retaliation for engaging in protected speech.

---

[5] The District Court also dismissed Plaintiff's claims for declaratory and injunctive relief against Judge Carroll in his official capacity that effectively would have required him to have Plaintiff reinstated to the practice of law.  JA 227-28.  Plaintiff does not appear to challenge that ruling in this appeal.  In any event, any such challenge would now be moot because, on May 9, 2022—after final judgment entered—a panel of the Superior Court ordered Plaintiff to be reinstated to the practice of law.  *Presentment Action*, Entry No. 230 (SA at 63-64); *see Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) ("[t]he occurrence of the action sought to be enjoined normally moots the request for preliminary injunctive relief") (quotation marks omitted).

Although Plaintiff is pursuing these claims only against Judge Carroll—and seeks to also pursue them against Judge Sheridan, though he currently is not a party to this lawsuit—the factual allegations in Plaintiff's Proposed FAC focus almost exclusively on the conduct of the OCDC, the SGC, and the Hartford SCRA. Plaintiff hardly even attempts to allege that Judge Carroll or Judge Sheridan were personally involved in her reinstatement proceedings, much less that they personally did something to intentionally violate her constitutional rights. In fact, Plaintiff has failed to plausibly allege that any unlawful conduct occurred at all.

Of the relatively few factual allegations actually directed at Judge Carroll and Judge Sheridan, none of them plausibly establish their personal involvement in the conduct complained of. Many are wholly conclusory assertions that they established or maintained a "policy or practice" of discrimination, retaliation, and selective enforcement of the rules, without identifying what that policy is or providing any explanation of its substance or their purported roles in promulgating or maintaining it. This Court and the Supreme Court have repeatedly recognized that such conclusory allegations that unlawful policies exist

16

are not entitled to the presumption of truth in a Rule 12(b)(6) context. The few "well-pled" facts against Judge Carroll and Judge Sheridan are unrelated to the conduct complained of and thus have no bearing on personal involvement. Because Plaintiff has not alleged a plausible claim that Judge Carroll or Judge Sheridan personally violated her constitutional rights—or even that any unlawful conduct occurred at all—her individual capacity claims under § 1983 are all subject to dismissal.

Alternatively, Plaintiff's claims are all barred by qualified immunity. Given that Plaintiff fails to allege that Judge Carroll or Judge Sheridan had any material involvement in her case, Plaintiff has not identified in her Proposed FAC any action on their part that was objectively unreasonable. Nor can she identify a robust consensus of cases that have found "a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Beckles v. City of New York*, 492 App's 181, 182 (2d Cir. 2012) (quotation marks omitted).

The District Court therefore properly concluded that Plaintiff's Proposed FAC failed to state a claim. Based on that conclusion, the

17

District Court correctly dismissed Plaintiff's TAC and denied her request to file the Proposed FAC as futile. However, if this Court were to conclude that Plaintiff's Proposed FAC were sufficient to state a claim and were not barred by qualified immunity, it should remand the case to the District Court to determine—in its discretion—whether Plaintiff's request to file the Proposed FAC should be denied on the alternative grounds of undue delay, dilatory motive and bad faith, and undue prejudice, which the District Court did not address because it denied Plaintiff's request on futility grounds. *See Iqbal v. Ashcroft*, 574 F.3d 820, 822 (2d Cir. 2009); *see also Smith v. Casey*, 741 F.3d 1236, 1243 n.7 (11th Cir. 2014) (decisions reviewed only for abuse of discretion should be decided in first instance by district court). Judge Carroll maintains, as he did in the District Court, that Plaintiff's request to amend would have properly been denied on those alternative grounds. But because Plaintiff's Proposed FAC fails to state a claim, this Court should affirm the judgment.

18

## ARGUMENT

## I.   STANDARDS OF REVIEW

### A.   Motion to dismiss for failure to state a claim.

Dismissals under Rule 12(b)(6) are reviewed de novo.  *Dorsett v. County of Nassau*, 732 F.3d 157, 161 (2d Cir. 2013).  To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Not all allegations in a complaint are entitled to the presumption of truth.  *Id.*  Conclusory allegations that are no more than "legal conclusions" or "[t]hreadbare recitals of elements of a cause of action" are not entitled to the presumption of truth.  *Id.*  If after considering the well-pled factual allegations the court finds that the complaint does not raise a plausible claim for relief, the court should dismiss the case.  *Id.* at 679.  The plausibility standard is more than mere possibility of misconduct.  *Id.*

Plaintiff is self-represented in this case, but that does not entitle her to the liberal pleading applicable to pro se litigants because she is an attorney trained in the law who "litigated cases in state and federal court for many years prior to her suspension."  JA at 17, *citing Harbulak v.*

19

*County of Suffolk*, 654 F.2d 194, 198 (2d Cir. 1981); *see also Parent v. New York*, 485 Fed. Appx. 500, 502-503, *cert. denied*, 568 U.S. 1027 (2d Cir. 2012).

## B. Motions to amend pleadings

Although Rule 15(a)(2) provides that leave to amend ordinarily should be freely given, the rule immediately qualifies that instruction with the language "when justice so requires." Fed. R. Civ. Proc. 15(a)(2). It is well established that justice does not require permitting an amendment when there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party by virtue of allowance of the amendment . . . ." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Shull v. TBTF Prods.*, No. 20-3529, 2021 U.S. App. LEXIS 21220, at *7 (2d Cir. July 19, 2021). A denial of a request to amend on futility grounds is reviewed de novo. *Id.*

II. **THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFF'S § 1983 CLAIMS AS ALLEGED IN THE PROPOSED FAC WERE LEGALLY DEFICIENT, AND THEREFORE PROPERLY DISMISSED THE TAC AND DENIED PLAINTIFF'S REQUEST TO AMEND HER PLEADING.**

A. **The District Court properly concluded that Plaintiff's Proposed FAC failed to plausibly allege that Judge Carroll or Judge Sheridan were personally involved in the conduct complained of.**

All four counts of the Proposed FAC seek money damages against Judge Carroll and Judge Sheridan in their individual capacities under § 1983. JA at 89-91. To prevail on a such a claim, the plaintiff "must directly plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020), *citing Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "[V]icarious liability is inapplicable to . . . § 1983 suits . . . ." *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). Therefore, "[a]n individual may be liable under [§] 1983 only if that individual is personally involved in the alleged deprivation." *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (quotation marks omitted).

21

Prior to *Tangreti*, this Court had established a special test for supervisory liability under § 1983, whereby a supervisor's personal involvement may be established in one of five different ways, including by knowing about and failing to remedy unlawful acts, grossly negligent supervision, and deliberate indifference. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). In *Tangreti*, however, this Court clarified that the *Colon* test was no longer valid in light of the Supreme Court's decision in *Iqbal*, and that "there is no special rule for supervisory liability." *Tangreti*, 983 F.3d at 618. Instead, as with all other government defendants, a plaintiff "must plead and prove that [the supervisor], through [his or her] own individual actions, has violated the Constitution." *Id.* Although "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," *id.* (quotation marks omitted), "[t]he violation must be established against the supervisory official directly." *Id.*

Therefore, under *Tangreti* a plaintiff "can no longer succeed on a § 1983 claim" against a supervisor merely "by showing . . . that [the supervisor] behaved knowingly or with deliberate indifference that a

22

constitutional violation would occur at the hands of [their] subordinates, unless that is the same state of mind required for the constitutional deprivation [the plaintiff] alleges." *Id.*, 618 (quotation marks omitted). Instead, "the plaintiff must establish a deliberate, intentional act on the part of the [supervisor] to violate the plaintiff's legal rights." *Id.* (quotation marks omitted).

Plaintiff's Proposed FAC does not come close to meeting that standard. Plaintiff's general theory is that various judicial and disciplinary authorities delayed scheduling the initial hearing on her application for reinstatement because of her race and in retaliation for engaging in protected speech. There are no allegations, however, that Judge Carroll or Judge Sheridan personally were involved in or contributed to that alleged conduct. In fact, Plaintiff has not even plausibly alleged that any discriminatory or retaliatory conduct took place at all.

At the outset, nearly all of Plaintiff's factual allegations are not directed at Judge Sheridan or Judge Carroll. Instead, Plaintiff's allegations focus almost exclusively on the conduct of the disciplinary bodies who handled her reinstatement process, including the Hartford

23

SCRA, the OCDC, and the SGC. *Proposed FAC* (JA at 75), ¶¶ 84-89, 92-93, 114-16, 119. That is not surprising. The Connecticut Practice Book provisions governing attorney reinstatement make those bodies solely responsible for adjudicating reinstatement applications. The OCDC and SGC file a report with the standing committee—here the Hartford SCRA—and the standing committee further investigates, schedules and holds an initial hearing on that application, and ultimately generates a report with its recommendation as to whether the application should be granted. Conn. Prac. Bk. § 2-53(h) through (k).

Nothing in these rules suggest that Judge Carroll or Judge Sheridan, by virtue of their positions as Chief Court Administrator and Presiding/Administrative Judge in Hartford, have supervisory authority over those bodies or the right to interfere with or influence how they process reinstatement applications. And even if Judge Carroll or Judge Sheridan did have supervisory authority over such matters, that would be insufficient as a matter of law under *Tangreti* to establish personal liability under § 1983 for the alleged conduct of those disciplinary

24

authorities during Plaintiff's reinstatement proceedings.[6]  *E.g.*

*McCluskey v. Roberts*, No. 20-4018, 2022 U.S. App. LEXIS 15621, at *8

(2d Cir. June 7, 2022) (citing *Tangreti* for proposition that plaintiff "must

establish that [the defendant] violated his constitutional rights through

[defendant's] own conduct, not through [defendant's] supervision of

others who may have committed the violation").

The relatively few allegations that actually are directed at Judge

Carroll and Judge Sheridan fail to establish their personal involvement

---

[6] Plaintiff's brief is replete with mischaracterizations of the pleadings and facts alleged.  Plaintiff also states in a footnote that, in her complaint against the Judicial Branch filed in the Connecticut Commission on Human Rights and Opportunities ("CHRO"), the "CHRO found that the [J]udicial [B]ranch had engaged in a discriminatory practice in the delay of [Plaintiff's] reinstatement hearing."  *Pl. Br.*, p. 8 n.1.  This is untrue. The CHRO did not find that discrimination had taken place; a single CHRO investigator found, based on the Hartford SCRA filing a motion seeking advice from the Superior Court on how to proceed in light of a potential conflict of interest, that reasonable cause existed to support Plaintiff's claim.  This determination has no binding effect, the Judicial Branch maintains it was made without subject matter jurisdiction, and it is currently being reviewed de novo by the Office of Public Hearings. In any case, the CHRO proceedings against the Judicial Branch are irrelevant.  Plaintiff's claims here are against Judge Carroll (and also by request Judge Sheridan), not the Judicial Branch.  And although Plaintiff contends that Judge Carroll "is effectively the Judicial Branch," that is plainly untrue, not least because Plaintiff is suing him in his individual capacity.  Moreover, Plaintiff's allegations in the CHRO matter are not directed at Judge Carroll or Judge Sheridan.

in any of the alleged discriminatory or retaliatory conduct. Many of them are conclusory and thus not entitled to the presumption of truth. For example, Plaintiff alleges that Judge Carroll and Judge Sheridan are the "ultimate policy maker[s]" for disciplinary proceedings, and that they have "established and maintained a policy and practice" of denying due process rights to attorneys seeking reinstatement, of applying the disciplinary rules in a selective and racially discriminatory manner, and of retaliating against attorneys for engaging in protected speech. *Proposed FAC* (JA 66), ¶¶ 28-34, 79, 82-83, 107, 147-48. Plaintiff alleges no facts to support these conclusory assertions. She has not identified what "policy" or "practice" Judge Carroll and Judge Sheridan purportedly established, when or how they established it, how they communicate or otherwise perpetuate or enforce it, whether or how someone actually applied the policy in Plaintiff's reinstatement proceedings, or whether or how the policy actually is unconstitutional.

These unsupported allegations are materially identical to the ones Supreme Court concluded were "conclusory and not entitled to be assumed true" in *Iqbal*. 556 U.S. at 680-81 (allegations that certain officials were "principal architect[s]" of or "instrumental" in adopting and

26

executing unlawful detention policies, and "knew of, condoned, and willfully and maliciously agreed to subject" plaintiff to those policies, were deemed conclusory). And this Court has similarly held that unsupported allegations that an unlawful policy or practice exists are insufficient to state a claim under § 1983. *Snall v. City of N.Y.*, No. 00-7375, 2000 U.S. App. LEXIS 33349, at *13 (2d Cir. Dec. 15, 2000); *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993). This Court should therefore disregard these conclusory allegations that Judge Carroll and Judge Sheridan are "ultimate policy maker[s]" and have created/maintained unlawful policies of discrimination and retaliation when assessing the sufficiency of Plaintiff's claims.

Plaintiff also alleges that Judge Carroll and Judge Sheridan "suspended the timeframes in Practice Book [§] 2-53" for the scheduling of initial hearings on reinstatement applications as to her but not as to a purported Caucasian comparator. *Proposed FAC* (JA 81), ¶ 109. Again, however, Plaintiff fails to support this allegation with any factual content. Plaintiff does not allege, for instance, that Judge Carroll or Judge Sheridan were involved in the scheduling of the hearing for this alleged Caucasian attorney. Moreover, it was the Rules Committee

27

acting pursuant to its emergency authority under Connecticut Practice Book § 1-9B—not Judge Carroll or Judge Sheridan—that suspended the deadlines. SA at 41. Neither Judge Carroll nor Judge Sheridan has authority to unilaterally suspend Connecticut Practice Book deadlines.

Plaintiff's only other allegations against Judge Carroll and Judge Sheridan that are related to her reinstatement proceedings likewise add nothing to the picture. Plaintiff alleges that Judge Carroll was "copied" on an e-mail sent by the Deputy Chief Court Administrator in May, 2021, notifying Plaintiff that her reinstatement action was transferred to the Middlesex SCRA. *Proposed FAC* (JA at 87), ¶ 141. As against Judge Sheridan, Plaintiff alleges that when she inquired about the delay in scheduling her initial hearing, a representative of the Hartford SCRA responded that she had been informed by Judge Sheridan on November 10, 2020, that they were "not allowing matters to occur in person," and that "he would have to get permission" to conduct the hearing virtually because it was a "nonjudicial use" of the system. *Proposed FAC* (JA 71), ¶¶ 59-60.

These allegations have no bearing. That Judge Carroll was copied on an e-mail does not show that he took any action at all, much less that

28

he personally contributed to any of the violations about which Plaintiff complains. Nor does Judge Sheridan's alleged statement that he needed permission to schedule Plaintiff's hearing because it was a nonjudicial use even arguably suggest that he personally engaged in any discrimination or retaliation. For example, Plaintiff does not allege facts to demonstrate that such permission was not actually required under Judicial Branch policies and procedures; that such permission was not also required for the other attorneys whom Plaintiff identifies as purported comparators; whether such permission ultimately was obtained in Plaintiff's case or when; if it was not obtained, whether Judge Sheridan (or Judge Carroll) had any personal involvement in or control over that decision;[7] or whether any purported failure to obtain

---

[7] That Judge Sheridan had to get permission from somebody else suggests that he did *not* have control over the decision whether to authorize the hearing. In fact, Plaintiff's own allegations admit that any delay in obtaining that permission had nothing to do with Judge Sheridan. Plaintiff alleges that, in a subsequent communication on or around November 18, 2020, the Hartford SCRA informed Plaintiff that her request for a hearing "has been forwarded to the appropriate department which funds such requests," and that "[t]he funding department has not yet approved our request." *Proposed FAC*, (JA at 71), ¶ 57(3).

permission was the actual cause of any delay in scheduling Plaintiff's hearing.

Moreover, to the extent Plaintiff is arguing that these allegations support the inference that Judge Carroll and Judge Sheridan knew about and failed to remedy the alleged unlawful delay in the scheduling of her initial hearing, her argument fails. These allegations do not plausibly support an inference of actual knowledge, and even if they did, knowledge and acquiescence to unlawful conduct is insufficient as a matter of law to establish personal involvement under § 1983. *Tangreti*, 983 F.3d at 618 (claims that supervisor "behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates" are insufficient to establish personal involvement).

Plaintiff's remaining allegations against Judge Carroll and Judge Sheridan are irrelevant. For instance, she makes allegations as to: (1) Judge Carroll's involvement in creating a "strategic plan" for the Judicial Branch's "Public Service and Trust Commission," ("PSTC") which Plaintiff describes as an effort by the Judicial Branch to improve collaboration with other state entities and the public, *id.* (JA at 83), ¶¶ 120-30; and (2) his service on the Judicial Media Committee ("JMC"),

30

which connects judges and journalists to engage in analyses of issues.

*Id.*, ¶¶ 131-33. Plaintiff does not allege a single fact to plausibly

demonstrate that either the PSTC or the JMC have anything at all to do

with Plaintiff's application for reinstatement, much less that Judge

Carroll's personal actions related to those projects in any way caused or

contributed to the constitutional violations about which Plaintiff

complains.

Finally, Plaintiff alleges that (1) Judge Carroll and Judge Sheridan

"are well aware of the discriminatory and retaliatory impact of their

policies, having been placed on notice" by Plaintiff's "factual statements

in multiple legal pleadings" in other lawsuits, *id.* (JA 80), ¶ 107, and (2)

a subcommittee of the JMC reported survey results about some judges

being upset with criticisms of the judicial branch, and that "[n]umerous

articles have appeared in the Connecticut Law Tribune regarding

Plaintiff's criticisms of the judicial branch" including judges and

disciplinary authorities. *Id.* (JA at 85), ¶¶ 131, 133.

Once again, these allegations are irrelevant. To the extent Plaintiff

contends that these facts show that Judge Carroll knew about the

purported violations Plaintiff alleges and failed to remedy them, *Pl. Br.*,

31

at 21, mere knowledge of and failure to correct unconstitutional behavior is insufficient under *Tangreti* to impose personal liability under § 1983. *See Tangreti*, 983 F.3d at 618. In any event, these allegations do not plausibly allege that Judge Carroll or Judge Sheridan actually were put on notice of the conduct complained of. There are countless lawsuits filed and media reports issued every year. Just because they are publicly available does not mean everyone is aware of them. Plaintiff alleges no facts suggesting that Judge Carroll or Judge Sheridan knew about the lawsuits or media reports Plaintiff references. And even if they did know about them, that would not mean they were on notice that unlawful conduct actually was taking place. Allegations made in a lawsuit or in a media report are not verifiable fact. These allegations therefore fail to plausibly establish that Judge Carroll or Judge Sheridan were even aware of the conduct of which Plaintiff's complains, much less that they were personally involved in that conduct.

Plaintiff's brief on appeal focuses largely on the adequacy of the material comparators alleged in the Proposed FAC. *Pl. Br.*, 15-16, 22-23, 26-30. These arguments are beside the point. Even if the alleged comparators were sufficient to raise an inference that Plaintiff was

discriminated or retaliated against during her reinstatement proceedings, Plaintiff has still failed to plausibly allege that Judge Carroll or Judge Sheridan were personally involved in that discrimination or retaliation.

Moreover, the purported comparators fail to raise an inference of discrimination or retaliation because Plaintiff has failed to "show that the comparators were 'similarly situated in all material respects.'" *Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 13 (2d Cir. 2018), *quoting Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). To the contrary, the Caucasian comparator who obtained an initial hearing before the Fairfield SCRA, *Proposed FAC* (JA 70), ¶¶ 50-56, 61, is not similarly situated because neither Judge Carroll nor Judge Sheridan were involved in scheduling his initial hearing. Moreover, his hearing was before a different standing committee. *C.f. Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir 1997) (holding in employment discrimination case that comparators were not similarly situated in part because they had different supervisors). The three other purported comparators who received initial hearings before the Fairfield SCRA, *id.* (JA at 74), ¶p 74-76, are not similarly situated to Plaintiff for

33

the same reasons. As to the twenty-nine other attorneys who allegedly obtained hearings before a final three-judge panel, *id.*, (JA 73), ¶¶ 66-69, those cases involved a different step in the reinstatement process and Plaintiff has not alleged in this lawsuit that her final panel hearing was unduly delayed.[8]

Accordingly, the Proposed FAC failed to allege any facts to plausibly establish Judge Carroll's or Judge Sheridan's personal involvement in the conduct complained of. The District Court's judgment should be affirmed on this basis alone.

**B.     Alternatively, Plaintiff's claims are all barred by qualified immunity.**

Although the District Court did not reach qualified immunity, this Court should affirm the judgment on this alternative ground even if the Proposed FAC alleged sufficient facts to state a claim. *See Allco Fin. Ltd.*

---

[8] Plaintiff is also materially distinct from all of these purported comparators because much of the delay in Plaintiff's reinstatement—as the Superior Court subsequently found—was due to her own failure to comply with the conditions for reinstatement, including her failure to submit passing MPRE results and her failure to designate an attorney-mentor until more than twenty months after filing her application for reinstatement.

*v. Klee,* 805 F.3d 89, 93 (2d Cir. 2015) ("[w]e are entitled to affirm the judgment on any basis that is supported by the record.").

It is well established that qualified immunity protects government officials from liability for their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). There is a high presumption "in favor of finding qualified immunity to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), *quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The inquiry for resolving whether a government official is entitled to qualified immunity is three-fold. "First, a court must decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted). Third, the Court

35

must decide whether "it was objectively reasonable [for the defendants] to believe that their acts did not violate these clearly established rights" under the circumstances present at the scene. *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010). Courts need not conduct these three inquiries in order, and should instead dismiss the claims if any of the three prongs favors the official. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011).

### 1. Plaintiff has not alleged that Judge Carroll or Judge Sheridan violated any "clearly established" rights.

Whether a right is "clearly established" for purposes of qualified immunity cannot be determined at abstract levels of generality. *Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2084 (2011). Rather, the specific contours of the right must be established by a "robust consensus" of existing precedents whose facts are not "materially different" from "the particular circumstances that [the defendants] faced." *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (2014); *see Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *Brosseau v. Haugen,* 543 U.S. 194, 198-99 (2004). The Court must therefore "ask whether various courts have agreed that certain conduct is a constitutional violation *under facts not distinguishable in a fair way*

36

*from the facts presented in the case at hand.*" *Beckles* v. *City of New York,* 492 F. App'x 181, 182 (2d Cir. 2012) (emphasis added; quotation marks omitted).

Here, Plaintiff's claims arose in the extraordinary and never-before-seen context of a global pandemic that resulted in the closure and reduction of many judicial services. In that unique context, Miller alleged that state actors *other than* Judge Carroll and Judge Sheridan improperly delayed resolution of her application for reinstatement. As discussed above, the Proposed FAC does not contain a single allegation that Judge Carroll and Judge Sheridan had any personal involvement in that delay, that they knew about the delay and failed to remedy it, or that they negligently exercised supervisory authority over the officials involved in Plaintiff's reinstatement process. There is not a single case that suggests the alleged delay about which Plaintiff complains—or the reasons for it—is itself unconstitutional, much less that Judge Carroll or Judge Sheridan can be held personally liable for any such violations if they occurred despite their lack of personal involvement in them. And there certainly is not a robust consensus of cases establishing such liability under facts not materially different from those alleged here.

37

Judge Carroll and Judge Sheridan are therefore entitled to qualified immunity for any individual capacity claim against him.

### 2. Plaintiff has not alleged any objectively unreasonably acts or omissions by Judge Carroll or Judge Sheridan.

"[E]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir. 1995), quoting *Anderson*, 483 U.S. at 641. Under this prong of the analysis courts "are not concerned with the correctness of the defendants' conduct, but rather with the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Id.* at 421. A court may find an officer's actions to be objectively unreasonable only if "*no officer of reasonable competence* could have made the same choice in similar circumstances." *Id.* at 420-21 (emphasis added).

Here, Plaintiff plainly has not alleged any objectively unreasonable acts or omissions by Judge Carroll and Judge Sheridan. In fact, she has

not alleged any personal involvement by Judge Carroll and Judge Sheridan at all. Other than conclusory allegations that are not entitled to the presumption of truth, virtually all of Plaintiff's factual allegations focus on purported conduct of *other* state actors involved in her reinstatement proceedings. Again, there is no suggestion that Judge Carroll or Judge Sheridan even personally knew about the details of or any delays in Plaintiff's reinstatement proceeding—though such knowledge alone would be insufficient under *Tangreti* to establish liability—much less that they personally took any actions related to it that were objectively unreasonable.

Plaintiff's conclusory and unexplained assertions that Judge Carroll and Judge Sheridan "established and maintained a policy and practice" of violating attorneys' constitutional rights through the attorney discipline process do not change that conclusion. As set forth above, these conclusory assertions are not entitled to the presumption of truth. Plaintiff alleges no actual facts regarding these supposed policies or practices or why it was objectively unreasonable for Judge Carroll and Judge Sheridan to have established them or permitted them to continue. That is because no such policy or practice actually exists.

In reality, Plaintiff's complaint is not with any policy or practice that Judge Carroll and Judge Sheridan established, but rather with the specific actions of other state actors in the context of Plaintiff's individual reinstatement proceeding. There is not a single allegation in the Proposed FAC to suggest that Judge Carroll or Judge Sheridan personally took any action with regard to Plaintiff's application that could be characterized as objectively unreasonable under the circumstances, and Judge Carroll and Judge Sheridan are entitled to qualified immunity on that additional basis.

## CONCLUSION

The judgment of the District Court should be affirmed.

40

Respectfully Submitted,

Judge Patrick Carroll, III

By:    /s/ *Timothy J. Holzman*
       Timothy J. Holzman
       Benjamin A. Abrams
       Assistant Attorneys General
       165 Capitol Avenue
       Hartford, CT 06106
       Tel: (860) 808-5020
       Fax: (860) 808-5347
       Email: Timothy.Holzman@ct.gov
       Email: Benjamin.Abrams@ct.gov

## <u>CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

I hereby certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by Second Circuit Local Rule 32.1(a)(4), in that this brief contains 7,889 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century font.

/s/*Timothy J. Holzman*
Timothy J. Holzman
Assistant Attorney General

Dated: October 20, 2022

## **CERTIFICATION OF SERVICE**

I hereby certify that on this 20th day of October, 2022, I caused the foregoing brief with attached supplemental appendix to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/Timothy J. Holzman*
Timothy Holzman
Assistant Attorney General

43

# 22-823

### IN THE
# United States Court of Appeals
### FOR THE SECOND CIRCUIT

---

### JOSEPHINE MILLER,
*Plaintiff-Appellant,*

### v.

### PATRICK CARROLL, III, HONORABLE, OFFICIAL AND INDIVIDUAL CAPACITIES,
*Defendant-Appellee*

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

---

### SUPPLEMENTAL APPENDIX

---

**WILLIAM TONG**
**ATTORNEY GENERAL**

**Timothy J. Holzman**
**Benjamin A. Abrams**
**Assistant Attorneys General**
**165 Capitol Avenue**
**Hartford, CT 06106**
**Tel. 860-808-5020**
**Fax 860-808-5347**
**Email: timothy.holzman@ct.gov**

SUPPLEMENTAL APPENDIX
TABLE OF CONTENTS

Connecticut Superior Court, Shaban, J., Memorandum of Decision dated November 26, 2018……………………………………………… SA001

Superior Court Rules Committee Notice Suspending Deadlines…. SA041

Excerpts from Plaintiff's Application for Reinstatement …………..SA054

Plaintiff's MPRE Results …………………………………………..... SA057

Letter from Attorney Cynthia R. Jennings dated August 30, 2021, regarding mentorship……………………………………….......SA059

Superior Court panel Memorandum of Decision dated March 30, 2022 …………………………………….......................................................... SA062

Connecticut Superior Court Order dated May 9, 2022 ……………. SA076

OFFICE OF THE CLERK
SUPERIOR COURT & GAD

DOCKET NO.: DBD CV17-6022075-S   2018 NOV 26  PM 3: 26 SUPERIOR COURT

OFFICE OF CHIEF DISCIPLINARY COUNSEL JUDICIAL DISTRICT   JUDICIAL DISTRICT
                                     DANBURY
V.                          STATE OF CONNECTICUT      OF DANBURY

JOSEPHINE SMALLS MILLER                              NOVEMBER 26, 2018

## MEMORANDUM OF DECISION

### I

### PROCEDURAL HISTORY

In this action, the Office of the Chief Disciplinary Counsel (petitioner) has filed an
amended four count presentment against attorney Josephine Smalls Miller (respondent) alleging
misconduct (#108).  Count one alleges violations of the Rules of Professional Conduct 1.15 (a)
(5) (safekeeping property), 1.15 (c)[1] (safekeeping property) and 8.1 (2) (bar admission and
disciplinary matters).  Count two alleges violations of rules 1.3 (diligence), 3.2 (expediting
litigation), and 8.4 (4) (misconduct). Count three alleges violations of rules 1.4 (a) (1) (2) (3) (4)
(5) and 1.4 (b) (communications). Count four alleges that with respect to General Statutes § 51-
88 and Practice Book § 2-44A, the respondent violated rule 5.5 when she engaged in the
unauthorized practice of law by providing legal advice and drafting legal documents for a client
relative to an Appellate Court matter while under an order of suspension by that court.

The respondent filed an answer and raised two "affirmative defenses" (#109) which claim
that the recommendations of the petitioner and the decisions of the Statewide Grievance
Committee (SGC) were based on racially discriminatory and retaliatory reasons, both in
violation of the respondent's constitutional rights.

---

[1] In paragraph 7 (b) of its complaint, the petitioner refers to a violation of "Rule 1.15c" although there is no such
section in the Rules of Professional Conduct.  However, during the presentment hearing and in its post-trial brief the
reference was made to rule 1.15 (c) which is substantively the section that was referred to and addressed by the
parties.  As such, it is clear the reference in the complaint is a scrivener's error and will be treated as such by the
court.

11/26/18 - JDNO sent re: notice of memo of decision (USC
131.05
11-26-18

SA001

The court held a hearing on the matter on June 25, 26 and 27, 2018, at which time the parties were heard and provided testimony and evidence. The parties stipulated to all of the petitioner's exhibits as being full exhibits. Following the hearing, the parties submitted post-trial briefs the last of which was filed on August 27, 2018. On July 30, 2018, subsequent to the completion of the hearing, the respondent filed a "motion to conform pleadings to the proofs" (#123) which was in reality, by virtue of its text, a request to amend her affirmative defenses. The court has read the pleading liberally pursuant to Practice Book § 1-8. Given that the petitioner filed no objection to it, the court considers the amendment to have become effective pursuant to Practice Book § 10-60 (a) (3).

II

STATEMENT OF LAW

The court has jurisdiction to hear such matters based on its inherent authority to discipline counsel, as well as pursuant to the provisions of Practice Book § 2-45. "It is fundamental that [t]he Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar." (Internal quotation marks omitted.) *O'Brien* v. *Superior Court*, 105 Conn. App. 774, 783, 939 A.2d 1223, cert. denied, 287 Conn. 901, 947 A.2d 342 (2008). As to the standard of proof "in a matter involving attorney discipline, no sanction may be imposed unless a violation of the Rules of Professional Conduct has been established by clear and convincing evidence." *State* v. *Perez*, 276 Conn. 285, 307, 885 A.2d 178 (2005).

There are statutory provisions and rules of practice applicable to reviewing claims of attorney misconduct. General Statutes § 51-80 provides in relevant part: "The Superior Court may admit and cause to be sworn as attorneys such persons as are qualified therefor, in accordance with the rules established by the judges of the Superior Court. . . ." General Statutes

2

SA002

§ 51-84 (a) provides in relevant part: "Attorneys admitted by the Superior Court . . . shall be subject to the rules and orders of the courts before which they act." Practice Book § 2-47 (a) provides in relevant part: "Presentment of attorneys for misconduct . . . shall be made by written complaint of the statewide disciplinary counsel."

Attorney "[d]isciplinary proceedings are for the purpose of preserving the courts from the official ministration of persons unfit to practice in them." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Rozbicki*, 211 Conn. 232, 238, 558 A.2d 986 (1989), aff'd, 219 Conn. 473, 595 A.2d 819 (1991), cert. denied, 502 U.S. 1094, 112 S. Ct. 1170, 117 L. Ed. 2d 416 (1992); *Ex parte Wall*, 107 U.S. 265, 288, 2 S. Ct. 569, 27 L. Ed. 552 (1883); *Chief Disciplinary Counsel* v. *Rozbicki*, 150 Conn. App. 472, 478, 91 A.3d 932, cert. denied, 314 Conn. 931, 102 A.3d 83 (2014). An attorney "as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited." *In re Peck*, 88 Conn. 447, 450, 91 A.2d 274 (1914). Therefore, "[i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Botwick*, 226 Conn. 299, 307, 627 A.2d 901 (1993). An attorney "is an officer of the court . . . . Disciplinary

3

proceedings not only concern the rights of the lawyer and the client, but also the rights of the public and the rights of the judiciary to ensure that lawyers uphold their unique position as officers . . . of the court. . . . An attorney must conduct himself or herself in a manner that comports with the proper functioning of the judicial system." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 232, 890 A.2d 509, cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006); Rules of Professional Conduct, preamble.

"[A] hearing such as this is not the trial of a criminal or civil action or suit, but an investigation by the court into the conduct of one of its own officers, and that, therefore, while the complaint should be sufficiently informing to advise the . . . attorney of the charges made against [her], it is not required that it be marked by the same precision of statement, or conformity to the recognized formalities or technicalities of pleadings, as are expected in complaints in civil or criminal actions." (Internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 20-21, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004).

### III

In that the counts against the respondent involve allegations of violations of different sections of the Rules of Professional Conduct, and some have facts separate and apart from other counts, the court will address each count individually and set forth the facts it finds relevant to each specific count.

### A

*Count One – Grievance Complaint #15-0652*

As to count one, the petitioner alleges violations of rules 1.15 (a) (5) (safekeeping property), 1.15 (c) (safekeeping property) and 8.1 (2) (bar admission and disciplinary matters) of

4

the Rules of Professional Conduct. The respondent, juris number 422896, has been an attorney since 1980 and was admitted to practice law in Connecticut on June 14, 2004. [Tr. 2 57:3-12, Miller].[2] She has practiced as a solo practitioner during her career in Connecticut. [Tr. 2 57:22, Miller; Respondent's Ex. K].[3] During the relevant time of the grievance complaint, she maintained an IOLTA account at Webster Bank. [Tr. 2 58:3, Miller]. She did not maintain a separate business account. [Tr. 2 58:7, Miller]. She did maintain a personal checking account. [Tr. 2 58:8-10, Miller].

During her time as an attorney in Connecticut and while attending her church of choice, the respondent met and became friends with a woman by the name of Sharon Israel I Am, whom she described as her "church sister." [Tr. 2 58:14-25, Miller]. They remained friends until approximately 2006 or 2007, when Ms. I Am moved out of state. In May, 2013, after having little or no contact between them in the intervening years, the respondent was contacted by Ms. I Am. [Tr. 2 59:7-10, Miller]. Pleased to have heard from her friend, the respondent agreed that the two should meet and they did so. During this meeting at the respondent's office, Ms. I Am told the respondent that she had come into a large sum of money and wanted some advice on how best to handle it. [Tr. 2 59:14-19, Miller]. The respondent gave her advice in this respect and Ms. I Am offered her $5,000 for the consultation which the respondent at first declined, but later accepted at Ms. I Am's insistence. [Tr. 2 60:7-17, Miller].

After the passage of a couple of weeks, Ms. I Am again contacted the respondent saying she wanted to renew their friendship and asked that they meet at a local hotel, which they did.

---

[2] "Tr. 1" refers to the June 25, 2018 morning transcript; "Miller" refers to the witness.
"Tr. 2" refers to the June 25, 2018 afternoon transcript.
"Tr. 3" refers to the June 26, 2018 transcript.
"Tr. 4" refers to the June 27, 2018 transcript.

[3] Conflicting with her testimony, her resume states she was admitted in Connecticut in 2002.

5

This was followed by several social visits. At a visit on or about May 27, 2013, Ms. I Am told the respondent that she wanted to "bless" her by giving her a gift of $200,000 and gave her a check dated May 27, 2013 payable to her in that amount. [Tr. 2 62:10-23, Miller; Petitioner's Ex. 5]. Ms. I Am placed no conditions or restrictions on the respondent's usage of the gift. [Tr. 2 63:13-15, Miller]. Although the funds were not related to any specific professional work done by the respondent for Ms. I Am, the respondent wrote her own name onto the check and deposited the funds into her IOLTA account on May 28, 2013. [Tr. 2 65:12-18, Miller; Petitioner's Ex. 5]. The respondent indicated her reason for placing the funds into the IOLTA account was that Ms. I Am was an "odd person." In doing so, the respondent co-mingled the gift funds with $14,587.59 of her clients' funds held in the IOLTA account.

Having received this unsolicited gift, the respondent decided to use ten percent (10%) of the funds to make a donation to her church, Community Temple. She testified "that any money that comes into my hands, I, as a matter of religious belief, pay a tithe on it." [Tr. 2 67:3-7, Miller]. On June 7, 2013, the respondent wrote check #1145 from her IOLTA account made payable to Josephine S. Miller in the amount of $10,000. [Tr. 2 66:23-25, Miller; Petitioner's Ex. 5]. The back of the check was endorsed to the order of Community Temple. On July 21, 2013, the respondent wrote a second check from her IOLTA account, #1118, made payable to Josephine S. Miller in the amount of $10,000, which was also endorsed to the order of Community Temple. [Tr. 2 67:16-20, Miller; Petitioner's Ex. 5]. Ms. I Am did not instruct nor require the respondent to make any donation to her church at the time she made the gift to the respondent. [Tr. 2 67:24-68:1, Miller].

In August, 2013, approximately three months after respondent's receipt of the gift, Ms. I Am contacted the respondent. In her conversation with the respondent, Ms. I Am asked her to

6

quit the practice of law as she felt it was inconsistent with their religious beliefs. When the respondent declined, Ms. I Am requested the return of the $200,000 gift. [Tr. 2 68:9-69:2, Miller]. The respondent explained that she had made the donations to the church but that she would return the remaining $180,000 which she still held. On August 12, 2013, the respondent wrote a third check from her IOLTA account, #1134, made payable to Sharon Israel I Am in the amount of $180,000. [Petitioner's Ex. 5].

Following a complaint, a grievance was initiated against the respondent by the Danbury Judicial District Grievance Panel. Thereafter, the Grievance Panel for the Judicial District of Stamford/Norwalk notified the respondent by letter dated March 22, 2016, that on January 27, 2016, it had determined there was probable cause to believe that she was guilty of misconduct. [Petitioner's Exs. 7, 10]. At the presentment hearing, the respondent acknowledged the finding of probable cause. The letter issued by the panel advised the respondent that she had violated rules 1.15 (a) (4) and (5) of the Rules of Professional Conduct in that the gift funds provided by Ms. I Am were improperly deposited into the respondent's IOLTA account.[4] Id. On March 30, 2016, the petitioner sent a letter to the respondent which requested that she provide eight listed items so that the petitioner could conduct an audit of the IOLTA account. [Petitioner's Ex. 6]. The requested information, pursuant to rule 8.1 of the Rules of Professional Conduct, was to be provided within fourteen days and noted that "[y]our failure to comply with this demand will be considered professional misconduct and expose you to further disciplinary action." [Id].

On June 9, 2016, a reviewing committee of the Statewide Grievance Committee (SGC) conducted a hearing on complaint #15-0652 and issued a decision on November 18, 2016, finding clear and convincing evidence that the respondent knowingly failed to respond to the

---

[4] The presentment to this court did not encompass rule 1.15 (a) (4) and therefore the court need not address it.

7

lawful demand for information from the disciplinary authority, noting that as of the date of that hearing, no documents had been submitted by the respondent. [Petitioner's Ex. 13].

At the presentment hearing before this court, the respondent submitted Respondent's Exhibit O, which included an e-mail dated June 22, 2016 from the petitioner acknowledging receipt of some of the documents originally requested on March 30, 2016. It also again asked for the IOLTA statements from the bank supporting the documents the respondent had belatedly forwarded. In her testimony, the respondent admitted that she did not timely or fully comply with the initial request. [Tr. 4 53:14-24, Miller]. She acknowledged that her reply was delivered not only eighty-four (84) days after the original request, but also after the reviewing committee had completed its hearing. [Tr. 4 53:4-10, Miller].

As to rule 1.15 (a) (5) of the Rules of Professional Conduct, the rule reads in relevant part: "An IOLTA account shall include only client or third person funds, . . ." Third person funds held by an attorney may only be placed in an IOLTA account in connection with the representation of a client.[5] The court finds by clear and convincing evidence that the respondent has violated rule 1.15 (a) (5). The $200,000 given to the respondent by Ms. I Am was an unconditional gift that was accepted by the respondent and became her personal property. She deposited those funds into her IOLTA account and exercised possession and control over them, evidenced by her issuing two separate $10,000 checks out of the account as donations to her church on June 7, 2013 and July 21, 2013. [Petitioner's Ex. 5]. The respondent characterized the transaction as an honest one that had no nefarious motive. In fact, the court finds that the respondent had no intent through this deposit to deceive anyone or deprive anyone of funds that otherwise rightfully belonged to them. However, the fact that the respondent returned the balance of the funds to

---

[5] Rule 1.15 (b) provides in relevant part: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property."

8

the donor some several months later does not excuse her violation. At the time of the deposit, the funds did not belong to a client of the respondent and had no connection to the representation of a client. Rules of Professional Conduct 1.15 (b).

As to rule 1.15 (c), it provides: "A lawyer may deposit the lawyer's own funds in a client trust account for the sole purposes of paying bank service charges on that account or obtaining a waiver of fees and service charges on the account, but only in an amount necessary for those purposes." Given the facts found by the court as recited above, there is clear and convincing evidence the respondent has violated rule 1.15 (c) of the Rules of Professional Conduct. There was no evidence that the funds deposited were to pay bank service charges. Further, the amount deposited could not reasonably be thought to be for the purpose of covering such charges as they were tremendously in excess of any amount necessary to do so.

As to rule 8.1 (2), it provides in relevant part that a lawyer in connection with a disciplinary matter shall not "knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . . ." The commentary to rule 8.1 provides that "it is a separate professional offense for a lawyer to knowingly make a misrepresentation or omission in connection with a disciplinary investigation of the lawyer's own conduct." From the facts recited above, the court finds by clear and convincing evidence that the respondent has violated rule 8.1 (2) of the Rules of Professional Conduct, in that after being advised of a probable cause finding against her, she failed to timely or completely respond to the disciplinary authority's lawful demand for information.

9

SA009

B

*Count Two - Grievance Complaint #15-0688*

As to count two, the petitioner alleges violations of rules 1.3 (diligence), 3.2 (expediting litigation) and 8.4 (4) (misconduct) of the Rules of Professional Conduct. The basis of the alleged violation stems from the respondent's conduct in several matters that were filed in the Superior Court. The facts as to each case will be set out separately and then the alleged violations shall be addressed on the basis of the respondent's actions in each case individually as well as collectively.

*Ronald Stone v. Bridgeport Board of Education*

In the matter of *Ronald Stone* v. *Bridgeport Board of Education,* judicial district of Fairfield, Docket No. FBT-CV13-6032345-S, the respondent represented the plaintiff in a complaint alleging "adverse employment action because of the plaintiff's race and in retaliation for his having raised a complaint of discrimination." [Petitioner's Ex. 4]. On September 3, 2014, the court, *Bellis, J.,* dismissed the action based on the respondent's failure to appear at a status conference scheduled for that date. The dismissal was ordered after the respondent repeatedly failed to appear for status conferences, file pleadings, and respond to discovery. [Petitioner's Ex. 4, order dated February 26, 2015].

The respondent's repeated violations are outlined in the Bridgeport Board of Education's July 7, 2014 motion for nonsuit, sanctions and judgment of dismissal. [Petitioner's Ex. 4]. On January 7, 2014, the court had ordered that the parties appear for a status conference on January 23, 2014. Defendant's counsel appeared but the respondent failed to attend. On February 21, 2014, the court again ordered the parties to attend a status conference, this time on March 13, 2014. On the day of the scheduled status conference, the respondent filed a caseflow request indicating she had a conflicting status conference involving a family case in the Superior Court at Hartford. [Petitioner's

10

Ex. 4, Caseflow Request]. No action was taken on the request, thereby leaving the respondent compelled to appear in Bridgeport for the status conference but she did not do so.

On March 19, 2014, the defendant filed a second amended motion for modification of scheduling order and sanctions, because of the plaintiff's failure to appear for his deposition, despite numerous notices, and to attend court ordered status conferences. [Petitioner's Ex. 4.] On March 28, 2014, the court yet again ordered the parties to appear for a status conference on April 10, 2014, and indicated the defendant's motion would be heard on that date. Defendant's counsel appeared, but again the respondent did not appear. [Id.] Following her receipt of a call from the clerk's office that morning inquiring as to her whereabouts, the respondent arrived almost two hours late. [Id.] The court then held a hearing on the defendant's motion and made clear to the respondent that if she failed again to appear or meet a deadline the court would dismiss the case. [Petitioner's Ex. 4, Transcript dated April 10, 2014 22:18-26.]

On June 15, 2014, the respondent sent opposing counsel an email indicating her availability for the deposition of the plaintiff on July 2, 2014. Based on that request, the defendant's counsel issued a deposition notice to the respondent confirming the scheduling of the deposition. [Petitioner's Ex. 4, exhibits E and F to motion dated July 7, 2014]. This notice was followed up on July 1, 2014, by an email to the respondent asking her to confirm the Stone deposition for the following day at 10:00 a.m. The respondent replied at 2:00 p.m. on July 1, 2014, that "we will need to reschedule as I became pre-occupied with a trial and did not have tomorrow down. Can we do this next week perhaps July 11 I think I'm free. But will need to check with Mr. Stone." [Petitioner's Ex. 4, exhibit G to the motion dated July 7, 2014]. At the presentment hearing, the respondent testified that she believed she failed to insert the July 2, 2014 deposition date into her electronic calendar. [Tr. 2 81:22-27, Miller].

11

On June 6, 2014, the defendant filed an answer, special defenses and counterclaim. [Petitioner's Ex. 4]. Respondent failed to file an answer to the counterclaim and the defendant thereafter filed a motion for default for failure to plead. [Petitioner's Ex. 4, motion dated June 11, 2014]. On July 7, 2014, the defendant filed a motion for nonsuit, sanctions and judgment of dismissal which was set down for a hearing for September 3, 2014. On that date, the court, *Bellis, J.*, dismissed the action based on the respondent's repeated failures to appear in court. The respondent testified at the presentment hearing that she "had not noted the date of September 3rd as the date for the status conference." [Tr. 2 84:1-2, Miller].

Following the dismissal of the case, the respondent filed a motion to open judgment of dismissal on November 28, 2014. [Petitioner's Ex. 4, motion]. The court scheduled a hearing on the motion for January 7, 2015. On December 31, 2014, the respondent filed a motion for continuance of the hearing which was granted by the court and the hearing was rescheduled to January 29, 2015. [Petitioner's Ex. 4, motion and order]. On January 28, 2015, the day before the hearing, the respondent filed a caseflow request indicating that she had a deposition to attend on January 29, 2015, which had to be completed by January 31, 2015. [Petitioner's Ex. 4, caseflow request]. That request was denied by the court that same day. [Petitioner's Ex. 4, order]. The court had previously advised the respondent not to use a caseflow request to ask for a continuance as such a request needed to be made by proper motion.[6] Nevertheless, the respondent persisted in utilizing a caseflow request to seek continuances. At the hearing on the motion to open, the court set out on the record the respondent's history of non-appearance in the case. The respondent did not appear at the hearing and

---

[6] The respondent had done the same thing in the matter of *Josephine Miller v. Bridgeport Board of Education,* judicial district of Fairfield, Docket No. FBT-CV-10-6011406-S, in which she had sued to collect attorney's fees for representation of an employee of the defendant. The court had admonished her not to use a caseflow request form in seeking a continuance of the matter, but rather, to file a motion for continuance. On July 10, 2012, Judge Bellis dismissed that case because the respondent failed to appear for trial. The court, in ruling on a motion for reconsideration indicated "the plaintiff improperly filed a caseflow request rather than a proper motion for continuance. The present case was set down for a trial well over 6 months beforehand, a date the plaintiff selected...." [Respondent's Ex. D]. At the presentment hearing, the respondent acknowledged in her testimony that she understood that to mean that she should not file a caseflow request when requesting a continuance. [Tr. 4 92:17-20, Miller].

12

as a result, was contacted and ordered to appear in court that afternoon, at which time she did appear. [Petitioner's Ex. 4, Transcript dated January 29, 2015].

On February 26, 2015, the court entered an order indicating that the Respondent did not provide a good and compelling reason to open the judgment. The court held "given the pattern in this case the plaintiff's counsel filing caseflow requests rather than proper continuance requests, appearing hours late for scheduled events, and importantly, by repeatedly failing to appear for scheduled events, along with the [inexcusable] neglect of counsel leading to the dismissal of the case, the court cannot in good conscience find reasonable cause. As such the motion to open is denied." [Petitioner's Ex. 4, order]. When questioned at the presentment hearing as to the reasons why she did not appear at the various scheduled events, the respondent repeatedly replied with words to the effect of "I don't know at this time." [Tr. 2 73:14, 74:7, 74:10, 75:5, 75:8, 76:20, Miller].

The dismissal of the case was not appealed.

### Gabor Meszaros v. Leonard Banks

In the matter of *Gabor Meszaros* v. *Leonard Banks*, judicial district of Fairfield, Docket No. FBT-CV-12-6027816-S, a Bridgeport police officer brought a claim against the defendant for injuries suffered in a motor vehicle accident. [Petitioner's Ex. 3, docket sheet]. The respondent filed a counterclaim on behalf of the defendant alleging that the plaintiff was responsible for the defendant's personal injuries. [Tr. 3 35:9-15, Miller]. The case was scheduled to begin jury selection on September 9, 2014. [Tr. 3 36:20-24, Miller]. On September 8, 2014, the plaintiff's attorney filed a motion for continuance for the reason that he had a funeral to attend. The motion was granted that same date. In addition, the respondent had a pre-trial conference in Waterbury scheduled for September 11, 2014. As a result, the parties agreed that jury selection would begin at noon on September 11, 2014. [Tr. 3 37:22-24, Miller]. That morning, the respondent attended the pre-trial conference at the Waterbury Superior Court. [Tr. 3 38:3-9, Miller]. She remained there until approximately 11:00 a.m., but then drove to Danbury, claiming she was not feeling well. [Tr. 3

13

38:23-27, Miller]. Upon returning to her office in Danbury, the Respondent filed a caseflow request with the court stating: "Counsel for defendant Leonard Banks required to seek medical treatment from primary care physician. Continuance is sought until after medical appointment on September 11, 2014." [Petitioner's Ex. 3; caseflow request dated September 11, 2014; Tr. 3 39:13-16, Miller]. Upon failing to appear for the commencement of jury selection, the court (*Bellis, J.*), entered an order dismissing the counterclaim. [Petitioner's Ex. 3, Obj. to Motion to Open, exhibit E]. Despite her claim of illness, the respondent filed various pleadings in *different* cases that same day, including a caseflow request, certificate of closed pleadings, and an objection to a motion for summary judgment. [Petitioner's Ex. 3, Obj. to motion to open, exhibit H].

On January 8, 2015, 119 days after the entry of the dismissal, the respondent filed a motion to open judgment of dismissal. [Petitioner's Ex. 3]. A hearing on the motion was scheduled for February 25, 2015. The respondent failed to appear to pursue her motion. As a result, the court entered the following order:

> Counsel for the counterclaim plaintiff (Attorney Miller) failed to appear for the hearing on her motion to open dismissal, despite the fact that written notice was sent by the court. Counsel for the counterclaim defendant (Attorney Edwards) appeared on time, and the court instructed Attorney Edwards to call Attorney Miller. Attorney Edwards represented, on the record, that pursuant to the court's instructions, she did call Attorney Miller, who told her that she thought the hearing was next week, and that furthermore, her pipes had burst. No continuance request was filed by Attorney Miller, nor did Attorney Miller contact the court until after she was called by Attorney Edwards. The court finds that Attorney Miller, who repeatedly fails to appear for scheduled court events, waived her right to argument on the motion to open, and the court, having reviewed all the filings, denies the motion to open on the papers.... There is simply no good cause to grant Attorney Miller's motion.... For these reasons, the motion to open is denied. Due to Attorney Miller's consistent failure to appear in court on her various cases, as well as her continued insistence on filing last-minute "caseflow requests" rather than proper motions for continuance, the court will not entertain a motion to reconsider or reargue this motion.

[Petitioner's Ex. 3, order February 25, 2018]. The respondent testified that she had believed that the hearing was scheduled for the following week. No appeal was taken from the court's order dismissing the case.

At the presentment hearing, the respondent testified as to the circumstances of her illness and her condition that prevented her from appearing at the September 11, 2014 commencement of jury selection in the *Meszaros* v. *Banks* matter and the subsequent February 25, 2015 hearing on the motion to open judgment. Specifically, she recounted that her condition was such that she required bed rest. However, under questioning by the Hon. Vanessa L. Bryant in the federal court matter of *Smith* v. *Department of Correction, et al*, Docket No. 13-CV-8L8 (VLB) (D. Conn.), the respondent conceded that she was not diagnosed with any medical condition until September 15, 2014, and that she had not been prescribed bed rest by any physician. [Petitioner's Ex. 3, objection to motion to open]. In that same case, the respondent had filed an affidavit dated November 5, 2014, that addressed her health. Paragraph 14 of the affidavit reads as follows: "As a consequence of this health issue, many work matters have been delayed. My 17 day trip outside of the country on an evangelistic and preaching mission (July 31 through August 17) also meant that many matters accumulated during my absence that required work upon my return. When added to new matters that accumulated while I was on medical rest the work has not yet been caught up." [Respondent's Ex. M].

As to rule 1.3 of the Rules of Professional Conduct, it provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." The commentary to this rule provides that "[a] lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. . . . A lawyer's workload must be controlled so that each matter can be handled competently."

Her multiple failures to appear for scheduled court matters in both the *Stone* and *Meszaros* matters reveal a pattern of both negligence and intentional avoidance of such matters, often to the detriment of her clients. In *Stone*, status conferences had to be rescheduled numerous times. The defendant was prevented from taking the deposition of the plaintiff because the respondent canceled scheduled dates on very short notice causing inconvenience to opposing counsel and parties. In

15

*Meszaros*, the respondent waited until literally the next to last day before filing the motion to open dismissal. Even accounting for the respondent's credible testimony that the delay was partly due to the respondent seeking to obtain other counsel for her client, the court can make a reasonable inference from the facts above that the respondent's workload, regardless of its size, exceeded her capacity to timely attend court appearances. This led to multiple dismissals of her clients' cases. The commentary to rule 1.3 states that "[a] client's interest often can be adversely affected by the passage of time or the change of conditions; in extreme instances, . . . the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness." Needless to say, it also undermines the public's respect for the judicial system. The court finds from the facts above that there is clear and convincing evidence that the respondent has committed a violation of rule 1.3 of the Rules of Professional Conduct.

As to rule 3.2, relative to expediting litigation, it states that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." The commentary to that rule provides that "[d]ilatory practices bring the administration of justice into disrepute. . . . It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay." The facts set forth above relative to the allegations of count two are replete with evidence of the respondent's repeated failure to attend scheduled court conferences, hearings, depositions, etc., that caused undue delay in the progress of multiple cases. The court finds from the facts above that the respondent not only delayed and frustrated the attempts of the court and opposing parties to obtain a timely resolution of the matters pending before the court, but also failed to make reasonable efforts to expedite litigation consistent with the interests of her own clients. Accordingly, there is clear and convincing evidence that the respondent committed a violation of rule 3.2 of the Rules of Professional Conduct.

16

Rule 8.4 of the Rules of Professional Conduct provides in part that "[i]t is professional misconduct for a lawyer to," among other things, "[e]ngage in conduct that is prejudicial to the administration of justice." Rules of Professional Conduct 8.4 (4). "It is well established that members of the bar [must] conduct themselves in a manner compatible with the role of courts in the administration of justice." (Internal quotation marks omitted.) *Notopoulos* v. *Statewide Grievance Committee*, supra, 277 Conn. 235. The respondent's lack of diligence, which as noted above was in some cases either negligent or an intentional avoidance of her various obligations, led to the dismissal of her clients' matters. This conduct was certainly prejudicial to the administration of justice in that it not only impeded the ability of the court and opposing counsel to timely dispose of pending matters, it specifically resulted in the dismissal of her own clients' matters without a hearing on the merits. This is particularly noteworthy with respect to this rule as the respondent was specifically forewarned by the court that continued failure to appear in court as scheduled or to meet a court deadline would result in dismissal of her client's case. [Petitioner's Ex. 4, transcript]. The court finds from the facts above that there is clear and convincing evidence that the respondent has committed a violation of rule 8.4 (4) of the Rules of Professional Conduct.

C

*Count Three – Grievance Complaint #17-0405*

As to count three, the petitioner has alleged that the respondent violated rules 1.4 (a) (1), (2), (3), (4) and (5) as well as 1.4 (b) of the Rules of Professional Conduct, all of which relate to communications with one's client. Upon completion of the presentation of the petitioner's evidence, the respondent moved the court to dismiss count three on the basis that the petitioner had failed to put forth any evidence to establish a violation of those rules.[7] Though not

---

[7] Though not cited by the respondent, the court took the position that her motion was based upon the standard set forth in Practice Book § 15-8 for regular civil court cases that allows a party to seek a dismissal of a case where a plaintiff has failed to make out a prima facie case upon the conclusion of its evidence and has rested.

17

specifically addressing that standard, the petitioner conceded that it had not set forth sufficient evidence to prove by clear and convincing evidence that the respondent had violated rules 1.4 (a) (1), (2), (3) and (4). It did however claim that there was sufficient evidence to proceed as to rules 1.4 (a) (5) and 1.4 (b). The court, having reserved decision on the respondent's motion, hereby grants the motion as to 1.4 (a) (1), (2), (3) and (4) and denies it as to 1.4 (a) (5) and 1.4 (b).

Rule 1.4 (a) (5), states that "[a] lawyer shall: . . . (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law." Rule 1.4 (b) provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." The respondent has admitted in her pleadings that the Danbury Judicial Grievance Panel made a finding of probable cause against her relative to a complaint brought against her by Jasmine Williams and that any action for an order of presentment was to be consolidated with the other pending matters that are the subject of this action.

The court finds the following facts as to this count. On December 9, 2014, the Appellate Court in *Marjorie Coble* v. *Bridgeport Board of Education, Rebecca Willis* v. *Community Health Services, Inc., et al., Margaret Jordan Addo* v. *Winston Rattray* and *Andrew Cimmino* v. *Maria Marcoccia, et al* entered an order that read as follows:

> "After reviewing Attorney Josephine Smalls Miller's conduct in *Marjorie Coble* v. *Bridgeport Board of Education*, AC 36677, *Rebecca Willis* v. *Community Health Services Inc. Et Al.*, AC 36955, *Andrew Cimmino* v. *Maria Marcoccia Et Al.*, AC 35944 and *Margaret Jordan Addo* v. *Winston Rattray*, AC 36837, the Appellate Court has determined that Attorney Josephine Smalls Miller has exhibited a persistent pattern of irresponsibility in handling her professional obligations before this court. Attorney Smalls Miller's conduct has included the filing of frivolous appeals and the failure to file, or to file in timely and

18

appropriate fashion, all documents and materials necessary for the perfection and prosecution of appeals before this court.

Attorney Josephine Smalls Miller's conduct before this court has threatened the vital interests of her own clients while consuming an inordinate amount of this court's time and her opponents' resources. Attorney Josephine Smalls Miller has neither accepted personal responsibility for the aforesaid conduct nor offered this court any assurance that such conduct will not be repeated, based upon either her commitment to improving her knowledge of appellate practice and procedure or her institution of changes in her law practice to monitor her cases more effectively and ensure timely compliance with our rules of procedure.

IT IS HEREBY ORDERED THAT:

1. Attorney Josephine Smalls Miller is suspended from practice before this court in all cases, except for the case of *Margaret Jordan Addo* v. *Winston Rattray*, AC 36837, effective immediately for a period of six months from issuance of notice of this order until June 9, 2015.

2. After June 9, 2015, Attorney Josephine Smalls Miller may not represent any client before this court until she files a motion for reinstatement and that motion has been granted. The motion for reinstatement shall not be filed until after June 9, 2015. Any motion for reinstatement shall include a personal affidavit in which Attorney Josephine Smalls Miller: A) Commits herself to discharging her professional responsibilities before this court in a timely and professional manner; B) Provides documentary proof of successful completion of a seminar on legal ethics and a seminar on Connecticut appellate procedure; C) Documents any other efforts since the date of this order to improve her knowledge of appellate practice and procedure; and D) Offers this court detailed, persuasive assurances that she has implemented changes in her law practice designed to ensure full compliance with the rules of appellate procedure including a written plan indicating what procedures she has implemented in her office to ensure her compliance with the appellate rules and procedures and to protect her clients' interests.

3. After June 9, 2015, upon the filing and granting of a motion for reinstatement, Attorney Josephine Smalls Miller may resume the practice of law before the Appellate Court if she is otherwise qualified to practice law in the courts of this state.

4. The Appellate Court Clerk's Office is directed not to accept for filing and to return any documents filed in violation of this order.

5. If Attorney Josephine Smalls Miller violates the provisions of this order she is subject to further sanctions.

It is further ordered that these matters are referred to the Chief Disciplinary Counsel for review and further action as it is deemed appropriate."

[Petitioner's Ex. 1; Respondent's Ex. A].

19

Respondent filed a writ of error to the Connecticut Supreme Court to challenge the order. The writ was dismissed on April 5, 2016. [Tr. 3 58:5-8, Miller].

In October, 2016, the respondent met with Jasmine Williams (Williams). [Tr. 3 44:26-27, Miller]. In a child protection action in the Superior Court, Williams' parental rights to her two minor children had been terminated. Seeking review of the judgment, she retained attorney James Hardy (Hardy) to file an appeal on her behalf. Hardy attempted to file the appeal but failed to make payment of the necessary filing fee. As a result, that appeal was dismissed by the Appellate Court. Thereafter, Hardy filed a second appeal seeking the same review. The Office of the Attorney General filed an appearance on behalf of the state of Connecticut and moved to have that appeal dismissed also. [Tr. 3 45:12-25, Miller]. At that point in time, Hardy referred Williams to the respondent. He credibly testified as to his reason for doing so; "I had explained to Ms. Williams that although I have handled some appellate matters previously in the past, it--it doesn't make up a majority of my practice, and I had indicated to her that I thought because of Attorney Miller's supreme knowledge with respect to appellate matters and her expertise and skill set, that she would be better suited at the very least to assist us in filing the appeal." [Tr. 2 6:21-27, Hardy]. He also told Williams that the respondent's involvement would not include going to court but would be primarily behind the scenes by assisting with the preparation and drafting of documents. In meeting with Williams, the respondent understood the purpose for which Williams had come to see her. "Well, I knew from Attorney Hardy that he wanted me to take whatever steps were necessary to try to resurrect this appeal that Ms.-you know, had been rejected and that he had to refile." [Tr. 3 46:9-12, Miller]. Respondent presented Williams with a retainer agreement which was signed on October 1, 2016. [Tr. 3 47:2-4, Miller; Petitioner's Ex. 9]. That agreement provided in relevant part: "Jasmine Williams . . . retains Attorney Miller to

20

represent her with respect to the following: A juvenile court termination of parental rights appeal. This agreement contemplates that Attorney Miller will provide legal services at the appellate court level, specifically reviewing of the relevant trial transcripts, documents, and orders, and drafting of the appellate brief. Attorney James Hardy will be responsible for oral argument of the case." [Petitioner's Ex. 9]. Further, in her answer to the grievance complaint that led to the current presentment, the respondent acknowledged that "[Williams] signed a retainer agreement at that time and paid an initial amount of $2,000 toward an estimated cost of $10,000 to fully prosecute the appeal." [Petitioner's Ex. 8].

Even prior to the execution of the agreement, by August or September of 2016, the respondent assisted Hardy with the appeal by drafting a pleading entitled appellant's objection to petitioner/appellee's motion to dismiss dated September 22, 2016. [Petitioner's Ex. 12]. Thereafter, pursuant to the retainer agreement, the respondent reviewed the forty-five page Superior Court decision, as well as client notes and documents provided by Hardy. [Tr. 3 50:3-14, Miller]. She continued to assist Hardy and Williams with the appeal by drafting a motion for reconsideration of the Appellate Court's granting of a motion to dismiss and forwarded it to Hardy for him to file in the Appellate Court. She also advised Hardy and Williams that a motion for permission to file a late appeal should be pursued. Based on that advice, she drafted the motion dated December 6, 2016 and again forwarded it to Hardy for filing under his letterhead. [Tr. 3 51:21-27, Miller; Petitioner's Ex. 12]. Following a ruling from the Appellate Court denying the motion for permission to do the late filing, the respondent met with Williams to consider other legal options. [Tr. 3 53:15-25, Miller; Petitioner's Ex. 9; Respondent's Ex. U].

21

At the time of the execution of the retainer letter with Williams, the respondent knew she had been suspended by the Appellate Court from representing clients in that court.[8] The information as to the limitation on her ability to practice before the Appellate Court was not found within any of the terms of the written retainer agreement. Although the retainer agreement indicated Hardy would be responsible for oral argument, this does not excuse the respondent's failure to completely provide all relevant information to Williams that would enable her to make an informed decision regarding the respondent's representation of her. At the presentment hearing, the respondent credibly testified that she orally advised Williams that there were some restrictions on her ability to represent her before the Appellate Court. However, her oral advisement was completely inconsistent with the express terms of the retainer letter which made no reference whatsoever as to any limitations placed upon her by the Appellate Court. Such conflicting information made it impossible for Williams to make an informed decision regarding the respondent's representation of her. The tangible impact of this was exemplified through the respondent's inability to file an appearance in the Appellate Court on Williams' behalf. Because of this, the respondent did not receive any notices from the Appellate Court relative to the case and had to rely upon Hardy for information as to the status of the case. After traveling out of the country to Africa for several weeks from late December, 2016 to sometime in January, 2017, it was only upon her return that she learned from Hardy that the motion to file a late appeal had been denied. By the time the respondent could consult with Williams, the period to seek any further appeal to the Supreme Court had passed.

Notably, Hardy also testified at the hearing that he and the respondent had been involved in a similar arrangement relative to an appeal to the Appellate Court involving an individual by

---

[8] In fact, the court later clarified the respondent's status with that court by a second order of February 15, 2018, which specifically stated she could not represent any clients in the court. The respondent had contended that the original December 9, 2014 order only prohibited her from *appearing* before the Appellate Court.

22

the name of Darric Myers.[9] [Tr. 2 22:21-23:4, 48:10-50:2, 51:5-52:11, Hardy]. In that instance, while the respondent was under suspension by the Appellate Court, it was agreed that Hardy would file the appearance with the court and physically appear while the respondent would do work similar to what was described relative to the Williams matter. This, along with the rest of Hardy's testimony, the court finds credible.

From the facts above, the court finds that there is clear and convincing evidence that the respondent has committed a violation of rules 1.4 (a) (5) and 1.4 (b) of the Rules of Professional Conduct.

D

*Count Four*

As to count four, the petitioner alleges the respondent engaged in the unauthorized practice of law in violation of rule 5.5 of the Rules of Professional Conduct, which states in relevant part: "(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so. The practice of law in this jurisdiction is defined in Practice Book Section 2-44A."[10]

---

[9] The court takes judicial notice of the matter *Jordan Myers* v. *Darric Myers*, judicial district of New Haven, Docket No. FA-15-4066531-S as well as the Appellate Court case, *Jordan M.* v. *Darric M.*, 168 Conn. App. 314, 146 A.3d 1041, cert. denied, 324 Conn. 902, 151 A.3d 1287 (2016).
[10] Connecticut Practice Book § 2-44A provides in relevant part:
(a) General Definition: The practice of law is ministering to the legal needs of another person and applying legal principles and judgment to the circumstances or objectives of that person. This includes but is not limited to:
(1) Holding oneself out in any manner as an attorney, lawyer, counselor, advisor or in any other capacity which directly or indirectly represents that such person is either (a) qualified or capable of performing or (b) is engaged in the business or activity of performing any act constituting the practice of law as herein defined.
(2) Giving advice or counsel to persons concerning or with respect to their legal rights or responsibilities or with regard to any matter involving the application of legal principles to rights, duties, obligations or liabilities.
(3) Drafting any legal document or agreement involving or affecting the legal rights of a person....
(6) Engaging in any other act which may indicate an occurrence of the authorized practice of law in the state of Connecticut as established by case law, statute, ruling or other authority. "Documents" includes, but is not limited to ... pleadings and any of the papers incident to legal actions and special proceedings.

23

SA023

The facts relative to count four are the same as those set forth in count three above and clearly support a violation of rule 5.5. The Appellate Court's order of December 9, 2014, as supplemented by its order of February 15, 2018, suspended the respondent from practicing and representing any individuals before the court (with one exception) until she had met the conditions set out for reinstatement. The respondent has acknowledged that she had not been reinstated by the court at any time prior to the presentment hearing. She also acknowledged that, while under suspension, she did work for Williams relative to her appeal in the Appellate Court, including, but not limited to, the review of notes and documents, legal research, drafting pleadings, and providing legal advice. Specifically, the retainer letter prepared by the respondent and executed by Williams stated that "[t]his agreement contemplates that attorney Miller will provide legal services at the Appellate Court level." [Petitioner's Ex. 9]. This language was placed in the agreement despite the express order of the Appellate Court which provided that "[a]ttorney Josephine Smalls Miller is suspended from practice before this court in all cases" and further provided that "[a]fter June 9, 2015, attorney Josephine Smalls Miller may not represent any client before this court until she files a motion for reinstatement and that motion has been granted."[11] [Petitioner's Ex. 1].

The court finds that the petitioner has established by clear and convincing evidence that the respondent has violated rule 5.5 of the Rules of Professional Conduct by engaging in the unauthorized practice of law as defined in Practice Book § 2-44A.

---

[11] On February 15, 2018, the Appellate Court issued an order clarifying its order of December 9, 2014 by stating that the original order precluded "attorney Smalls Miller from providing legal services of any kind in connection with any Connecticut Appellate Court matter until she files a motion for reinstatement and that motion has been granted." At the presentment hearing, the respondent acknowledged that this order did clarify the original order. However, the latter order is not necessary for a finding of a violation of Rule 5.5, or any other rule, as the facts are sufficient to establish a violation of the rules based on the language of the original order alone. [Petitioner's Ex. 2].

24

IV

*Respondent's Affirmative Defenses*

The respondent has raised two amended affirmative defenses to the allegations of the amended presentment complaint. Specifically, the respondent contends that the recommendations of the petitioner and/or the decisions of the SGC were based upon both racially discriminatory and retaliatory reasons in violation of the respondent's constitutional rights under the fourteenth amendment to the United States constitution and article first, § 20 of the Connecticut constitution.

Special defenses are appropriate in a disciplinary hearing. See *Statewide Grievance Committee* v. *Presnick*, 216 Conn. 135, 139, 577 A.2d 1058 (1990) ("[d]espite its sui generis character, we see no reason why a presentment should proceed in a piecemeal fashion and why basic concepts of res judicata are not equally applicable to presentment proceedings"). The respondent's attempt to raise these special defenses, however, is unavailing. While this is not a regular civil proceeding, a review of Practice Book § 10-50 would be instructive in this regard. The purpose of a special defense is to set forth facts that "show that the [petitioner's] statements are untrue." It can also be used to set forth facts that are consistent with such statements, but show nonetheless that the petitioner has no cause of action.[12] The respondent's special defenses fail to do either. They simply recite legal conclusions of racial discrimination or retaliation unsupported by any factual allegations, and such conclusory allegations are insufficient to properly plead a special defense. See *Vendor Resource Management* v. *Estate of Zackowski*,

---

[12] Practice Book § 10-50 states: "No facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. Thus, accord and satisfaction, arbitration and award, duress, fraud, illegality not apparent on the face of the pleadings, infancy, that the defendant was non compos mentis, payment (even though non-payment is alleged by the plaintiff), release, the statute of limitations and res judicata must be specially pleaded, while advantage may be taken, under a simple denial, of such matters as the statute of frauds, or title in a third person to what the plaintiff sues upon or alleges to be the plaintiff's own.

25

Superior Court, judicial district of Middlesex, Docket No. CV-17-6016941-S (August 10, 2017,

*Vitale, J.*). It has long been held that special defenses must allege facts which the proponent then

has the burden to prove. See *Kaye* v. *Housman*, 184 Conn. App. 808, 817, __ A.3d __ (2018).

Moreover, the allegations of her affirmative defenses do not actually constitute a special

defense, instead, they constitute an independent cause of action through which the respondent

can seek specific damages or other relief. See, e.g., *Sovereign Bank* v. *Harrison*, 184 Conn. App.

436, 444, __ A.3d __ (2018); *Mitchell* v. *Guardian Systems, Inc.*, 72 Conn. App. 158, 167 and

n.6, 804 A.2d 1004, cert. denied, 262 Conn. 903, 810 A.2d 269 (2002). "Although a

counterclaim is similar to a special defense in that both are employed by a defendant to diminish

or defeat a plaintiff's claim, they nonetheless are separate and distinct types of pleadings. . . . The

heart of the distinction is that a counterclaim is an independent cause of action, and a special

defense is not. See *Historic District Commission* v. *Sciame*, 152 Conn. App. 161, 176, 99 A.3d

207 ("[a] counterclaim is a cause of action . . . on which the defendant might have secured

affirmative relief had he sued the plaintiff in a separate action" [internal quotation marks

omitted]), cert. denied, 314 Conn. 933, 102 A.3d 84 (2014); *Valentine* v. *LaBow*, [95 Conn. App.

436, 447 n.10, 897 A.2d 624, cert. denied, 280 Conn. 933, 909 A.2d 963 (2006)] ("a special

defense is not an independent action"). . . . [A] special defense operates as a shield, to defeat a

cause of action, not as a sword, to seek a judicial remedy for a wrong." (Citations omitted;

internal quotation marks omitted.) *Sovereign Bank* v. *Harrison*, supra, 444.

In fact, at the presentment hearing, the respondent presented evidence through her

witness Rebecca Johnson that she has in fact done so. In *Rebecca L. Johnson, et al.* v. *Karyl

Carrasquilla, et al.*, United States District Court, Docket No. 3:17-CV-01429 (MPS) (D. Conn.),

the respondent is a co-plaintiff who has brought an action against Karyl Carrasquilla as Chief

26

Disciplinary Counsel and Michael Bowler as Bar Counsel for the SGC, alleging that "Johnson and Miller have been targeted by the attorney discipline authorities in a racially discriminatory manner, and in part because of their civil rights litigation practice." [See Respondent's Ex. N, ¶ 27]. In the complaint, the respondent makes the same arguments and allegations that she presented in her testimony and pleadings to this court as part of the presentment hearing. That federal complaint goes into considerable detail relative to her claim of disparate treatment by the disciplinary authorities relative to herself, Rebecca Johnson and other African-American attorneys as compared to the treatment given to Caucasian attorneys engaging in what they describe as similar conduct. From a review of that complaint, it is clear that even if the respondent's special defenses are not viable in the presentment hearing, she will not be prejudiced if precluded from pursuing them as she has already exercised her right to relief from and for such treatment in a prior pending claim in federal court. Indeed, the fact that the respondent has brought an action based on these allegations only reinforces the court's conclusion that her "affirmative defenses" are not proper special defenses.

In the matter now before this court, the respondent has, through her own testimony and that of Rebecca Johnson, set forth a lengthy recitation of the conduct that they engaged in which led to disciplinary action against them compared to the similar conduct of Caucasian attorneys who received no discipline. The respondent particularly referenced her own attempts to have the disciplinary counsel or the SGC investigate complaints against Caucasian attorneys only to have the disciplinary authorities refuse to do so. [Tr. 3 103:1-23, 124:27-125:22, 127:1-135:4; Tr. 4 7:5-11:13, Miller]. However, the respondent's own testimony made clear that upon the respondent's informal presentation of a September 1, 2015 letter and materials containing information relative to the possible misconduct of other attorneys, the disciplinary authorities

27

SA027

responded with a September 4, 2015 letter detailing the proper process for lodging such a complaint and advising the respondent that she was free to resubmit it. [Respondent's Ex. S]. That letter read in relevant part as follows:

> In your letter, you "ask that these matters be investigated as soon as possible." If you have evidence of attorney misconduct, you are welcome to file grievance complaints, as you already have done regarding two of the attorneys mentioned in your documents. Any additional grievance complaints which you file will be processed in accordance with Practice Book § 2-32 (a).
>
> Alternatively, you can submit to our office information you have regarding any alleged attorney misconduct, along with supporting documentation. Our office will then determine whether the information and documentation is sufficient to support a referral of the misconduct to a grievance panel. If so, the Grievance Panel to which any such referral is made will then investigate the allegations and make a determination as to whether a grievance complaint should be filed. Please note, however, that any such submissions by you should address the alleged misconduct of any such attorney in a separate and individual filing, to allow the consideration of each matter to be conducted without reference to irrelevant and immaterial allegations regarding other attorneys.

[Respondent's Ex. S].

This is clearly contrary to her claim at the hearing, and as addressed in her post-hearing brief, that disciplinary authorities refused to investigate. Moreover, there is no evidence that she ever resubmitted the materials consistent with the provisions of Practice Book § 2-32 (a).

Again, the defenses raised by the respondent are not properly before the court in this proceeding and, further, would fail even if they were properly before the court because she has failed to meet her burden of proof in this regard.[13]

---

[13] The respondent spent a considerable portion of her time at the hearing addressing the claim of disparate treatment. She presented her own testimony, that of Rebecca Johnson, and cross-examined witnesses attorney Michael Bayone and attorney Betsy Ingraham on the issue. However, her focus on this issue did nothing to address or rebut the allegations contained in the four counts of the presentment. For example, she claims in part that cases were dismissed because she used a caseflow request form to ask for a continuance of a trial date instead of a motion for continuance form. This, however, ignores the ample evidence that there were multiple other reasons that collectively led to the dismissals and it was not based solely on her use of a caseflow request form. She also claimed that when she confronted a judge claiming that ex-parte communications were held between that judge and opposing counsel, the judge failed to respond and such silence constituted an admission on the judge's part. This of course is of no moment as the judge was not a party or witness in the proceeding and therefore was not subject to questioning

28

V

*Discipline*

Pursuant to Practice Book § 2-47 (a), if the court finds following a presentment hearing that an attorney has violated the Rules of Professional Conduct, it may impose a "reprimand, suspension for a period of time, disbarment or such other discipline as the court deems appropriate." The trial court possesses a great deal of discretion in this regard. *Statewide Grievance Committee* v. *Timbers*, 70 Conn. App. 1, 3, 796 A.2d 565, cert. denied, 261 Conn. 908, 804 A.2d 214 (2002), cert. denied, 537 U.S. 1192, 123 S. Ct. 1274, 154 L. Ed. 2d 1027 (2003). As was noted above, in determining whether any discipline should be imposed, discipline or sanctions are not intended to punish an attorney but rather to safeguard the courts and the public from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession. Additional facts will be set forth below as necessary to address the issue of what discipline is to be imposed.

Reviews of misconduct are often guided by the use of the American Bar Association's Standards for Imposing Lawyer Sanctions which has been approved by the Connecticut Supreme Court. *Burton* v. *Mottolese*, supra, 267 Conn. 55 and n.50. The Standards provide that, after a finding of misconduct, a court should consider: "(1) the nature of the duty violated; (2) the attorney's mental state; (3) the potential or actual injury stemming from the attorney's misconduct; and (4) the existence of aggravating or mitigating factors." A.B.A., Standards for Imposing Lawyer Sanctions (1986) Standard 3.0; see also *Burton* v. *Mottolese,* supra, 55. The Standards list the following as aggravating factors: "(a) prior disciplinary offenses; (b) dishonest

or any obligation to answer a question posed. The respondent has gone so far as to uniquely characterize her view of the motive behind her treatment by disciplinary authorities. On page 15 of her post-hearing brief, the respondent states "[s]omeone with a desire to remove a pesky Negress from practicing in the Connecticut courts surely had a hand in this matter."

29

or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution and (k) illegal conduct, including that involving the use of controlled substances." A.B.A., Standards for Imposing Lawyer Sanctions (1986) Standard 9.22; see also *Burton* v. *Mottolese*, supra, 55.

The Standards also list the following as mitigating factors which are to be considered: "(a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when: (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; [and] (m) remoteness of prior offenses." A.B.A., Standards for Imposing Lawyer Sanctions (1986) Standard 9.32; see also *Burton* v. *Mottolese*, supra, 55-56.

30

SA030

With these standards in mind, the court must first consider the nature of the duties violated by the respondent. As to count one, the respondent's maintenance of an IOLTA account placed upon her a duty to hold her clients' funds with the care required of a professional fiduciary. Rules of Professional Conduct 1.15, commentary. By depositing the respondent's personal funds into the IOLTA account, she violated a duty owed to her clients and to the legal profession to keep client funds separate from her own. The reason given for the deposit of the gift from Ms. I Am into the IOLTA account—that she was acting peculiarly—was not reasonable under the circumstances. Nor was the respondent's delay in responding to the petitioner's request for documentation explained by any sort of mental impairment or other valid reason. A breach of this duty to comply with the rules of the profession and to comply with requests from disciplinary authorities reflects adversely on the profession as a whole and not just on the one attorney. The duties to her clients in counts two, three and four all stem from her obligation, individually and as an officer of the court, to abide by the rules and orders of the court and to not to engage any in misconduct. By acting in disregard of court orders and failing to diligently attend to her cases, the respondent has engaged in conduct that was prejudicial to the administration of justice. Further, she failed to meet her duty to communicate with her client about the matter for which she was retained.

With respect to her mental state as to all counts, the court does not find any impairment that would have prevented the respondent from acting appropriately or consistently with her obligations under both the Rules of Professional Conduct and the rules of practice, including orders issued by the court.

While no financial harm came to her clients as result of the deposit of the respondent's personal funds into the IOLTA account as described in count one, there were potentially serious

31

financial consequences to those of her clients whose actions and/or claims were dismissed by different courts without a hearing on the merits as a result of her failure to comply with the Rules of Professional Conduct or court orders as described in count two. Both of her clients in the *Stone* matter (employment discrimination claim) and the *Meszaros* matter (motor vehicle personal injury claim) had their actions/claims dismissed. Neither dismissal was appealed to the Appellate Court. With respect to counts three and four, the respondent's actions in representing Williams relative to the appeal of the judgment terminating her parental rights resulted in a financial loss to Williams through her payment of a retainer and any other fees to the respondent that she was not rightfully entitled to earn due to the suspension she was actively under. The respondent's actions were done intentionally and in direct contravention of a valid court order.

In reviewing the alleged misconduct under the ABA Standards, the court can also consider any aggravating and mitigating factors that are relevant to the respondent's actions. There are several relevant aggravating factors. First, the court looks to see if there is any history of prior disciplinary actions. The respondent received a reprimand in 2015 based on a violation of Rule 11 of the Federal Rules of Civil Procedure in *Miller* v. *Bridgeport Board of Education*, United States District Court, Docket No. 3:12-CV-01287 (JAM) (D. Conn. July 30, 2014). There the court found that as to the complaint filed by the respondent, no objectively reasonable attorney could have made the allegations, in the complaint, without knowing that they were verifiably false. [Id.; see also Tr. 1 92:12-14, Ingraham]. There is, of course, also the ongoing suspension by our Appellate Court.

A pattern of misconduct may also be considered as an aggravating factor. Evidence was presented at the hearing that the respondent has been involved in eleven cases where her client's action or claim has been dismissed directly as a result of the respondent's conduct. Some

32

include the dismissal of the *Stone* and the *Meszaros* matters set forth above. Also, in *Miller* v. *Appellate Court*, 370 Conn. 759, 770 (2016), our Supreme Court identified the dismissal by the Appellate Court of the following cases: *Addo* v. *Rattray*, Docket No. AC 38637 (respondent failed to timely file the appellant's brief and appendix in compliance with the appellate rules); *Willis* v. *Community Health Services*, Docket No. AC 36955 (respondent failed to respond to a July 31, 2014 order *nisi* informing her that the appeal would be dismissed if, by August 11, 2014, she did not file a certificate indicating the estimated date of delivery of the transcript pursuant to Practice Book § 63-8 (b); also failed to appear at a previously scheduled hearing and falsely certified that certain documents had been sent to opposing counsel); *Cimmino* v. *Marcoccia*, Docket No. AC 35944 (respondent failed to meet deadlines and to comply with the rules of appellate procedure and court orders.); *Coble* v. *Board of Education*, Docket No. AC 36677 (dismissed as frivolous). [Respondent's Ex. T]. At the trial level, *Coble* had been nonsuited for failing to prosecute the action. [Respondent's Ex. B]. This court takes judicial notice that following the non-suit, the action was refiled under the accidental failure of suit statute. The trial court subsequently entered a summary judgment against the plaintiff and the court supplemented its decision with a special finding pursuant to General Statutes § 52-226a that the refiled action was meritless and not brought in good faith. [See Judge Gilardi's order #127.20 in the matter of *Coble* v. *Bridgeport Board of Education*, judicial district of Fairfield, Docket No. FBT-CV-13-6033790-S]. Additionally, during the course of this presentment, the respondent herself referenced *Igidi* v. *Department of Correction,* (dismissed for failure to timely respond to discovery). [Tr. 4 109:6-15, Miller]. Even in *Miller* v. *Bridgeport Board of Education*, judicial district of Fairfield, Docket No. FBT-CV-10-6011406-S, where the respondent prosecuted her own action for the collection of attorney's fees, the matter was dismissed for her failure to appear

33

SA033

at trial on July 10, 2012. [Respondent's Ex. D]. In *Smith* v. *Connecticut Department of Correction, et al.*, United States District Court, Docket No. 3:13-CV-00828 (VLB) (D. Conn.), the respondent sought attorney's fees for her representation of the plaintiff but the matter was dismissed. [Tr. 4 107:6-8, Miller]. In that case that court stated:

> "On August 4, 2014, the defense filed a partial motion for summary judgment, and the Court entered an order dismissing the specious claim for monetary damages from a defendant sued in their official capacity.
> Such a claim is well-known to be barred by the Eleventh Amendment, and the court has, I believe, issued decisions on cases filed by attorney Miller previously noting that well-settled law.
> Why the plaintiff persists in filing such specious claims to which the defense has to respond and the Court has to waste its time reiterating well-settled law that such a claim is barred is beyond the Court's comprehension."

[Petitioner's Ex. 3, referencing exhibit E; transcript pages 4-5].

As to the aggravating factor of multiple offenses, there have been findings of probable cause by the appropriate grievance panels as to each count which have led to the respondent's presentment. Each count alleges different violations of the Rules of Professional Conduct and the court has found clear and convincing evidence as to the violation of nine different rules.

Another relevant aggravating factor is the refusal to acknowledge the wrongful nature of one's conduct. The respondent, throughout the presentment process, has not acknowledged any wrongful conduct and has taken no steps to address the issues that led to her suspension by the Appellate Court despite being given a clear roadmap by that court on how to do so. To this factor, the court must recite additional facts. From her testimony it is clear that the respondent sees herself as a victim of conspiracies by both individual judges as well as a bureaucratic one through the Office of the Chief Disciplinary Counsel and SGC. Generally speaking, she contends that because she is African-American she is treated differently, in a negative way, than Caucasian attorneys by both judges and the disciplinary offices. Effectively, her contention is

34

SA034

that Caucasian attorneys who engage in conduct similar to hers are not referred for discipline or admonished by the courts whereas she has been.

At the presentment hearing, the respondent testified that at a court hearing before Judge Bellis she saw at least four judges standing there [in or around the courtroom] "obviously waiting to see what was happening" and then immediately going in to talk to Judge Bellis "about what had occurred." [Tr. 4 110:3-12, Miller]. When questioned by this court as to whether a remedy "would be to bring a complaint against Judge Bellis before the Judicial Review Council" the respondent replied "I think we all know that hardly anybody who was ever brought before that Counsel [sic] gets any kind of relief. Or, rather, I should say, any - judges who are brought before that Counsel [sic] nothin[g] ever happens." [Tr. 3 94:7-10, Miller]. In another matter, the respondent testified that she argued an objection to a motion to dismiss her claim. During the argument, Judge Bellis asked opposing counsel why she had waited almost a year to file the motion to dismiss. The respondent confronted Judge Bellis about the reason for her question and testified that the judge did not respond. As a result, the respondent sought and obtained a transcript of the proceeding, but testified that "all reference to this matter had been removed from the hearing transcript." [Tr. 3 121:4-8, Miller]. Her testimony unabashedly implied that the judge had pressured a court monitor or conspired with the monitor to manipulate an official court recording. The court does not find her testimony as to these matters credible and she submitted no other evidence corroborating this allegation. See Rules of Professional Conduct 8.2 (a).[14]

The respondent also referenced an incident in the *Cimmino* matter in which her client had received a favorable jury verdict. She alleged that after confronting Judge Bellis about having

---

[14] Rule 8.2 (a) of the Rules of Professional Conduct provides: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office." Such comments are sufficient on their own to establish a basis for discipline of an attorney. See *Statewide Grievance Committee* v. *Burton*, 299 Conn. 405, 413, 10 A.3d 507 (2011).

communications with opposing counsel in a different matter, the trial judge in *Cimmino* appeared to have a discussion with Judge Bellis about *Cimmino* and that the jury verdict was set aside shortly thereafter. [Respondent's Ex. G]. In support of this claim, the respondent testified "[i]n my mind, it appeared to me that the change was because of a conversation I had with Judge Bellis." [Tr. 4 112:12-13, Miller]. In her post-hearing brief, the respondent referred to it as "an unexplainable reversal" and that "[t]here is a reasonable inference that this request came at the request of the presiding judge." [Respondent's post-hearing brief, p. 12]. The clear implication is that Judge Bellis persuaded or pressured a trial judge to reverse a jury's decision and to have the verdict set aside. No other evidence was presented in support of this claim. The court gives little weight to this testimony as it is simply rank speculation and opinion on her part.

Lastly, the court may consider the respondent's experience in the practice of law. The respondent has been an attorney since 1980 and has been a solo practitioner in Connecticut since 2002. [Respondent's Ex. K].[15] She has practiced in both federal and state court and worked for executive agencies at the state and federal level. She has worked as counsel for private corporations. She is not a newcomer to the practice of law and in fact has substantial litigation and appellate experience. In this respect, the respondent presented evidence in the form of her resume; Respondent's Exhibit K; and a court ruling in the matter of *Gaul* v. *New Haven*, United States District Court, Docket No. 3:14-CV-00558 (D. Conn. March 12, 2016), relative to her motion for attorney's fees in which Judge Meyer found her to be "a highly capable and skilled trial attorney, and that those skills were indispensable to the success of her client in this case." [Respondent's Ex. L]. However, he also noted in that same ruling that the court had "been previously critical of the conduct of [the respondent] in a different case, see *Miller* v. *Bridgeport Board of Education*. . . ." [Id]. From such experience one would normally expect a practitioner

---

[15] See footnote 3 above.

to have acquired a well-versed knowledge of the Rules of Professional Conduct, and as a practical matter, a basic understanding of courtroom process, demeanor and the professional expectations that go with it.

The only relevant mitigating factor the court can mine from the testimony presented at the hearing is the physical illness the respondent described she experienced around September, 2014 which she claims prevented her from attending court proceedings before Judge Bellis and in the federal court. Even that testimony and evidence was called into question by virtue of the respondent's conduct in filing other pleadings in other cases that same day after advising the court that she was too ill to appear in court. It was also exposed as misleading and inaccurate through her questioning by Judge Bryant. Though there was some credible evidence presented to demonstrate that she may have had undiagnosed medical issues at the time of the events that led to the presentment with respect to the *Meszaros* matter; Respondent's Exhibit M; it does not appear that she was unable to represent her client at that time due to a medical condition, nor did it affect her performance with respect to the other matters for which she has been presented. Even if ill, it was the respondent's obligation to ensure that her clients' interests were adequately protected. Her failure to take those steps to protect her clients resulted in adverse outcomes for them.

The court finds that the aggravating factors clearly outweigh any potential mitigation. "A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials." Rules of Professional Conduct, Preamble. The respondent's actions have resulted in injury to the legal profession through her disrespect for judicial authority and her unwillingness to abide by specific court orders. Also, despite having had the opportunity since near the end of 2015 to lift the Appellate Court suspension, there was

37

no evidence presented that she has attempted to take any of the steps outlined by that court to do so.

## VI

## CONCLUSION

As to count one, the respondent is guilty of misconduct in that she violated rules 1.15 (a) (5), 1.15 (c), and 8.1 (2) of the Rules of Professional Conduct. The respondent is suspended from the practice of law in Connecticut effective immediately for a period of thirty (30) days. The general conditions stated herein shall apply as to this count.

As to count two, the respondent is guilty of misconduct in that she violated rules 1.3, 3.2, and 8.4(4) of the Rules of Professional Conduct. The Respondent is suspended from the practice of law in Connecticut effective immediately for a period of six (6) months. This suspension shall be concurrent to the suspension in count one. The general conditions stated herein shall apply to this count.

As to count three, the petitioner has failed to carry its burden of proof as to a violation of rules, 1.4 (a) (1), (2), (3) and (4) of the Rules of Professional Conduct and those charges are dismissed. However, the respondent is guilty of misconduct in that she violated rules 1.4 (a) (5) and 1.4 (b) of the Rules of Professional Conduct. The respondent is suspended from the practice of law in Connecticut effective immediately for a period of one (1) year. The suspension shall be concurrent to the suspensions of count one and two. The general conditions stated herein shall apply to this count.

As to count four, the respondent is guilty of misconduct in that she violated rule 5.5 of the Rules of Professional Conduct. The respondent is suspended from the practice of law in

SA038

Connecticut effective immediately for a period of one (1) year. This suspension shall be concurrent to the suspensions in counts one, two and three.

In addition to the above, these general conditions shall apply:

The petitioner is ordered to designate a Trustee, subject to the approval of the court, to take such steps as are necessary pursuant to Practice Book § 2-64 to protect the interests of respondent's clients, to inventory respondent's files, and to take control of her clients' funds, and any IOLTA or other fiduciary accounts. A hearing shall be held by the court relative to the approval of the designated Trustee on January 3, 2019 or sooner upon motion of the petitioner. Once approved, the respondent must fully cooperate with the Trustee in all respects. Failure to do so may constitute additional misconduct and subject her to additional sanctions by this court.

The respondent shall comply with all terms and conditions of Practice Book § 2-47B; Restrictions on the Activities of Deactivated Attorneys.

The respondent shall comply with all terms and conditions of Practice Book § 2-53 in the event that she applies for reinstatement to the Connecticut bar following her period of suspension.

Prior to reinstatement in Connecticut, the respondent must satisfy any Connecticut bar requirements and must be otherwise in good standing.

As a condition of reinstatement to the bar, the respondent must agree that upon reinstatement she will be mentored for a period of one year by a practicing attorney with at least ten years of experience in the Connecticut bar. Such mentor shall be a member of the Connecticut Bar Association, be in good standing, have no disciplinary history and shall acknowledge in writing their willingness to so act. The mentor's appointment shall be effective only upon the approval of this court and shall be made by separate motion by the respondent.

The respondent shall, as a condition of reinstatement, attend a Connecticut Bar Association approved continuing legal education course in both legal ethics and law office management. Such courses must be attended in-person and not on-line. Written proof of the attendance shall be required as a condition of reinstatement.

Any relief from suspension relative to her practice before the Appellate Court must be made separately to the Appellate Court consistent with its orders of December 9, 2014 and February 15, 2018.[16]

BY THE COURT

Shaban, J.

---

[16] Though not all exhibits admitted into evidence have been specifically referenced in this decision, the court has reviewed all of the exhibits and considered and reviewed the testimony of each witness.

40

<u>Notice of Meeting</u>

<u>of the Rules Committee of the Superior Court</u>

<u>Under Practice Book Section 1-9B</u>

Practice Book § 1-9B provides the Superior Court Rules Committee certain emergency powers in the event that the governor declares a public health emergency or a civil preparedness emergency pursuant to C.G.S. §§ 19a-131a and 28-9 or both.  On March 10, 2020, Governor Ned Lamont declared a public health emergency and a civil preparedness emergency pursuant to his statutory authority.  As such, and pursuant to Practice Book § 1-9B, on March 20, 2020, Chief Justice Richard A. Robinson called a meeting of the Superior Court Rules Committee at which the Rules Committee shall consider and shall have the power to adopt on an interim basis any new rules and to amend or suspend in whole or in part on an interim basis any existing rules concerning practice and procedure in the Superior Court that the committee deems necessary in light of the circumstances of the declared emergency.

In compliance with and furtherance of the actions taken by the Chief Justice pursuant to Section 1-9B of the Practice Book, a meeting of the Superior Court Rules Committee was held on Tuesday, March 24, 2020, at 10:00 a.m.  Because of the public health concerns raised by the current declared emergencies, and consistent with the spirit of Executive Order No. 7B issued by Governor Lamont which suspended in-person meeting requirements pursuant to the Freedom of Information Act, the meeting was conducted by the Committee electronically by teleconference and is available to the public through an audio recording posted on the Judicial Branch website.

At the meeting, the Rules Committee suspended the rules in Appendix A of this notice and adopted the new rule set out in Appendix B of this notice, effective immediately.  Pursuant to Section 1-9B of the Practice Book, suspension of existing rules and the adoption of the new rule shall remain in effect for the duration of the declared emergency or until such time, as soon as practicable, as a meeting of the Superior Court Judges can be convened to consider a vote on the changes.

Hon. Andrew J. McDonald, Chair
Rules Committee of the Superior Court

**Appendix A (032420)**

**Superior Court – General Provisions**

Chapter 1 – Scope of Rules

- Sec. 1-24. Record of Off-Site Judicial Proceedings

Sec. 1-24 requires an on-the-record summary off-site judicial proceedings "by the next court day." Suspending this rule would allow flexibility for the court given limited resources.

Chapter 2 – Attorneys

- Sec. 2-11A. Appeal from Decision of Bar Examining Committee concerning Conditions of Admission

Sec. 2-11A provides that an appeal of a decision of the Connecticut Bar Examining Committee be filed within 30 days of the decision. Given the suspension of statutes of limitation it is consistent to suspend this requirement.

- Sec. 2-27A. Minimum Continuing Legal Education.

Sec. 2-27A prescribes the requirements for MCLE. Due to limitations of public gatherings, it is appropriate to suspend this rule.

- Sec. 2-28B (c) and (e). – Advisory Opinions.

Sec. 2-28B (c) prescribes timelines by which the Statewide Grievance Committee must issue advisory opinions. Sec. 2-28B (e) states that the failure of the Committee to issue a timely opinion means that the Committee acquiesces that relevant advertisement or communication is compliant with the Rules. Current staffing levels require greater flexibility.

- Sec. 2-32. Filing Complaints against Attorneys; Action; Time Limitation

Sec. 2-32 contains various deadlines, including deadlines that are akin to a statute of limitations. Sec. 2-32 (a) requires the statewide bar counsel to review and process complaints within seven days of receipt. Current staffing levels require greater flexibility.

- Sec. 2-35. Action by Statewide Grievance Committee or Reviewing Committee

Sec. 2-35 contains various deadlines including a requirement that Disciplinary Counsel has 14 days to respond to a request for review. Current staffing levels require greater flexibility.

- Sec. 2-36. Action by Statewide Grievance Committee on Request for Review

Sec. 2-36 requires that the Statewide Grievance Committee must issue its decision on a request for

review within 60 days. The current situation requires greater flexibility.

- Sec. 2-38. Appeal from Decision of Statewide Grievance Committee or Reviewing Committee Imposing Sanctions or Conditions

Sec. 2-38 provides that an appeal of a grievance decision must be taken within 30 days. Given the suspension of statutes of limitation it is consistent to suspend this requirement.

- Sec. 2-39 (b). Reciprocal Discipline

Sec. 2-39 (b) sets forth time limits with regard to reciprocal discipline. The current situation requires greater flexibility.

- Sec. 2-40 (f). Discipline of Attorneys Found Guilty of Serious Crimes in Connecticut

Sec. 2-40 (f) requires that a hearing on a presentment complaint shall be held within sixty days of the filing of the presentment. The current situation requires greater flexibility. Note that it is not recommend that the Sec. 2-40 (d) be suspended. Sec. 2-40 (d) requires that the "any attorney found guilty of any crime shall send written notice of the finding of guilt to the disciplinary counsel and the Statewide Grievance Committee, by certified mail, return receipt requested, or with electronic delivery confirmation, within ten days of the date of the finding of guilt."

- Sec. 2-41 (f). Discipline of Attorneys Found Guilty of Serious Crimes in Another Jurisdiction.

Sec. 2-41 (f) Sec. 2-40 (f) requires that a hearing on a presentment complaint shall be held within sixty days of the filing of the presentment. The current situation requires greater flexibility. Note that it is not recommend that the Sec. 2-41 (d) be suspended. Sec. 2-41 (d) requires that the "any attorney found guilty of any crime in another jurisdiction shall send written notice of the finding of guilt to the disciplinary counsel and the Statewide Grievance Committee, by certified mail, return receipt requested, or with electronic delivery confirmation, within ten days of the date of the finding of guilt."

- Sec. 2-47 (a). Presentments and Unauthorized Practice of Law Petitions

Sec. 2-47 (a) requires a hearing on the merits of the complaint shall be held within sixty days of the date a complaint was filed with the court. The current situation requires greater flexibility.

- Sec. 2-53 (h) and (j). Reinstatement after Suspension, Disbarment or Resignation

Sec. 2-53 (h) requires that the Statewide Grievance Committee and the Office of the Chief Disciplinary Counsel file a report with the standing committee within 60 days of referral from the chief justice. Sec. 2-53 (j) requires that the standing committee shall complete its work within 180 days of the referral. The current situation requires greater flexibility.

- Sec. 2-70 (a). –Client Security Fund Fee

Sec. 2-70 (a) requires the collection of the Client Security Fund Fee. Suspension of the rule would allow for flexibility in assessing the fee.

SA043

- Sec. 2-71 (a) (3). –Eligible Claims

Sec. 2-71 (a) (3) requires that claims for reimbursement be filed within four years. Given the suspension of statutes of limitation it is consistent to suspend this requirement.

- Sec. 2-75 (a). –Processing Claims

Sec. 2-75 (a) sets forth timelines by which the client security fund committee and attorney must take certain actions. The current situation requires greater flexibility.

- Sec. 2-79 (a). –Enforcement of Payment of Fee

Sec. 2-79 (a) sets out the timeframe for administrative suspensions. The current situation requires greater flexibility.

Chapter 3 – Appearances

- Sec. 3-2. Time To File Appearance

Appearances must be filed within two days of the return day to avoid the filing of a Motion for Default for Failure to Appear. We propose suspending this requirement as no default orders are issuing at this time.

Chapter 4 – Pleadings

- Sec. 4-5 (b). Notice Require for Ex Parte Temporary Injunctions

Temporary Injunction orders expire 30 days after issuance unless the court holds a hearing and makes factual findings. This may not be possible under prevailing circumstances.

Chapter 6 – Judgments

- Sec. 6-1 (c). Statement of Decision; When

This section involves appeals of § 14-3 dismissals for lack of diligence and requires parties to file briefs within 20 days of filing the appeal. This isn't a problem if they are e-filed or filed on paper (by excluded attorneys and self-represented parties). The problem is that the judicial authority is required to issue a memorandum of decision within 20 days of briefs being filed. It is likely that the appeals will not be processed in a timely manner, if at all, and that judges will be unable to meet this deadline.

Chapter 7 – Clerks; Files and Records

- Sec. 7-4B (d). Motion To File Record under Seal

Sec. 7-4B (d) provides that the clerk shall return or destroy a lodged record upon the expiration of the appeal period. Given the current situation destruction on such a tight schedule may not be advisable.

- Sec. 7-13. –Criminal/Motor Vehicle Files and Records

Sec. 7-13 addresses the destruction of files and mandates the destruction of certain criminal files. The timelines for such destruction may not be appropriate given the current situation.

- Sec. 7-14. –Reports from Adult Probation and Family Division

Sec. 7-14 addresses the destruction of Reports from the Adult Probation and Family Division. The timelines for such destruction may not be appropriate given the current situation.

- Sec. 7-17. Clerks' Offices

Sec. 7-17 provides that each clerk's office shall be open at least five days per week, except during weeks with a legal holiday. The current situation requires that the Chief Court Administrator have greater flexibility to operate the clerk's offices and courthouses.

**Superior Court – Procedure in Civil Matters**

Chapter 11 – Motions, Requests, Orders of Notice and Short Calendar

- Sec. 11-14. –Short Calendar; Frequency; Time; Lists

This section requires short calendar to be held at least once a month. Unfortunately, we may not be able to comply with this.

- Sec. 11-19 (a). –Time Limit for Deciding Short Calendar Matters

This section imposes a 120 day time limit for decisions on short calendar matters. Currently, all civil short calendars are cancelled, but even if this were to change, we may not be able to process the orders due to reduced staffing levels even if they are completed. Also, those judges who are unable to work from home will not be able to complete their decisions.

- Sec. 11-20A. Sealing Files or Limiting Disclosure of Documents in Civil Cases

According to this section, all sealing motions must be placed on short calendar within 15 days of filing. Until short calendar is recommenced, this section cannot be complied with.

Chapter 17 – Judgments

- Sec. 17-30 (a) and (b). –Summary Process; Default and Judgment for Failure To Appear or Plead

Subsection (a) requires summary process defendants to appear within two days of the return day or be subject to being defaulted for failure to appear. Under subsection (b), if the defendant fails to plead within two days of return date, the plaintiff can file a motion for judgment and if no responsive pleading is filed within three days of the motion, the judicial authority shall enter judgment of possession. Clearly, we don't want these provisions to be enforced against tenants right now.

Chapter 23 – Miscellaneous Remedies and Procedures

- Sec. 23-20. Review of Civil Contempt

This section requires that those held on civil contempt orders be brought to court within 30 days for a hearing. This may not be possible under current circumstances.

- Sec. 23-68. Where Presence of Person May Be by Means of an Interactive Audiovisual Device

Suspension recommended to permit the Chief Court Administrator to issue orders or directives which allow that during the pendency of the Governor's public health emergency and civil preparedness emergency declarations of March 10, 2020 a judicial authority may, after giving due consideration to public health concerns, order that any person be present for any proceeding in any civil matter, including all proceedings within the jurisdiction of the small claims section, or any family matter, including all proceedings within the jurisdiction of the family support magistrate division, by means of an interactive audiovisual device if the interests of justice permit such appearance.

Chapter 24 – Small Claims

- Sec. 24-15 (a). –Scheduling of Hearings; Continuances

This section requires Small Claims hearings to be held between six and 45 days after the answer date. This is clearly impossible right now given the fact that Small Claims court is suspended.

**Superior Court – Procedure in Family Matters**

Chapter 25 – General Provisions

- Sec. 25-3. Action for Custody of Minor Child

This rule requires hearings on new custody applications to be held no more than thirty days from filing. We are continuing, and should continue, to accept new filings and the clerks must set dates for hearings and for service of the papers on the opposing party, but under current circumstances it is not feasible to set a hearing date within the thirty-day time limit.

- Sec. 25-4. Action for Visitation of Minor Child

This rule requires hearings on new visitation applications to be held no more than thirty days from filing. We have the same concern as for custody applications described above.

- Sec. 25-17. –Date for Hearing

This rule requires that a motion to strike in a family case be placed on a short calendar within fifteen days. Such motions in family are very rare, but if one were to be filed the court likely would be unable to meet the time requirement.

- Sec. 25-59A. Sealing Files or Limiting Disclosure of Documents in Family Matters

This rule, in subsection (f) (1), requires that a motion to seal a file in a family case be placed on a short calendar within fifteen days, which likely would not be possible.

**Superior Court – Procedure in Family Support Magistrate Matters**

Chapter 25a – Family Support Magistrate Matters

- Sec. 25a-2 Prompt Filing of Appearance

This section requires appearances in Title IV-D child support matters (which could include appearances by Support Enforcement Services), to be filed "promptly," which may not be possible.

- Sec. 25a-3. Withdrawal of Appearance; Duration of Appearance

This section establishes automatic time periods for the withdrawal of appearances which may not be feasible and may result in the premature elimination of attorney appearances.

- Sec. 25a-14. –Continuances when Counsel's Presence or Oral Argument Required

This section only allows for continuances from certain short calendar matters for good cause shown, unless the parties agree or the court orders otherwise.

- Sec. 25a-15. Statements To Be Filed

This rule imposes on parties and counsel the obligation to file certain documents before a hearing. It may not be necessary to address this as it involves time periods binding on the parties, not the court, and would likely be deemed moot if the hearing did not go forward due to the limited court operations.

- Sec. 25a-17. Motion To Open Judgment of Paternity by Acknowledgment

This rule requires hearings on motions to open acknowledgments of paternity to be held no more than thirty days from filing. Under current circumstances it is not feasible to set a hearing date within the thirty-day time limit.

- Sec. 25a-19. Standard Disclosure and Production

This rule imposes on parties and counsel the obligation to exchange certain documents by way of discovery within thirty days of a request or order. It involves time periods binding on the parties, not the court.

- Sec. 25a-23. Answers to Interrogatories

This rule imposes on parties and counsel the obligation to respond to interrogatories within sixty days. It also involves time periods binding on the parties, not the court, although a request for extension of time may be filed with the court.

SA047

**Superior Court – Procedure in Juvenile Matters**

Chapter 30 – Detention

- Sec. 30-7 Place of Detention Hearings

Pursuant to the Branch's consolidation of courts, only two of the 11 juvenile courthouses remain open. Priority 1 delinquency cases are being heard only in the Hartford and Bridgeport juvenile courthouses.

Chapter 31a – Delinquency and Family with Service Needs Motions and Applications

- Sec. 31a-1A (a). Continuances and Advancements

Non-priority 1 cases are not being processed or assigned court dates.

Chapter 34a – Pleadings, Motions and Discovery: Neglected, Abused and Uncared for Children and Termination of Parental Rights

- Sec. 34a-1 (c). Motions, Requests and Amendments

Termination of Parental Rights (TPRs) are now deemed non-priority 1 cases as are all other child protection matters except for Orders of Temporary Custody (OTCs).

- Sec. 34a-5. Continuances and Advancements

Same as above.

Chapter 35a – Hearings Concerning Neglected, Abused and Uncared for Children and Termination of Parental Rights

- Sec. 35a-12 (b), (c), and (e). Protective Supervision —Conditions, Modification, and Termination

Protective supervision cases require an in court review hearing no less than thirty days prior to protective supervision ending. These are not priority 1 cases and therefore cannot be scheduled or addressed.

- Sec. 35a-14 (c), (f), and (h). Motions for Review of Permanency Plan

Children adjudicated abused/neglected and/or uncared for and committed to DCF until further order of the court. Nine months after commitment (or date of entering DCF care) DCF must file permanency plan and a court hearing to approve a permanency plan must occur every 12 months. Adherence to such a timetable is not possible under the present circumstances. These are not priority 1 cases.

- Sec. 35a- 21 (a) and (c). Appeals in Child Protection Matters

Child protection appeals, except those involving OTC, are not priority 1 cases.

SA048

**Superior Court – Procedure in Criminal Matters**

Chapter 37 – Arraignment

- Sec. 37-1. Arraignment; Timing

The request is being made to allow flexibility in the timing of the presentment of a defendant before a court.  In the event that arraignment procedures needed to be modified to a more restricted schedule, the suspension of the rule would permit the arraignments to be conducted in a manner consistent with the court's ability to operate.

- Sec. 37-12. Defendant in Custody; Determination of Probable Cause

The courts have continued to maintain probable cause findings, specifically as it relates to weekend arrests. In the event that it is not possible to have this finding within 48 hours, the suspension of the rule would permit the court to make the probable cause determination at the soonest date available under the circumstances. The suspension would also address the sealing requirement so as not to require a party to respond within seven days for recommendations as to the court order and also allows the court to continue its sealing order beyond fourteen days. This suspension of the rule would allow for appropriate notice and a full hearing to take place on the merits of any sealing order.

Chapter 38 – Pretrial Release

- Sec. 38-6. Appearance after Release

The suspension of the rule only applies to a defendant who is not in custody. Currently, the courts are receiving all domestic arraignments on the next court date. All domestic arraignments have protective orders issued by law enforcement which remain in effect until the defendant is seen before the court. In the event that it is not possible to conduct an arraignment on the next court date, the suspension of the rule would allow for the court to schedule the first presentment on a different, but still expedited date.  In cases where the defendant is not in custody and it is not a domestic arraignment, the suspension of the rule requiring an initial appearance of not more than fourteen days allows the courts to maintain appropriately sized dockets and provides notice to all parties as to the scheduling of the cases.

- Sec. 38-18. –Review of Detention Prior to Arraignment, Trial or Sentencing

The rule requires the review of any detained person's bail within 45 days and within 30 days if the person is held on a misdemeanor or class D felony. The suspension of the rule would remove mandatory bail reviews within these time restraints. A court could still conduct bail reviews by way of motion or through a video-conference at an appropriately scheduled date.

- Sec. 38-21. –Forfeiture of Bail and Rearrest Warrant

The rule requires any person whose bond has been forfeited to be returned to custody within 6 months in order to release a surety from their bond obligation.  The suspension of the rule would allow the surety additional time to locate the person and is consistent with the court focusing on designated

priority cases.

Chapter 40 – Discovery and Depositions

- Sec. 40-11. Disclosure by the Prosecuting Authority

The rule requires the prosecution to disclose certain materials within 45 days from the filing of a request to disclose. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have a finding of good cause shown for the delay.

- Sec. 40-13. Names of Witnesses; Prior Record of Witnesses; Statements of Witnesses

The rule requires the prosecution to disclose the names of witnesses, the records of witnesses and the statements of witnesses within 45 days from the filing of a request to produce these materials. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have a finding of good cause shown for the delay.

- Sec. 40-13A. Law Enforcement Reports, Affidavits and Statements

The rule requires the prosecution to disclose certain materials within 45 days from the filing of a request to disclose. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have a finding of good cause shown for the delay.

- Sec. 40-17. Defense of Mental Disease or Defect or Extreme Emotional Disturbance; Notice by Defendant

The rule requires the defendant, when relying on one of the above-captioned affirmative defenses, to notice the prosecution within 45 days of the intention to use said defense. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have a finding of good cause shown for the delay.

- Sec. 40-18. –Notice by Defendant of Intention To Use Expert Testimony regarding Mental State; Filing Reports of Exam

The rule requires the defendant to notice the prosecution within 45 days of the intention to use an expert witness and to produce the report of the expert within 5 days of receipt. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have a finding of good cause shown for the delay.

- Sec. 40-21. Defense of Alibi; Notice by Defendant

The rule requires the defendant to notice the prosecution within 20 days after written demand of the intention to use said defense. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have the court direct the time period in which the defense needs to comply with the notice.

SA050

- Sec. 40-22. –Notice by Prosecuting Authority concerning Alibi Defense

The rule requires the prosecution to notice the defense within 20 days, but no less than 10 days before trial, the use of witnesses to rebut an alibi defense. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have the court direct the time period in which the prosecution needs to comply with the notice.

- Sec. 40-26. Disclosure by the Defendant; Information and Materials Discoverable by the Prosecuting Authority as of Right

The rule requires the prosecution to disclose certain materials within 45 days from the filing of a request to disclose. By suspending the rule, it would allow the court to permit an extension of this time period without requiring each case to have a finding of good cause shown for the delay.

Chapter 41 – Pretrial Motions

- Sec. 41-5 –Time for Filing Motion To Suppress

The rule requires the filing of pretrial motions not later than 10 days after the first pretrial conference. By suspending the rule, the court will not be required to grant permission for an extension of time due to the current circumstances.

Chapter 42 – Trial Procedure

- Sec. 42-49A Sealing or Limiting Disclosure of Documents in Criminal Cases

The rule pertains to any motion sealing or limiting order on criminal documents which must be held not less than 15 days following the filing of the motion and must notice the public as to the date, time and place of the hearing. By suspending the rule, it would allow the court to provide appropriate notice and to schedule a full hearing to take place on the merits of any sealing order.

- Sec. 42-52 –Time for Filing Motion for Judgment of Acquittal

The rule pertains requiring the motion to be filed within 5 days after a mistrial or verdict. By suspending the rule for those cases affected by the current situation, the court would be allowed to extend the timing as it deems appropriate.

- Sec. 42-54 – Time for Filing Motion for New Trial

The rule pertains to requiring the motion to be filed within 5 days after a verdict. By suspending the rule for those cases affected by the current situation, the court would be allowed to extend the timing as it deems appropriate.

Chapter 43 – Sentencing, Judgment and Appeal

- Sec. 43-24 – Time for Filing Application for Sentence Review

By suspending the rule, it would dispense with the 30 day time requirement for filing an application for sentence review. Because of the limited courthouse access, some filings may not be able to be processed within the time frame allowed.

- Sec. 43-33 –Appointment of Initial Counsel for Appeal by Indigent Defendant

The rule requires the application to be heard within 20 days. By suspending the rule, it will allow the courts to maintain appropriately sized dockets and not require a finding of good cause shown under the circumstances.

- Sec. 43-39 Speedy Trial; Time Limitations

The suspension of the rule would allow the court flexibility in scheduling a trial, in the event that trials are restricted. The suspension would still allow courts the ability to schedule trials as expeditiously as possible.

Chapter 44 – General Provisions

- Sec. 44-10A – Where Presence of Defendant May Be by Means of an Interactive Audiovisual Device

Suspension recommended to permit the Chief Court Administrator to issue orders or directives which allow that during the pendency of the Governor's public health emergency and civil preparedness emergency declarations of March 10, 2020 a judicial authority may, after giving due consideration to public health concerns, order that any person be present for any proceeding in any criminal matter by means of an interactive audiovisual device if the interests of justice permit such appearance.

- Sec. 44-13. –Scheduling of Proceedings before Trial; Continuances

The rule requires that a continuance shall not exceed two weeks. The suspension of the rule would give the courts the flexibility necessary to maintain appropriately sized dockets and attend to those matters designated as priority cases.

- Sec. 44-14 –Assignments for Plea in Judicial District Court Location

The rule requires that the assignment to a Judicial District shall not exceed two weeks. The suspension of the rule would give the courts the flexibility necessary to maintain appropriately sized dockets and attend to those matters designated as priority cases.

- Sec. 44-27 Hearing of Infractions, Violations to Which Not Guilty Plea Filed

The rule requires that within 10 days of filing a not guilty plea, the clerk shall schedule a hearing in the matter. By allowing the suspension of the rule, it will allow the courts to delay scheduling of infractions so that they may focus on those matters designated as priority cases.

- Sec. 44-30 –Hearing by Magistrates of Infractions and Certain Motor Vehicle Violations

Suspension of the rule will dispense with the 5 day time requirement imposed on the defendant to file a trial de novo during this time period.

**APPLICATION FOR REINSTATEMENT**
JD-GC-23   Rev. 10-17
P.B. § 2-53

| ADA NOTICE |
|---|
| The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*. |

**Instructions**

*1. To be completed by suspended, disbarred or resigned attorneys.*
*2. All sections must be completed or the application will be returned.*
*3. This is a continuing application. The applicant must provide all new or updated information on a timely basis.*
*4. Attach additional sheets as necessary to answer any question. For each*

*additional sheet, identify the specific Section for which the applicant is providing additional information.*
*5. The applicant should maintain a copy for his or her records.*
*6. File this application with the clerk of the superior court for the jurisdiction that issued the discipline.*

Pursuant to section 2-53 of the Practice Book, I, the undersigned applicant, submit this application for reinstatement to practice as an attorney in Connecticut, and in support of such application I submit the following sworn statement and attachments. I have read section 2-53 of the Practice Book and the Rules of Professional Conduct.

## Section 1. Biographical Information

| Full name *(Last, first, middle)* MILLER, JOSEPHINE SMALLS | | Birth year 1953 | Juris number 422896 |
|---|---|---|---|
| Current street address *(a street address is required: a P.O. box number only is not acceptable)* 130 DEER HILL AVENUE UNIT 13 | City DANBURY | State CT | Zip code 06810 |
| Telephone number 2035122795 | E-mail address JMILLERLAW@SBCGLOBAL.NET | | |

## Section 2. Mandatory section 2-53(d) of the Practice Book Requirements

Check off compliance with section 2-53(d) of the Practice Book and **attach proof of compliance** with each requirement to your application.

- [ ] N/A  [�x] Yes   I paid the Connecticut Bar Examining Committee the application fee.

- [ ] N/A  [�x] Yes   I am no longer the subject of any pending disciplinary proceedings or investigations.

- [�x] N/A  [ ] Yes   I took the Multistate Professional Responsibility Examination in the past six months on _____ and received a passing score which was sent to the Connecticut Bar Examining Committee.

- [�x] N/A  [ ] Yes   I have successfully completed any criminal sentence including, but not limited to, a sentence of incarceration, probation, parole, supervised release, or period of sex offender registration and I have fully complied with any orders regarding conditions, restitution, criminal penalties or fines.

- [ ] N/A  [�x] Yes   I fully complied with all court ordered conditions imposed pursuant to the order of discipline or I have received relief from that condition from the court. EX A

- [ ] N/A  [�x] Yes   I am in compliance with sections 2-27(d), 2-70 and 2-80 of the Practice Book. This includes having registered *(suspended attorneys only)* and having paid all fees and restitution due to the Client Security Fund. EX B

**STOP!  IF YOU HAVE NOT COMPLETED THE ABOVE REQUIREMENTS, YOU ARE NOT ELIGIBLE TO APPLY FOR REINSTATEMENT. THIS APPLICATION WILL BE RETURNED TO YOU AS INCOMPLETE WITHOUT A PUBLIC HEARING. IF YOU SELECTED N/A BECAUSE THE COURT HAS EXEMPTED YOU FROM COMPLYING WITH THIS REQUIREMENT, ATTACH A COPY OF THE COURT ORDER TO YOUR APPLICATION.**

SA054

## Section 6. Civil and Family Proceedings *(Continued)*

[x] No  [ ] Yes   Have you, or a representative, ever settled a legal malpractice claim brought against you? If yes, provide the following information:

| Name of client | Settlement amount | Date of settlement |
|---|---|---|
|  |  |  |
| Name of client | Settlement amount | Date of settlement |
|  |  |  |

## Section 7. Criminal And Motor Vehicle Proceedings

[x] No  [ ] Yes   Have you ever been charged with a crime? *(Include pending matters and dispositions resulting in convictions, pretrial diversionary programs, protective and restraining orders, nolles and dismissals).* If yes, provide the following information:

Title of case

| Docket number | Name of forum | Status | Disposition |
|---|---|---|---|
| Initial charge *(if different)* | Conviction offense | | Date of disposition |

[x] No  [ ] Yes   Within the last five years, have you been charged with reckless driving, evading responsibility, driving under the influence (DUI) or driving while intoxicated (DWI)? If yes, provide the following information:

Title of case

| Docket number | Name of forum | Status | Disposition |
|---|---|---|---|
| Initial charge *(if different)* | Conviction offense | | Date of disposition |

## Section 8. Current Fitness To Practice Law And Good Moral Character

[ ] No  [x] Yes   Have you taken any continuing legal education (CLE) courses since you were disciplined? If yes, provide a copy of each CLE certificate you have received.   EX C

What areas of law did you practice in before you were disciplined?
**CIVIL RIGHTS, LABOR & EMPLOYMENT, FAMILY, LITIGATION, GENERAL**

What areas of law do you intend to practice in if you are reinstated?
**CIVIL RIGHTS, LABOR & EMPLOYMENT,  FAMILY, LITIGATION, GENERAL**

[ ] No  [x] Yes   Do you intend to consult with a practice mentor if you are reinstated? If yes, list the mentor's name and juris number.

[x] No  [ ] Yes   Do you have an offer of employment if you are reinstated to the bar? If yes, where would you work?

[x] No  [ ] Yes   Do you currently have any condition or impairment *(including, but not limited to, medical problem, substance abuse, alcohol abuse or a mental, emotional or nervous disorder or condition)* which, in a material way, affects your ability to practice law? If yes, state the condition and describe how it would affect your ability to practice.

## Section 10. References

List the names and complete addresses of three people, at least one of whom must be an attorney licensed in Connecticut, as references. None of the references may be related to each other, or to you, by blood or marriage. Provide a letter of reference from each person with your application. *Ex E*

| Name |
|---|
| **SAUDA BARAKA** |

| Street | City | State | Zip code |
|---|---|---|---|
| 1464 Seaview Avenue | **BRIDGEPORT** | **CT** | 06607 |

| Name |
|---|
| **BISHOP MICHAEL DENSMORE** |

| Street | City | State | Zip code |
|---|---|---|---|
| P O Box 412 | **NORWALK** | **CT** | 06856 |

| Name |
|---|
| **ATTORNEY JOHN WILLIAMS** |

| Street | City | State | Zip code |
|---|---|---|---|
| 51 Elm Street Suit 409 | **NEW HAVEN** | **CT** | 06510 |

## Section 11. Personal Statement

You may attach a personal statement summarizing the application and provide any additional information that you would like considered.

## Section 12. Signature And Oath

This application must be signed under oath. Please use BLUE ink.

| Signed (Signature of Applicant) | Dated at | City | State | Date signed |
|---|---|---|---|---|
| Josephine S. Miller | | Danbury | CT | 12-16-19 |

STATE OF CONNECTICUT )

ss. Danbury

COUNTY OF Fairfield )

On this the 16 day of December, 20 19 before me, Christian Moore _____ personally appeared Josephine Smalls Miller, known to me *(or satisfactorily proven)* to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained and that his/her responses are true, under penalty of making a false statement pursuant to section 53a-157b of the Connecticut General Statutes *(a Class A misdemeanor)*.

In witness whereof I hereunto set my hand.

Christian Moore
*(Notary public/Commissioner of the Superior Court)*

> Christian Moore
> Notary Public State of Connecticut
> My Commission Expires 03/31/2024

JD-GC-23  Rev. 10-17

SA056

mail.

Exhibit

SA057

4/13/20, 12:28 PM

# MPRE Score

Name: JOSEPHINE MILLER
NCBE Number: N10527830
Date of Birth: 10/23/1953

Your score on the Multistate Professional Responsibility Examination (MPRE) administered on 03/12/2020 is as follows:

Scaled Score: 80

The score shown above has been reported to CONNECTICUT as you requested when you registered for the MPRE.

**Your MPRE score will be available on your NCBE account only until the next MPRE test date. If you want to obtain your score after that, you will need to request a score transcript, and pay the required fee. Therefore, we recommend that you save this page and/or print it for your records.**

Each jurisdiction determines its own passing score on the MPRE. You may find a jurisdiction's passing score, as well as contact information for its bar admission agency, by selecting the jurisdiction from the                    . Any questions about admission requirements pertaining to MPRE scores should be directed to the bar admission agency in the jurisdiction to which you are applying.

The MPRE scaled score is a standard score. Standard scaled scores range from 50 (low) to 150 (high).

**MPRE Score Services: All MPRE score services listed below must be requested under the Score Services tab or from the File Cabinet of your NCBE account.**

- MPRE Score Report: If you would like to have your MPRE score sent to another jurisdiction, you must submit a request to NCBE for a score report. Score reports are sent to jurisdictions by secure transfer.
- MPRE Score Verification: If you would like to have the scoring of your MPRE answer sheet rechecked by hand, you must request a score verification. **Score verification requests must be submitted to NCBE within two months of the original test date.**
  Note: See link in File Cabinet to request a MPRE Score Verification. This link is only visible when the service is available.
- MPRE Unofficial Score Transcript: If you would like a replacement copy of your MPRE score after it is no longer available on this page, you must submit a request to NCBE for an MPRE Unofficial Score Transcript. The transcript will include all the MPRE scores you earned from 1999 to the present. All scores on the MPRE Unofficial Score Transcript are duplicative of score information provided following the exam. MPRE Unofficial Score Transcripts will be available in the File Cabinet of your NCBE account, and are not sent by

SA058



— THE —
**LAW OFFICES OF**
**Cynthia R. Jennings, ESQ**
Email: attorneyjennings@gmail.com

Cynthia R. Jennings, Esq.
55 Filley Street
Windsor, CT 06095

August 30, 2021

The Honorable Kenneth McDonnell, Esq.
Chairman:  Statewide Grievance Panel
Gould, Larson, Bennet & McDonnel, P.C.
30 Plains Road
Essex, CT 06426

**SUBJECT:  Mentorship Application in the matter of Disciplinary Counsel v. Smalls Miller, Josephine**
**DBD-CV17-6022075-S**

Dear Chairman McDonnell, Esq.:

This letter sets forth a proposed mentoring Practice Plan for Attorney Josephine Smalls Miller, as well as my agreement to serve in the role of practice mentor for a period of one year from the date of Attorney Miller's reinstatement to practice in Connecticut courts.

Attorney Miller and I have practiced for many years in civil rights, labor, and employment law, and I believe that I am particularly well-suited to serve as a practice mentor for her.  For a mentoring relationship to work effectively, it is important that the mentor have both technical skills, as well as cultural sensitivity and competency relative to the kinds of clients that Ms. Miller is likely to represent, and a comfort level necessary to be able to work with and relate to the person that is being mentored.

I served as Assistant to the Chief Court Administrator, Judge Aaron Ment, for two years, and I have been an environmental and civil rights attorney since 2000.  I am an educator by profession, and as a Master Trainer, I have trained more than 2500 individuals throughout the State of Connecticut prior to my becoming a lawyer in Connecticut.  I served as Assistant to the Commissioner of Education for the State of Connecticut, and I also served as a Testing Consultant to the State Department of Education as well as Affirmative Action Administrator to this Department, for two years.  I served as Executive Director of the Black and Latino Caucus of the Connecticut General Assembly for three years, and I have worked in all three branches of government—the Executive, Legislative and Judicial Branch.  I am serious about education, and I take the role of a mentor seriously.

I understand the responsibility that I will have first and foremost to the Court that is committed to high standards relative to the judicial bar, as well as to the individual being mentored.

A successful mentoring outcome means that the standards that the Court desires to see in the attorneys practicing before the Court are upheld, and that the judiciary continues to be respected and that the Honorable leadership of the Courts are treated with dignity and respect.

***I am proposing the following:***

Upon reinstatement I will work with Attorney Miller in accordance with the well thought out and clearly presented plan outlined by the Statewide Grievance Committee and the disciplinary Counsel in their Joint Reported dated November 10, 2020.  I am fully aware through the documents presented to me, that the Joint Report outlines several areas that as a Mentor, I will be required to address.  It is my understanding that Attorney Miller was suspended for one year and is now required to apply for reinstatement.  Part of her reinstatement requires that she have a mentor to work with her throughout her first year following her reinstatement.  I believe that I am more than qualified to serve as her mentor, and I would certainly be honored to serve in this capacity.

It is at this juncture that I am representing to the Statewide Grievance Committee and the Office of Chief Disciplinary Counsel, that I am willing to work with Attorney Miller in the reinstatement requirements presented to her as outlined in the Joint Report.

I have known Attorney Miller for many years.  We worked together at the Barrister Law Group in Bridgeport,

SA059

Connecticut, and she was then, and still is, one of the hardest working and most diligent attorneys that I have had the pleasure of knowing. Clients used to come to the law firm and seek her representation, because she so zealously represented her clients.

She has spent almost forty years practicing law and changing the lives of clients who may not have been able to obtain effective representation of counsel, had it not been for Attorney Miller.

Mentoring is critical at this juncture, because a skilled attorney must not only know the law and court proceedings, but the legal profession also requires that each sole practitioner be able to manage the business side of the profession. As a mentor, I will commit to working with Attorney Miller, and I will also commit to keeping the court updated and advised as to progress or problems that arise in designated critical areas.

1.      I will work with Attorney Miller to determine the scope of her return to the practice of law in the Connecticut state courts, separate and distinct from her practice of law in the federal courts.

2.      I will work with her to develop parameters for her state court practice goals and practice areas. This includes conducting an initial assessment of her knowledge of state court rules, policies, practices, and procedures, as well as an assessment of her management of case files, training, and support in law office management software (CLIO) designed to grow and efficiently manage her practice.

3.      I will communicate with Attorney Miller by electronic mail, telephone and zoom meetings daily during the initial outset of the mentoring process, and subsequently tapering down to once or twice per week to address any issues that may arise regarding her state court practice. The purpose of this oversight is to eliminate concerns stated by the presentment judge regarding time management issues.

4.      I will work with Attorney Miller in the re-activation of her Client Funds account for state court cases and claims, distinct from her federal practice cases and claims. This oversight will target and address statutes, policies, and practices of the Client Funds Account (IOLTA) to avoid co-mingling of client funds.

5.      Additionally, we will review state statutes relevant to client retainer agreements and review the retainer agreements that Attorney Miller currently uses, to determine if these agreements are appropriate for use in State court, and to ensure her utilization of appropriate retainer agreements with state case clients.

6.      Once Attorney Miller resumes the practice of law, I will meet with her in person at least once per month to review her state case retainer letters; review her Client Fund account bank statements and review practice management protocols. Practice management will include the training and utilization of the CLIO automated office law practice software management tools. The CLIO software is a program that assists small law firms with time management, case management, billing, document handling, scheduling, and most issues that small law firms confront. CLIO is a "…web-based legal practice management program…" designed to meet the needs of small firms. CLIO is endorsed by the Connecticut Bar Association (CBA) and is featured in their Member Benefits document as one of the discounted programs that they provide as a member benefit.

Under the mentorship program, Attorney Miller will be required to attend law office management seminars and webinars so that she can learn new, innovative software systems that are designed to effectively manage her law practice, including client payments, billing, client balances and federal and state tax records as well as how to connect client payments and billing to quick books to maintain up to date income and expense records.

This training and oversight mentoring program will provide Attorney Miller with internal office procedures that will assist her in effective overall management of her law practice and will assist her in avoiding burn out. This intensive training will also provide her with an understanding of her cash flow, tax status and billing and other fiscal responsibilities of a law practice. This training and support will likely prevent her from becoming overwhelmed because of administrative and overhead matters in her law practice. Every sole practitioner needs support and encouragement relative to their practice area and clientele.

7.      The Connecticut Bar Association (CBA) has outstanding Continuing Legal Education Resources. As Attorney Miller's mentor, I plan to encourage her participation in the CBA Minimum Continuing Legal Education program by attending CLE course offerings, with Attorney Miller so that she can feel supported in this process and expand her knowledge of other Attorneys in her practice area. This will provide her with other attorneys whom she can contact if she has questions or concerns, outside of her mentorship.

8.      As Attorney Miller's mentor, it will be my responsibility and my pleasure to provide the Office of Chief Disciplinary Counsel and the Statewide Grievance Committee with monthly reports regarding Attorney Miller's compliance with the terms of this practice plan, as well as compliance with any additional requirements that may be imposed by the Chief Disciplinary Counsel. This oversight will assist Attorney Miller in avoiding the issues raised in the presentment regarding each of the individual charges.

I look forward to this proposed opportunity to work with Attorney Miller as her mentor. Please do not hesitate to contact me through my email address at attorneyjennings@gmail.com, or via my cell phone at 860.883.6947 with any questions or concerns that you may have regarding this proposed mentorship. Thank you in advance for the opportunity to serve in this capacity. I consider it an honor to do so.

Respectfully,

_____/S/_____
Cynthia R. Jennings, Esq.
Juris No. 418241

DOCKET NO.: DBD-CV-17-6022075-S     OFFICE OF THE CLERK     SUPERIOR COURT

OFFICE OF CHIEF DISCIPLINARY     2022 MAR 30 PM 4: 34     J. D. OF DANBURY
COUNSEL

V.     STATE OF CONNECTICUT     AT DANBURY

JOSEPHINE SMALLS MILLER     MARCH 30, 2022

## MEMORANDUM OF DECISION

### I.     The Nature of The Proceedings

By way of its March 6, 2018 amended complaint, the Office of Chief Disciplinary Counsel (CDC) brought a four count presentment alleging misconduct by Josephine Smalls Miller (Miller), an attorney. Following a three-day hearing, the court (*Shaban, J.*) found that Miller violated rules §§ 1.15 (a) (5), 1.15 (c) and 8.1 (2) of the Rules of Professional Conduct under count one for which her license to practice was suspended for a period of thirty (30) days. Under count two, Miller was found to have violated rules §§ 1.3, 3.2 and 8.4 (4) for which her license to practice was suspended for a period of six (6) months. Under count three, the court found that the CDC had not met its burden of proof in alleging violations by Miller of rules §§ 1.4 (a) (1), (2), (3) and (4), and dismissed those charges. Miller was, however found to have violated rules §§ 1.4 (a) (5) and 1.4 (b) under count three for which her license was suspended for a period of one (1) year. Finally, under count four, Miller was found to have violated rule § 5.5 for which her license was suspended for a period of one (1) year. See *Office of Chief Disciplinary Counsel* v. *Miller*, Superior Court, judicial district of Danbury, Docket No. CV-17-6022075-S (November 26, 2018, *Shaban, J.*) (Suspension Order), reprinted in *Office of Chief Disciplinary Counsel* v. *Miller*, 335 Conn. 474, 480-524, 239 A.3d 288 (2020).

The suspensions given Miller were to run concurrently with each other for a total effective suspension of one (1) year. The court also ordered and set several conditions in connection with Miller's suspension which included that she: (i) comply with all terms and conditions of Practice Book § 2-47B,[1] Restrictions on the Activities of Deactivated Attorneys; (ii) comply with all terms and conditions of Practice Book § 2-53 in any reinstatement applications; (iii) satisfy, prior to reinstatement, any Connecticut bar requirements and establish herself to be in good standing; (iv) agree to be mentored for a period of one year following reinstatement by an attorney whose appointment to such role would become effective upon motion by Miller and approval of the court; and (v) attend, in person, a Connecticut Bar Association approved continuing legal education course in both legal ethics and law office management. Finally, the court required Miller to separately seek relief from the suspension of her license to practice before the Appellate Court in accordance with the Appellate Court's orders of December 9, 2014, and February 15, 2018.

Miller appealed her suspension. On November 3, 2020, the Connecticut Supreme Court affirmed Miller's suspension. *Office of Chief Disciplinary Counsel* v. *Miller*, 335 Conn. 474, 480, 239 A.3d 288 (2020) (per curiam).

The following facts and procedural history are relevant to this matter.

II.    Procedural Chronology

On December 18, 2019, Miller filed an application for reinstatement of her license under Practice Book § 2-53 (# 147.00). She filed this application before she took and passed the Multistate Professional Responsibility Examination (MPRE) as required by Practice Book § 2-53 (d) (3). She also failed to pay the $1,000 filing fee and had additional deficiencies in her application.

---

[1] Practice Book § 2-47B (b) (1) and (d) prohibit a deactivated attorney from engaging in any of seven specifically enumerated "law-related" activities. As discussed further below, Miller violated no fewer than three of those prohibitions.

2

On December 30, 2019, having paid the filing fee, Miller filed a second reinstatement application despite still having failed to comply with the MPRE requirement.

The Office of the Chief Court Administrator referred Miller's application to the Hartford Standing Committee on January 13, 2020. The Statewide Grievance Committee (SGC) moved to dismiss on January 31, 2020 (# 152.00). Seven weeks later, Miller filed a March 16, 2020 motion seeking a waiver of the MPRE requirement. That motion was never acted upon by the court because Miller took and passed the MPRE, filing notice of such fact on April 13, 2020 (# 158.00). In response, the SGC withdrew its motion to dismiss (# 159.00).

By April of 2020, Connecticut – including the judicial branch – was in the throes of the COVID epidemic, a fact reflected in e-mail communications between the SGC and Miller on April 16 and November 2, 2020. Miller had e-mailed counsel for the SGC and Statewide Disciplinary Counsel (SDC) on October 30, 2020, and November 2, 2020, objecting to what she described as the authorities' "failure" to take action upon her reinstatement application, an accusation disputed by the Hartford Committee and the SGC on October 30, 2020, and November 2, 2020, respectively.

On November 10, 2020, the SGC and SDC filed a joint report with seven exhibits which the Hartford Committee made part of its record (Joint Report). The Joint Report informed the Hartford Committee and Miller that a new grievance complaint had been filed against Miller on October 30, 2020, by a Theresa Levine. The existence of said new grievance precluded action on Miller's application under Practice Book § 2-53 (d) (2). This grievance was dismissed by the SGC on November 12, 2020. The grievant's appeal of the dismissal was denied on December 18, 2020.

The Hartford Committee again corresponded with Miller by e-mail on November 18, 2020, describing the then on-going efforts being made to schedule a hearing on her application and suggesting that one would probably not be possible until February of 2021. In the wake of Miller's

3

SA064

claims of disparate treatment, the Hartford Committee first sought advice from the court (Nos. 167.00 and 171.00) and thereafter a transfer of Miller's application to another committee (# 178.00), a request granted by this court (# 178.01).

In December of 2020, Miller filed a complaint with the Commission on Human Rights and Opportunities (CHRO) alleging discrimination against her by the judicial branch. On March 11, 2021, the CHRO concluded that Miller's race "was not a factor in the scheduling of her hearing" after detailing the multiple non-racial reasons for the delays which occurred (some of them Miller's doing) and thereafter released its jurisdiction. [2]

On May 3, 2021, the United States District Court (*Underhill, J.*) reinstated Miller's license to practice in federal court. *In re: Josephine Smalls Miller*, United States District Court, Docket No. 3:18-GP-00035 (SRU) (D. Conn. May 3, 2021). On May 11, 2021, the Office of the Chief Court Administrator (*Bozzuto, J.*) referred Miller's application to the Standing Committee on Recommendations for Middlesex County (the Middlesex Committee). The Middlesex Committee[3] thereafter published the notices required by the Practice Book and conducted its hearing on September 1, 2021.

The Middlesex Committee, at Miller's request, kept its record open for two weeks thereafter to permit post-hearing submissions. Two weeks later, on September 16, 2021, Miller submitted six filings including a post-hearing brief (# 189.00) and a one page affidavit (# 190.00) addressing additional paralegal work she did while under suspension which we address below. On

---

[2] Throughout the extensive proceedings in this matter, Miller has raised the issue of discrimination claiming to be the victim of disparate treatment on account of her race, a claim rejected at every stage. This court sees no evidence or basis upon which to agree with Miller and also rejects such claim.

[3] Kenneth J. McDonnell, Lisa A. Faccadio and Thomas Cartelli, attorneys, comprised the Middlesex Committee with Attorney McDonnell serving as chair.

4

SA065

October 7, 2021, the Middlesex Committee filed its report (the Middlesex Report). On January 12, 2022, this court conducted a hearing on the petitioner's application for reinstatement.

### III.    Committee Proceedings

At its September 1, 2021 hearing, the Middlesex Committee received direct testimony from Miller, who was not represented by counsel. Miller was cross-examined by counsel for both the SGC (Attorney Elizabeth Rowe) and the SDC (Attorney Brian Staines). The Middlesex Committee also heard testimony from June Ware f/k/a Jasmine Williams, an individual who attended to oppose Miller's application.

Without objection, the Middlesex Committee accepted the record previously submitted to the Hartford Committee and additional exhibits ultimately comprising a record of twenty-four exhibits. See # 195.00, Middlesex Committee's September 23, 2021 List of Exhibits (# 195.00).[4] While the SDC and the SGC remain in absolute disagreement with Miller on the ultimate question of whether this court should reinstate Miller's license, to a very substantial degree, the diligently assembled record of the Middlesex Committee is comprised of undisputed facts and admissions by Miller.

After setting forth the procedural history of the case and referencing the applicable legal precedents controlling the committee's work, the Middlesex Report made specific findings in paragraphs twelve and sixteen. In paragraph twelve, the Middlesex Committee observed that Miller "complains about the length of time between the filing of her original Application for Reinstatement and the hearing held thereon" but found that the delay was caused "by a

---

[4] On January 24, 2022, the SGC filed a motion with this court styled as a motion to "supplement" the record for the purpose of making clear that the record in this matter includes the seven exhibits attached to the Joint Report originally filed with the Hartford Committee and thereafter transferred to the Middlesex Committee. Absent objection, the motion, which did not seek to introduce any new documents into the record; Middlesex Tr. p. 5; was granted by this court on February 17, 2022 (*Pavia, J.*).

5

combination of factors" including the "COVID pandemic" and Miller's "own failure to submit a complete application until two days before the September 1, 2021 hearing," a finding which this court deems fully supported by the record. In paragraph sixteen, the Middlesex Committee found that Miller did not comply with Practice Book § 2-47B, set forth the facts supporting that finding and enumerated the specific provisions (Practice Book §§ 2-47B (a) (3) (e) and 2-47B (4) (b) and (d)) that she violated. See section IV, 5 of this opinion.

The Middlesex Report has no references to exhibit numbers or transcript pages though it does discuss some of Miller's testimony. The Middlesex Committee's record contains substantial evidence regarding the multiple continuing legal education courses taken by Miller, including a law office management course approved by New York State. The record also establishes that Miller did not take such a course approved by the Connecticut Bar Association. The Middlesex Report did not address the law office management course requirement of the Suspension Order.

Ultimately, the Middlesex Report concluded with a recommendation to this court that Miller's license be reinstated subject to two conditions: (1) that the one-year mentorship previously ordered be extended to two years, and (2) that Miller must separately seek reinstatement from the Appellate Court of her license to practice there (as previously ordered).

IV.    Discussion

The decision of whether to readmit an applicant to the practice of law is "an exercise of judicial power." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Ganim*, 311 Conn. 430, 450, 87 A.3d 1078 (2014). While the court is assisted by the committees of the bar "[i]t is the court, and not the bar, or a committee, which takes the final and decisive action." (Internal quotation marks omitted.) Id. In fulfilling this obligation, however this court may not take evidence or hear the matter de novo. Id., 450-51. Attorney discipline exists not to punish the

6

offender but to safeguard the administration of justice and protect the court and the public from those lacking the present fitness to practice. Id., 453. The burden is on Miller to prove her present fitness. Id., 451.

This court must consider the application and the Middlesex Committee's recommendation on the basis of the record made by the committee to determine whether it "acted fairly and reasonably or from prejudice and ill will in its consideration of the application." (Internal quotation marks omitted.) Id. "Ultimately, the court must decide whether the standing committee, by approving or withholding its approval of an application, acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts." (Internal quotation marks omitted.) Id. The ultimate issue raised by an application for reinstatement to the bar is "whether the applicant is presently fit to exercise the privileges and functions of an attorney, as an officer of the court, and as a confidential manager of the affairs and business of others entrusted to his care." *In re Application of Avcollie*, 43 Conn. Supp. 13, 14, 637 A.2d 409 (1993). "An applicant for readmission to the bar must be possessed of such standards of honor and honesty and have such an appreciation of the distinctions between right and wrong in the conduct of men towards each other as will make him a fit and safe person to engage in the practice of law." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Toro*, Superior Court, judicial district of New Haven, Docket No. CV-03-0478961-S (November 14, 2008, *Lager, J.*) (46 Conn. L. Rptr. 658, 659). This court is tasked with reviewing the standing committee's decision on its record, employing a clearly erroneous standard. See *In re Ganim*, Superior Court, judicial district of Fairfield, Docket No. CV-03-0404638-S (September 27, 2012, *Bellis, J.*). That requires a determination of "whether the reasons advanced to support the recommendation [of the Committee] have merit and are reasonable and proper in view of the subordinate facts found and the applicable

7

principles of law." *In re Application of Koenig*, 152 Conn. 125, 133, 204 A.2d 33 (1964); see also *Statewide Grievance Committee* v. *Toro*, supra, 659.

This court concludes upon a review of the entire record, that the Middlesex Committee acted "fairly and reasonably" and not from "prejudice and ill will" in its consideration of Miller's application, thereby satisfying its responsibility to provide all parties with a fair hearing under *Statewide Grievance Committee* v. *Ganim*, supra, 311 Conn. 451. Nevertheless, the Middlesex Report does not reflect, with sufficient specificity, all of the evidence in the record. Because most of the material evidence in the record was uncontroverted, it would be, in this court's judgment, ill-advised to reject, solely for such reason, the Middlesex Report. This panel is permitted to review the Middlesex Committee's ultimate recommendation on the totality of the record assembled by the committee. See id., 461 n.29 (three judge panel may properly observe uncontroverted evidence in record). The conclusion is consistent with the principle that this panel's consideration encompasses the entire record before the committee. Id., 452.

In making a final determination, this court must apply the following ten considerations when determining whether Miller has satisfied her burden: (1) her present moral fitness, (2) her acceptance of wrong doing with sincerity and honesty, (3) the extent of her rehabilitation, (4) the nature and seriousness of the original misconduct, (5) her conduct following the discipline, (6) time elapsed since the original discipline, (7) her character, maturity and experience at the time of discipline, (8) her current competency and qualifications to practice law, (9) payment of restitution, and (10) proof that her return to the practice of law will not be detrimental to the integrity and standing of the bar or the administration of justice or subversive of the public interest. Id., 454-455.

*1. Present Moral Fitness*

The Committee Report does not explicitly include a "finding" on Miller's present moral fitness; the report lists moral fitness as one of three considerations as to which the committee "has no concerns." Its record, however, includes both testimony and exhibits supporting Miller's present moral fitness.

*2. Acceptance of Wrongdoing with Sincerity and Honesty*

The Committee Report has no finding on or discussion of this consideration. Its report includes unequivocal acknowledgments by Miller that she co-mingled funds; (Middlesex Tr. p. 24); and committed the acts set forth in the presentment against her (Middlesex Tr. pp. 24, 96). It also includes Miller's statement that she has no "ill will" against the Superior Court judges who either disciplined her (*Shaban, J.*), or entered orders in cases based on her non-compliance with orders and/or procedures (*Bellis, J.*); (Middlesex Tr. p. 30); as well as her admission that there's never been any finding by any court that the judicial branch has treated her unfairly or denied her equal protection (Middlesex Tr. p. 32).

To the extent this second *Ganim* consideration is viewed through the prism of whether the applicant has sufficiently expressed "remorse" for her transgressions, the record before the Middlesex Committee is mixed. Miller testified that in alerting clients of her suspension, she had no "reason to be ashamed, embarrassed, or whatever about the suspension . . . ." (Middlesex Tr. pp. 21-22.)

When, during cross-examination by Attorney Rowe, she was told that remorse meant "knowing distress over what happened," Miller sparred with counsel. During the course of her extended answer; (Middlesex Tr. pp. 24-26); Miller by turns, acknowledged

9

**SA070**

wrongdoing, professed to be unsure how to answer, reasserted her disparate treatment argument and ultimately said she felt no distress over her actions which resulted in her Appellate Court (not Superior Court) suspension. Nevertheless, in her appearance before this panel, Miller said, "I take full responsibility for those matters which were initially found by the judge to be worthy of suspension." (January 12, 2022 Tr. p. 15.)

3. *Extent of the Applicant's Rehabilitation*

The Committee Report did not include a finding on or discussion of this consideration; its record, however, includes testimony and exhibits regarding Miller's acceptance of the mentorship and commitment to following the practice plan prepared by Attorney Cynthia Jennings, Miller's proposed mentor. See # 188.

4. *Nature and Seriousness of the Original Misconduct*

The seriousness of Miller's actions for which she was suspended inclusive of co-mingling funds and engaging in conduct prejudicial to the administration of justice as set forth in Judge Shaban's opinion, was recognized by the committee. This panel concurs that Miller's actions constituted serious violations of the rules of conduct.

5. *Conduct Following Discipline*

The Middlesex Committee Report contains a specific finding that Miller did not comply with Practice Book § 2-47B. Report, ¶ 16. It explicitly describes her improper actions in that regard which included her amicus NLRB brief and her compensated work as a paralegal "on three or four occasions" for another attorney. The record also shows that Miller did not deny she violated Practice Book § 2-47B. Report, ¶ 17. Miller also testified she did not "re-read" the rules of practice to ascertain whether her work for the attorney

10

would violate the court's Suspension Order (Middlesex Tr. pp. 83-84). It is inconceivable that Miller could have been unaware of the prohibitions in the Suspension Order on her post-suspension activities.

6. *Time Elapsed Since Original Discipline*

Almost three and one-half years have passed since the entry of the Suspension Order. The Middlesex Committee's finding (Report, ¶ 12) that such passage of time is attributable to multiple causes, including the COVID-19 pandemic and Miller's own actions or inactions, is fully supported by the record. It is also true the Middlesex Committee concluded that more than one year has passed since Miller's last Practice Book § 2-47B violation. This panel is mindful that "the question for determination on an application like this is not one as to the sufficiency of the punishment already suffered by the offending attorney, but one as to the present fitness of the applicant for reinstatement to again exercise the privileges and functions of an attorney as an officer of the court and confidential manager of the affairs and business of others entrusted to his care and keeping, in view of his previous misconduct, his discipline therefor, and any reformation of character wrought thereby or otherwise as shown by his more recent life and conduct." *In re Kone*, 90 Conn. 440, 442, 97 A. 307 (1916). For that reason, the length of an attorney's suspension is not, in and of itself, sufficient grounds to permit reinstatement. See id. It is a factor which the court considered, but it is subordinate to the question of whether Miller has the requisite present fitness to be readmitted.

7/8. *Applicant's Character, Maturity and Experience at Time of Discipline and Applicant's Current Competency and Qualifications*

The Committee Report made no explicit findings on the seventh and eighth *Ganim* considerations, but instead stated, "This Committee has no concerns regarding the Applicant's . . . character, maturity, experience, competency and qualifications to practice law." It is clear, however, that the record the Middlesex Committee assembled contains substantial evidence upon which it could conclude that Miller satisfies both considerations.

9. *Restitution does not apply to this matter*

10. *Administration of Justice*

The Committee Report does not explicitly discuss this last consideration. Its recommendation includes an additional one year of mentorship based upon its finding that Miller did not come into full compliance with the Suspension Order until October 7, 2020. The integrity and standing of the bar as well as the public interest and the administration of justice are all furthered when those with a license to practice obey court orders and the rules of practice, an issue addressed by the orders issued below.

On the basis of a complete review of the entire record in this matter, inclusive of the Suspension Order and pursuant to General Statutes § 51-93, this court concludes that Miller may be reinstated to practice before the Superior Court subject to her satisfying the conditions described subsequently in this memorandum. This court, therefore, accepts the Middlesex Committee's recommendation. This court's decision to accept the Middlesex Committee's recommendation is based on three facts: (1) the Middlesex Committee provided the parties a fair hearing and compiled a record which has sufficient support for its recommendation; (2) the extension of the time period

12

SA073

initially set in the Suspension Order was caused by multiple reasons including unavoidable circumstances, i.e. COVID-19 pandemic, as previously discussed, and the failure of Miller to fully comply with the conditions of the court and requirements for reinstatement as set forth by the court, the rules of practice and statutory authority; and (3) the additional conditions described subsequently in this memorandum protect the integrity of the bar and further the sound administration of justice.

V.    Conclusion

It is hereby ordered that:

A. On or before April 15, 2022, Miller shall file with this court the following:

1. A motion seeking the appointment of Attorney Cynthia Jennings to serve as Miller's mentor for a period of two years, and such motion must comply, in all respects, with this court's November 26, 2018 order concerning said mentor;

2. An affidavit attesting to the following matters:

    a. with respect to her September 13, 2021 affidavit: (i) the names of the clients; (ii) the dates the paralegal work was done; (iii) any compensation received for such work; and (iv) whether any of the clients were former clients of Miller;

    b. that Miller has committed no violations of Practice Book § 2-47B subsequent to October 7, 2020; and

    c. that Miller shall abide by the practice plan submitted with her application for a period of two years following reinstatement;

13

SA074

3.  Any material she may wish to submit to support her position that this court should accept the New York State law office management course in satisfaction of the requirement set forth in the Suspension Order;

4.  Reinstatement of Miller's license shall be taken up at a hearing before this court to occur within ten (10) days of Miller filing with this court the documents required above at which hearing this court will allow Miller, the Statewide Grievance Committee and the Office of Chief Disciplinary Counsel to be heard.

BY THE COURT

Pavia, J.

Brazzel-Massaro, J.

Medina, J.

14

SA075

DBD-CV17-6022075-S                                    SUPERIOR COURT

OFFICE OF CHIEF DISCIPLINARY                          J. D. OF DANBURY
COUNCIL

V.                                                    AT DANBURY

JOSEPHINE SMALLS MILLER                               MAY 9, 2022


## ORDER

This court has considered the positions of all of the parties as reported during the April 25, 2022 hearing and has reviewed the filings of Attorney Jennings and Attorney Miller in response to this court's order of April 27, 2022. The November 26, 2018 Suspension Order (*Shaban, J.*) required Attorney Miller to attend, in person, as a precondition to her readmission, a Connecticut Bar Association approved continuing legal education course on both legal ethics and law office management. On September 29, 2021, Attorney Miller attended in person a CBA course on "Legal Ethics: Law Office/IOLTA Management." Attorney Miller also attended on October 28, 2019, a "Solo Practitioner Conference" approved for New York State continuing legal education credits. The New York course falls short of what was expected but given the effect of COVID on course offerings in Connecticut and the CBA-approved IOLTA course she did take, this court deems the educational requirement of the Suspension Order satisfied.

The court approves the mentoring plan of August 30, 2021 developed by Attorney Jennings.

It is therefore herby ORDERED that:

1. Applicant's April 15, 2022 motion for appointment of mentor is GRANTED;

2. Attorney Jennings shall serve as Attorney Miller's mentor effective May 16, 2022 and continuing through May 15, 2024 and shall implement the August 30, 2021 mentoring plan with all of its provisions extending through May of 2024;

SA076

3. Attorney Miller is readmitted to the practice of law in Connecticut effective May 16, 2022;

4. This order has no effect on Attorney Miller's continuing suspension from practicing before the Connecticut Appellate Court.

BY THE COURT

Pavia, J.

Brazzel-Massaro, J.

Medina, Jr., J.